## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>Nirvanix, Inc.,[1]<br><br>           Debtor. | Chapter 11<br><br>Case No. 13-12595 (BLS)<br><br>**Hearing Date: October 23, 2013 at 9:30 am (ET)**<br>**Objection Deadline: October 18, 2013 at 4:00 pm (ET)** |

**MOTION OF THE DEBTOR AND DEBTOR IN POSSESSION PURSUANT TO SECTIONS 105(A), 363 AND 365 OF THE BANKRUPTCY CODE FOR AN ORDER (I)(A) APPROVING PROCEDURES IN CONNECTION WITH THE SALE(S) OF SUBSTANTIALLY ALL OF THE DEBTOR'S ASSETS; (B) APPROVING THE LOT 1 STALKING HORSE BIDDER PROTECTIONS; (C) SCHEDULING THE AUCTION(S) AND HEARING TO CONSIDER APPROVAL OF THE SALE(S); (D) APPROVING PROCEDURES RELATED TO THE ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES; (E) APPROVING THE FORM AND MANNER OF NOTICE THEREOF; (F) AUTHORIZING THE UNITED STATES TRUSTEE TO APPOINT A CONSUMER PRIVACY OMBUDSMAN, AND (G) GRANTING RELATED RELIEF; AND (II)(A) AUTHORIZING THE SALE(S) OF SUBSTANTIALLY ALL OF THE DEBTOR'S ASSETS PURSUANT TO A SUCCESSFUL BIDDER'S PURCHASE AGREEMENT FREE AND CLEAR OF LIENS, CLAIMS, ENCUMBRANCES, AND OTHER INTERESTS; (B) APPROVING THE ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES RELATED THERETO; AND (C) GRANTING RELATED RELIEF**

The above-captioned debtor and debtor in possession (the "Debtor" or "Seller") hereby moves the Court (the "Motion") for the entry of an order pursuant to sections 105(a), 363 and 365 of title 11 of the United States Code (the "Bankruptcy Code"), Rules 2002, 6004, 6006, 9007 and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Rules 2002-1 and 6004-1 of the Local Rules for the United States Bankruptcy Court for the District of Delaware (the "Local Rules") for an order (i)(a) approving procedures in connection with the

---

[1]     The last four digits of the Debtor's federal tax identification number are 6586. The Debtor's address is 9191 Towne Centre Drive, Suite 510, San Diego, California 92122.

sale(s) of substantially all of the Debtor's assets; (b) approving the Lot 1 Stalking Horse Bidder Protections (as defined below); (c) scheduling the related auction(s) and hearing to consider approval of the sale(s); (d) approving procedures related to the assumption and assignment of certain executory contracts and unexpired leases; (e) approving the form and manner of notice thereof; (f) authorizing the United States Trustee to appoint a consumer privacy ombudsmen, and (g) granting related relief; and (ii)(a) authorizing the sale(s) of such assets free and clear of liens, claims, encumbrances and other interests, except as provided in a Purchase Agreement (as defined below); (b) approving the assumption and assignment of certain of the Debtor's executory contracts and unexpired leases related thereto; and (c) granting related relief.   In support of this Motion, the Debtor further respectfully states as follows:

## Jurisdiction and Venue

1.        The Court has jurisdiction over this matter under 28 U.S.C. §§ 157 and 1334. This is a core proceeding under 28 U.S.C. § 157(b).  Venue is proper in this district under 28 U.S.C. §§ 1408 and 1409.

## Background

**I.     Introduction**

2.        On October 1, 2013 (the "Petition Date"), the Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code.  The Debtor is continuing in possession of its property and managing its business as debtor in possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.  No trustee or official committee of unsecured creditors has been appointed as of the filing of this Motion.

3.        The events leading up to the Petition Date and the facts and circumstances further supporting the relief requested herein are set forth in the *Declaration of Debra Chrapaty*

2

*in Support of Chapter 11 Petition and First Day Motions* (the "First Day Declaration") [D.I. 13].

## II.    The Sale Process

4.    Prior to the Petition Date, over the past three months, the Debtor's management has held discussions with potential strategic acquirers in an effort to find a buyer for the Debtor or its assets (the "Prepetition Marketing Process").  Despite the expressed interest of a number of parties in the Debtor's business, the Debtor was unable to agree on the terms of a sale prior to the filing of this chapter 11 case.  As part of the Prepetition Marketing Process, the Debtor contacted over twenty-five potential strategic buyers.  Several parties expressed interest.  The Debtor's management held several presentations regarding the Debtor's business and its various assets and conducted in-person meetings with a number of potential buyers.  Several buyers expressed interest and the Debtor has continued to work with some of these parties to make a formal offer to acquire some or all of the Debtor's assets.  Given the Debtor's liquidity constraints and the difficulty of securing long term financing to support reorganization, the Debtor believes that the best way to maximize the value of its assets for all stakeholders is through one or more sales of substantially all of its assets (the "Assets") in accordance with the procedures proposed herein.

5.    Since the Petition Date, the Debtor has continued its sales efforts (the "Sale Process").  Accordingly and as a result of both the Prepetition Marketing Process and the Sale Process, shortly after the commencement of this case, the Debtor, with the assistance of its financial advisor, Arch & Beam Global LLC ("Arch + Beam") and corporate counsel, Cooley LLP ("Cooley"), has reached an agreement in principal and is close to finalizing a "stalking horse" purchase agreement (the "Lot 1 Stalking Horse Agreement") with a strategic buyer (the

3

"Lot 1 Stalking Horse Bidder") wherein the Lot 1 Stalking Horse Bidder will purchase, *inter alia*, substantially all of the Debtor's intellectual property (the "Lot 1" Assets), subject to competitive bidding as set forth herein. The Debtor expects to file a copy of the Lot 1 Stalking Horse Agreement as a supplemental Exhibit B to this Motion soon after the filing of this Motion.

6.      The Debtor anticipates that the purchase price in the Lot 1 Stalking Horse Agreement will be comprised of a cash payment plus the Lot 1 Stalking Horse Bidder's assumption of certain liabilities (the "Lot 1 Stalking Horse Purchase Price"). The Lot 1 Stalking Horse Bidder, in working with the Debtor to negotiate the Lot 1 Stalking Horse Agreement, has relied on promises by the Debtor to seek the Court's approval of (i) reimbursement of the Lot 1 Stalking Horse Bidder's reasonable expenses up to $150,000 and (ii) a break-up fee of $150,000 (together, the "Lot 1 Stalking Horse Bidder Protections"), and in reasonable expectation that this Court would enter an order providing such relief. The Debtor, in the exercise of its business judgment, believes that the Lot 1 Stalking Horse Bidder Protections are a necessary inducement for the Lot 1 Stalking Horse Bidder, and thus, necessary to establish a "floor" for the sale of the Lot 1 Assets and ultimately encourage competitive bidding and realization of the highest value for the Lot 1 Assets.

7.      The Debtor has also received indications of interest from multiple parties with regard to the Debtor's Assets not included in the Lot 1 Stalking Horse Agreement (collectively, the "Lot 2" Assets), but has not entered into a stalking horse agreement with a potential purchaser with regard to the Lot 2 Assets as of the date of this Motion.

8.      The Debtor and its advisors have decided that the best way to maximize the value of the Debtor's Assets is to proceed with the Sale Process by seeking to hold an auction for the Lot 1 Assets, which will be immediately followed by an auction for the Lot 2 Assets (the

4

"Auction(s)") as contemplated and more fully described in the Bidding Procedures (defined below).

9.    Given the capital infusion provided by the Debtor's postpetition lenders (collectively, the "DIP Lenders"), the Debtor has sufficient cash to operate and satisfy its post-petition obligations to customers, vendors, and other creditors through the anticipated closing of the Sale(s) (defined below) of substantially all of its assets. However, the Debtor's cash is limited and it needs to complete the Sale Process and a closing to the Lot 1 Stalking Horse Bidder – or an overbidder – on the timeline proposed herein to avoid running out of cash. If the proposed timeline is not approved, or if there are material delays in that timeline, the Debtor will run out of cash and be unable to continue its operations and Sale Process.

## Relief Requested[2]

10.    *First*, the Debtor requests entry of an order, attached hereto as Exhibit C (the "Bidding Procedures Order"): (A) approving procedures (the "Bidding Procedures," the form of which is attached thereto as Exhibit 1) for (i) submitting bids for the Assets and (ii) conducting an Auction with respect to (x) the Lot 1 Assets in the event the Debtor receives at least one additional Qualified Bid (defined below) and (y) the Lot 2 Assets in the event the Debtor receives more than one Qualified Bid for the Lot 2 Assets; (B) approving the Lot 1 Stalking Horse Bidder Protections; (C) scheduling the Auction(s) for November 15, 2013 at 10:00 a.m.

---

[2]    In compliance with Local Rule 6004-1 and for the convenience of the reader, the salient terms of the transaction as set forth in the Lot 1 Stalking Horse Agreement will be summarized and will be attached hereto as a supplemental Exhibit A. To the extent that there are any conflicts between the Lot 1 Stalking Horse Agreement and the summaries to be provided, the Lot 1 Stalking Horse Agreement will govern. Additionally, as a result of the wind-down of the Debtor's operations, certain former employees and a member of the Debtor's management team (the "Former Employees") have resigned from their positions of employment with the Debtor and accepted offers of employment with the Lot 1 Stalking Horse Bidder. At the Debtor's request, the Lot 1 Stalking Horse Bidder is entering into a Services Agreement with the Debtor contemporaneously herewith and in the ordinary course of its business, to provide the Debtor with the services of the Former Employees to assist for a limited period with the wind-down of the Debtor's operations.

(prevailing Pacific Time) at the offices of Cooley LLP, 101 California Street, 5th Floor, San Francisco, California 94111, or at such other place, date and time as may be designated by the Debtor; (D) scheduling a hearing to approve any Sale(s) of the Assets; (E) approving procedures (the "Cure Procedures"), as set forth below, for the assumption and assignment of certain executory contracts (the "Contracts") and unexpired leases (the "Leases") of the Debtor to any purchaser(s) of the Assets, and to resolve any objections thereto; (F) approving (i) the form of notice of the Auction(s) and Sale(s) (the "Procedures Notice"), attached hereto as Exhibit D, to be served on the Procedures Notice Parties (as defined below) and (ii) the form of notice to parties holding Contracts and Leases likely to be assumed and assigned in connection with the sale of Assets, in the form attached hereto as Exhibit E (the "Cure Notice"); and (f) authorizing the United States Trustee to appoint a consumer privacy ombudsmen.

11.    *Second*, the Debtor will request entry of an order in the form attached hereto as Exhibit F (the "Sale Order"), pursuant to sections 105, 363 and 365 of the Bankruptcy Code: (i) approving the Sale(s) of the Assets of the Debtor to the purchaser(s), free and clear of all liens, claims, encumbrances and liabilities, except as provided in a Purchase Agreement(s) (as defined below), and (ii) authorizing the Debtor to consummate the Sale(s) (as defined below) and all documents, agreements and contracts executed in conjunction therewith.

## I.    PROPOSED BID AND SALE PROCEDURES

### Assets to be Sold

12.    As noted above, the Debtor seeks to complete a sale or sales (the "Sale(s)") of substantially all of its Assets.  The Debtor has separated its Assets into two lots: (i) the Lot 1 Assets, which are comprised of the Assets listed in Section 2.1 of the Lot 1 Stalking Horse Agreement, which include, among other things, substantially all of the Debtor's intellectual

6

property, and (ii) the Lot 2 Assets, which include the assets designated as "Excluded Assets" in Section 2.2 of the Lot 1 Stalking Horse Agreement. Each of the Lots are described more fully on Schedule 2 of the Bidding Procedures.

13.     Except as otherwise provided in any purchase agreement(s) (a "Purchase Agreement(s)") submitted by Potential Bidders (defined below), all of the Debtor's rights, title and interest in all of the Assets shall be sold free and clear of any liens, security interests, claims, charges or encumbrances in accordance with section 363 of the Bankruptcy Code. The Debtor proposes that any such liens, security interests, claims, charges or encumbrances shall attach to the amounts payable to the Debtor's estate resulting from the Sale(s), net of any transaction fees (the "Sale Proceeds"), in the same order of priority and subject to the rights, claims, defenses, and objections, if any, of all parties with respect thereto, subject to any further order of the Court.

**Summary of Proposed Bidding Procedures**

14.     In order to ensure that the Debtor receives the maximum value for the Lot 1 Assets, the Lot 1 Stalking Horse Agreement is subject to higher or better offers, and, as such, the Lot 1 Stalking Horse Agreement will serve as the "stalking horse" bid for the Assets. In order to ensure that the Debtor receives the maximum value for the Lot 2 Assets, the Debtor will hold an Auction for such Lot 2 Assets if more than one Qualified Bid (as defined below) is received for the Lot 2 Assets.

**A.     Provisions Governing Qualifications of Bidders**

15.     Any person or entity that wishes to conduct due diligence with respect to the Assets must first deliver to the Debtor an executed confidentiality agreement (to be delivered prior to the distribution of any confidential information by the Debtor to a Potential Bidder(s)) in form and substance satisfactory to the Debtor and which shall inure to the benefit of any

7

purchaser of the Assets (it being understood that any person or entity who previously signed a confidentiality agreement with the Debtor in connection with the Sale(s) shall not be required to execute a new confidentiality agreement). The executed confidentiality agreement must be signed and transmitted by the person or entity wishing to become a Potential Bidder so as to be received by each of the following parties prior to any dissemination of confidential information: (i) the Debtor's financial advisor, Arch & Beam Global LLC, 2500 Camino Diablo, Ste 108, Walnut Creek, CA 94597 (Attn.: Matthew English); (ii) the Debtor's counsel, Cole, Schotz, Meisel, Forman & Leonard P.A. ("Cole Schotz"), 500 Delaware Avenue, Suite 1410, Wilmington, Delaware 19801 (Attn.: Patrick Reilley, Esq.); and the Debtor's corporate counsel, Cooley LLP, 101 California Street, 5th Floor, San Francisco, California 94111 (Attn.: Keith McDaniels, Esq.).

16. A "Potential Bidder" is a person or entity that the Debtor determines is reasonably likely to: (a) submit a *bona fide* offer for all or a portion of the Assets and (b) be able to consummate the Sale(s) if selected as a Successful Bidder for the relevant Assets.

**B.     Due Diligence**

17. The Debtor may afford each Potential Bidder the time and opportunity to conduct reasonable due diligence; *provided, however*, that neither the Debtor nor any of its representatives shall be obligated to furnish any due diligence information (i) at any time, to any person or entity other than a Potential Bidder or (ii) after the Bid Deadline, to any Potential Bidder.

18. The Debtor may, in the exercise of its business judgment, extend a Qualified Bidder's (as defined below) time to conduct due diligence after the Bid Deadline until the Auction; *provided, however*, that the Successful Bidder(s) and the Back-Up Bidder(s) (as defined

8

below) shall be permitted to continue to conduct due diligence until closing(s) of the Sale(s) (subject to the terms of the applicable Purchase Agreement(s)); *provided, further,* that no Qualified Bid shall be subject to any condition related to due diligence after the Bid Deadline.

## C.    Provisions Governing Qualified Bids

19.    To participate in the Bidding Process, the Debtor proposes that a bidder must be a Potential Bidder and must deliver a written offer to Arch + Beam, Cole Shotz, and Cooley which includes, at a minimum, the following items (the "Required Bid Materials") prior to the Bid Deadline:

a.    An executed letter of intent that, among other things, identifies (a) the specific Lot that the Potential Bidder intends to purchase and (b) the purchase price for such Lot.  The purchase price for Lot 1 shall be payable in cash and equal to or greater than $2,900,000 plus (a) the Lot 1 Break-Up Fee in the amount of $150,000 and (b) the Expense Reimbursement in an amount not to exceed the lesser of $150,000 and the Lot 1 Stalking Horse's reasonable out-of-pocket documented expenses incurred in connection with the Lot 1 Stalking Horse Agreement (the "Lot 1 Minimum Bid Price").  The purchase price for Lot 2 shall be payable in cash and equal to or greater than an amount to be determined at the hearing regarding the Bidding Procedures (the "Lot 2 Minimum Bid Price," together with the Lot 1 Minimum Bid Price, collectively, the "Minimum Bid Price").

b.    A written acknowledgment that the bid (a) is not subject to any due diligence or financing contingency, (b) is not conditioned on the payment in any circumstances of a break-up fee, expense reimbursement or similar type of payment to the bidder; *provided, however,* that this subsection (b) shall not apply to the Lot 1 Stalking Horse or the Lot 2 Stalking Horse, if any, (c) is irrevocable until the conclusion of the relevant Auction (unless it is selected as the Successful Bid or Back-Up Bid for the particular Lot of Assets, in which case it shall remain binding as set forth below), (d) will not require any indemnity or similar obligation by the Debtor and (e) is not subject to any approvals, consents or conditions except as specified therein.

c.    A written acknowledgement by the bidder that it agrees to all of the terms for sale set forth in these Bid Procedures and that the offer constitutes a good faith *bona fide* offer to purchase the Assets identified in its bid.

d.    Delivery by certified check or wire transfer of a good faith deposit in immediately available funds (the "Deposit") equal to 10% of the Minimum Bid Price for each

9

Lot of Assets that the bidder is interested in purchasing.  The Deposit shall be held in escrow and will be refunded on the terms set forth below.

e.  Evidence or a statement indicating that the bidder has obtained authorization and approval from its board of directors (or comparable governing body) with respect to the submission and consummation of its bid and acceptance of the terms of sale in these Bid Procedures, or a representation that no such authorization or approval is required and that any and all consents required in connection with the submission and consummation of the bid have been obtained and that no other consents are required.

f.  Full disclosure of the identity of each entity that will be bidding for or purchasing the relevant Assets or otherwise participating in connection with such bid, and the complete terms of any such participation, including any agreements, arrangements or understandings concerning a collaborative or joint bid or any other combination concerning the proposed bid.

g.  A statement that the bidder consents to the jurisdiction of the Court.

h.  Evidence of sufficient cash on hand or written evidence of a binding, unconditional (except for customary closing conditions) commitment for financing or other evidence of the ability to consummate the Sale satisfactory to the Debtor with appropriate contact (and any other necessary) information for such financing sources.

i.  An affirmation that the cure amounts under any assigned executory contracts and any applicable transfer taxes or similar charges will be the bidder's responsibility; and provision of adequate assurance of future performance with respect to such executory contracts and/or unexpired leases.

j.  Such other information as may be reasonably requested in writing by the Debtor.

20.    A bid received from a Potential Bidder that includes all of the Required Bid Materials and is actually received by the Bid Deadline is a "Qualified Bid" if the Debtor, in consultation with the Consulting Parties, determines that such bid evidences a *bona fide* interest in, and ability to purchase, the Assets identified in such bid.  A Potential Bidder that submits a Qualified Bid (each a "Qualified Bidder") shall be entitled to participate in the Auction(s).  The Debtor reserves the right to contact bidders before or after the Bid Deadline to discuss or clarify

10

the terms of their bid and to indicate any terms which may need to be modified in order to make their bid a "Qualified Bid" or otherwise evaluate their bid.

21.     The Qualified Bid for each Lot selected by the Debtor, in consultation with the Consulting Parties, as the highest or otherwise best bid (each, the "Opening Bid") for each Lot following the Bid Deadline and prior to the start of the relevant Auction shall be provided to all other Qualified Bidders no less than one (1) business day prior to the commencement of the relevant Auction.

22.     Notwithstanding the foregoing, the Lot 1 Stalking Horse Bidder will be deemed a Qualified Bidder, and the Lot 1 Stalking Horse Agreement will be deemed a Qualified Bid for the Lot 1 Assets.

23.     Additionally, the right of any party qualifying under Section 363(k) of the Bankruptcy Code to credit bid, up to the full amount of their claims under the prepetition or postpetition credit facilities, shall be fully preserved in all circumstances (the "Credit Bid").  For the avoidance of doubt, a party making a Credit Bid will be deemed a Qualified Bidder and entitled to bid at Auction provided that such Credit Bid also qualifies with subparagraphs 19(b), (c), (e), (f), (g), (i), and (j) of the Required Bid Materials described above.

24.     The Debtor shall notify the Lot 1 Stalking Horse Bidder and all Qualified Bidders in writing as to whether or not any bids constitute Qualified Bids no later than one (1) business days following the expiration of the Bid Deadline.

**D.     Bid Deadline**

25.     A Potential Bidder who desires to make a bid on one or both Lots of the Assets, must deliver a bid for each Lot that satisfies all of the bid requirements set forth below so as to **actually be received by Arch + Beam, Cole Shotz, and Cooley no later than November 12,**

11

2013 at 5:00 p.m. (prevailing Eastern Time) (the "Bid Deadline"). The Debtor will promptly provide copies of all bids received to the Consulting Parties. Each bid shall be served by courier, facsimile, e-mail or as otherwise specified by the Debtor. The Debtor, in consultation with the Consulting Parties (as defined in the Bidding Procedures), may extend the Bid Deadline once or successively, but is not obligated to do so. Any Potential Bidder who fails to submit a bid in advance of the Bid Deadline consistent with the foregoing requirements shall not be permitted to participate in the Bidding Process and will not be a Qualified Bidder.

**E.     No Other Qualified Bids for Lot 1 Assets**

26.     If the Debtor does not receive any Qualified Bids other than the Lot 1 Stalking Horse Agreement for the Lot 1 Assets, then the Debtor will not hold an auction for the Lot 1 Assets and the Lot 1 Stalking Horse Bidder will be named the Successful Bidder for the Lot 1 Assets on the Bid Deadline.

**F.     Auction Process**

27.     To the extent the Debtor receives more than one Qualified Bid for a particular Lot of the Assets on or before the Bid Deadline or as otherwise decided by the Debtor, the Debtor will conduct an auction (the "Auction(s)") for each such Lot of Assets to take place on the date that is not less than three (3) business days prior to the Sale Hearing at the offices of Cooley LLP, 101 California St., 5th Floor, San Francisco, California 94111, commencing at **10:00 a.m. (prevailing Pacific Time) on November 15, 2013** (the "Auction Date"). If the Debtor receives more than one Qualified Bid for both Lot 1 and Lot 2, the Auction for Lot 1 shall take place first and the Auction for Lot 2 shall begin immediately after the conclusion of the Auction for Lot 1. The Debtor reserves the right, in consultation with the Consulting Parties, to adjourn or cancel the Auction Date, or change the location of the Auction or the Auction Date

to another Auction Date, at any time by delivering notice of such adjournment, cancellation or modification to the applicable Qualified Bidders.

28.    The Auction(s) shall be governed by the following procedures, which procedures shall be subject to modification by the Debtor, in consultation with the Consulting Parties, as the Debtor deems necessary, to better promote the goals of the Auction(s) and to comply with its fiduciary obligations:[3]

(a)    Each Qualified Bidder shall appear in person at the Auction(s) through a duly authorized representative, unless the Debtor has agreed to a different form of appearance by a particular Qualified Bidder.

(b)    Only the representatives of (i) the Debtor, (ii) persons or entities making Qualified Bids, (iii) the DIP Lenders, and (iv) the Committee shall be permitted to be present at the Auction(s).  For the avoidance of doubt, although these parties shall be permitted to be present at the Auction(s), only Qualified Bidders may bid at the Auction(s).

(c)    The material terms of each Qualified Bid selected from time to time by the Debtor, in consultation with the Consulting Parties, as being the highest or otherwise best offer for a particular Lot of the Assets at any such time (each such Qualified Bid selected at any time, the "Leading Bid" at such time) shall be fully disclosed to all other Qualified Bidders for the relevant Lot of Assets.  For the avoidance of doubt, each Leading Bid and each bid identified as being the highest or otherwise best offer for a particular Lot of Assets at any time shall have no conditions other than those disclosed.

(d)    The Auction(s) shall commence with the Debtor confirming the particulars of the Opening Bid for each Lot of the Assets and asking for higher or otherwise better offers for each Lot of the Assets.  The first incremental competitive bid at the Auction for the Lot 1 Assets shall be at least $100,000 over the Opening Bid for the Lot 1 Assets.  The first incremental competitive bid at the Auction for the Lot 2 Assets shall be at least $50,000 over the Opening Bid for the Lot 2 Assets.

(e)    The Auction(s) shall continue with subsequent rounds of bidding and, after each round, the Debtor shall announce the Leading Bid.  A Qualified Bidder that does not submit a Qualified Bid in any round of bidding with value greater than the

---

[3] To the extent that there are any conflicts between the Bidding Procedures at Exhibit 1 of the proposed order attached hereto as Exhibit C and the summary Bidding Procedures described in this Motion, the Bidding Procedures attached to the proposed order shall govern.

52238/0001-9923497v1

Leading Bid as of the commencement of such round shall not be able to submit further bids in any subsequent round.

(f)     The Debtor shall provide for a court reporter to be present at, and prepare a transcript of, the Auction(s). The Debtor may determine to make all or any part of the transcript subject to confidentiality requirements and seal.

(g)     Each Qualified Bidder shall be required to confirm that it has not engaged in any collusion with respect to the bidding or the Sale(s).

(h)     All Qualified Bidders shall have the right to submit additional bids and make modifications to their respective Purchase Agreements at the Auction(s) to improve such bids.

(j)     The Auction(s) may include individual negotiations with Qualified Bidders and/or open bidding in the presence of all other Qualified Bidders.

(k)     The Debtor reserves the right, in consultation with the Consulting Parties, to (i) determine in its reasonable discretion which Qualified Bid is the highest or otherwise best bid for a particular Lot of Assets and (ii) reject at any time, without liability, any bid that the Debtor, in its business judgment, deems to be (1) inadequate or insufficient, (2) not in conformity with the requirements of the Bankruptcy Code, the Bankruptcy Rules, the Local Rules or procedures set forth therein or in the Bid Procedures Order, or (3) contrary to the best interests of the Debtor and its estate.

(l)     The Auction(s) shall continue until there is only one bid that the Debtor, in consultation with the Consulting Parties, determines, subject to Court approval, constitutes the highest or otherwise best offer for a particular Lot of the Assets from among the Qualified Bids submitted for such Lot of the Assets at the relevant Auction (the "Successful Bid"). In determining the Successful Bid for a particular Lot of Assets, the Debtor, in the exercise of its business judgment and in consultation with the Consulting Parties, shall consider all relevant factors including, without limitation: (i) the amount of the purchase price, (ii) the form of consideration being offered, (iii) the ability of the Qualified Bidder to complete the transaction constituting the Successful Bid (including without limitation, the ability to obtain any required regulatory approvals or consents or the lack thereof), (iv) the proposed timing thereof, (v) the contracts being assumed by the Qualified Bidder and the rights of the Qualified Bidder and the Debtor with respect to the termination thereof, (vi) the number, type and nature of the changes to the Purchase Agreement requested by the Qualified Bidder, and (vii) the net benefit to the Debtor's estate. The Qualified Bidder submitting such Successful Bid (the "Successful Bidder") shall have the rights and responsibilities of the purchaser, as set forth in the Purchase Agreement, or modified definitive purchase agreement, as applicable, and in the terms and conditions of the Successful Bid provided at the relevant Auction.

14

(m)    At the conclusion of the Auction(s), a Successful Bidder(s) shall have negotiated and executed a Purchase Agreement(s) with the Debtor.

(n)    The next highest or otherwise best bid for each Lot of the Assets will be the "Back-Up Bid" and the maker of each such bid will be the "Back-Up Bidder." Prior to the Sale Hearing, but in no event later than two (2) days after conclusion of the applicable Auction, the Back-Up Bidder and the Debtor shall complete and execute a Purchase Agreement, for the relevant Lot of Assets, and any other applicable agreements, contracts, instruments, or other documents evidencing and containing the terms and conditions upon which each such Successful Bid and Back-Up Bid was made (subject, in the case of the Debtor, to the qualifications set forth in "Acceptance and Termination of Qualified Bids" below).

29.    THE SUCCESSFUL BID(S) SUBMITTED AT THE AUCTION(S) SHALL CONSTITUTE AN IRREVOCABLE OFFER AND BE BINDING ON THE SUCCESSFUL BIDDER(S) FROM THE TIME THE BID IS SUBMITTED UNTIL THIRTY (30) DAYS AFTER ENTRY OF THE SALE ORDER AND ON THE BACK-UP BIDDER(S) FOR FORTY-FIVE (45) DAYS AFTER THE AUCTION(S) HAVE OCCURRED.    EACH QUALIFIED BID THAT IS NOT THE SUCCESSFUL OR THE BACK-UP BID FOR THE RELEVANT LOT OF ASSETS AS APPROVED BY THE COURT AT THE SALE HEARING SHALL BE DEEMED WITHDRAWN AND TERMINATED AT THE CONCLUSION OF THE RESPECTIVE AUCTION.

**G.    Return of Deposits**

30.    Each Deposit submitted pursuant to the Bid Procedures will be held in escrow by the escrow agent (the "Escrow Agent") and will not become property of the Debtor's estate absent further order of the Court.  Within three (3) business days after the conclusion of the last Auction, the Escrow Agent shall return the Deposits made by any Qualified Bidder who is not a Successful Bidder or a Back-Up Bidder, and the Escrow Agent shall return any of the Back-Up Bidder's Deposits within three (3) business days following the termination of such Back-Up Bid in accordance with the provisions set forth herein.

15

31.    If the Successful Bidder(s) or the Back-Up Bidder(s), as applicable, fails to consummate the approved Sale(s) because of a breach or failure to perform on the part of the Successful Bidder(s) or the Back-Up Bidder(s), as applicable, the Debtor shall be entitled to retain the Deposits of each such Successful Bidder(s) or Back-Up Bidder(s), as applicable, in addition to other remedies available to the Debtor under applicable law.  The Debtor shall credit the Deposit of each Successful Bidder(s) or Back-Up Bidder(s), as applicable, towards the purchase price at the time of funding consistent with the terms of the applicable Purchase Agreement.

**H.    The Lot 1 Stalking Horse Bidder Protections**

32.    Absent the offer to be contained in the Lot 1 Stalking Horse Agreement, the Debtor would face the risk that the Auction for the Lot 1 Assets would fail to generate bids for the Debtor's assets in excess of the minimum amount sought by the Debtor for the Lot 1 Assets. Approval of the Lot 1 Stalking Horse Agreement will encourage competitive bidding, rather than chill the bidding process.  In addition, the Lot 1 Stalking Horse Bidder has committed significant time and expense in due diligence and in negotiating and drafting the Lot 1 Stalking Horse Agreement, which agreement will likely minimize time required to negotiate asset purchase agreements with other interested bidders and thereby encourage other bidders to participate in the Auction for the Lot 1 Assets.

33.    In recognition of the Lot 1 Stalking Horse Bidder's expenditure of time, energy, and resources, and the many benefits for the Debtor's sale process from the Lot 1 Stalking Horse Agreement, if the Lot 1 Stalking Horse Bidder is not the Successful Bidder, the Debtor will pay the Lot 1 Stalking Horse Bidder (i) a fee in an amount equal to $150,000 (the "Lot 1 Break-Up Fee"), and (ii) an amount not to exceed the lesser of $150,000 and the Lot 1 Stalking Horse

16

Bidder's reasonable out-of-pocket documented expenses incurred in connection with the Sale Process (the "Expense Reimbursement"). The Lot 1 Break-Up Fee and Expense Reimbursement shall be payable as provided for pursuant to the terms of the Stalking Horse Agreement. The Debtor has further agreed that its obligation to pay the Break-Up Fee and Expense Reimbursement pursuant to the Stalking Horse Agreement shall, to the extent owed by the Debtor, constitute an administrative expense claim under section 503(b) and 507(a)(1) of the Bankruptcy Code, and in the event of the consummation of an Alternative Transaction or Restructuring Transaction (as such terms are described in the Lot 1 Stalking Horse Agreement), as applicable, the payment of the Lot 1 Break-Up Fee and the Expense Reimbursement shall be made directly from the proceeds of, and concurrently with the closing of, the Alternative Transaction or Restructuring Transaction, as applicable.

## I.    Debtor's Option to Select a Lot 2 Stalking Horse Bidder

34.    Based upon Qualified Bids received for Lot 2, the Debtor seeks authorization to have the option to at any time, in consultation with the Consulting Parties, designate a Qualified Bidder for Lot 2 as a "Lot 2 Stalking Horse Bidder." Notice of selection of such Lot 2 Stalking Horse Bidder shall be immediately given to all Qualified Bidders and filed with the Court. The Debtor also seeks this Court's authorization to, in the Debtor's business judgment and in consultation with the Consulting Parties, provide a selected Lot 2 Stalking Horse Bidder (if any) with a "break-up fee" in an amount not to exceed 5% of the Lot 2 Minimum Bid Price (the "Lot 2 Break-Up Fee"). Additionally, in the event that the Debtor selects a Lot 2 Stalking Horse Bidder, then the bid of each Potential Bidder for the Lot 2 Assets, in order to constitute a Qualified Bid, shall in addition to meeting the other criteria set forth in these Bid Procedures, be

17

(i) in an amount that is sufficient to pay the Lot 2 Break-Up Fee <u>plus</u> (ii) an amount equal to or greater than $50,000 above the bid of the Lot 2 Stalking Horse Bidder.

**J.      Debtor's Option to Divide Lot 2 into Sub-Lots**

35.      The Debtor seeks to reserve the right, in consultation with the Consulting Parties, to divide the Lot 2 Assets into one or more sub-lots if, in the Debtor's business judgment, it believes such a division or divisions would promote the goals of the Auction process.

**K.      Sale Hearing**

36.      The Debtor will seek entry of an order from the Bankruptcy Court at a hearing (the "<u>Sale Hearing</u>") to begin on November 19, 2013, to approve and authorize the Sale(s) to the Successful Bidder(s) on terms and conditions determined in accordance with the Bid Procedures.

<u>**Notice of Sale Hearing**</u>

37.      As stated above, the Debtor requests that this Court schedule the Sale Hearing for November 19, 2013.   The Debtor proposes that any objections to the Sale be filed by November 12, 2013 at 4 p.m. (prevailing Eastern Time).

38.      The Debtor also requests that the Court approve the form of the Procedures Notice, substantially in the form of <u>Exhibit D</u> hereto.   The Debtor will serve a copy of the Procedures Notice on the following parties: (a) the U.S. Trustee, (b) the Official Committee of Unsecured Creditors or the holders of the twenty (20) largest general unsecured claims in the Debtor's bankruptcy case in the event that no Official Committee of Unsecured Creditors has been formed, (c) any parties requesting notices in these cases pursuant to Bankruptcy Rule 2002, (d) all known secured creditors of the Debtor, (e) counsel to the Lot 1 Stalking Horse Bidder, (f) the Debtor's DIP Lenders, and (g) all Potential Bidders (collectively with the parties specified in this paragraph, the "<u>Procedures Notice Parties</u>").

18

39.     The Debtor proposes to serve the Procedures Notice within two (2) business days following entry of the Bidding Procedures Order, by first-class mail, postage prepaid on the Procedures Notice Parties.  The Procedures Notice provides that any party that has not received a copy of the Motion or the Bidding Procedures Order that wishes to obtain a copy of the Motion or the Bidding Procedures Order, including all exhibits thereto, may make such a request in writing to the undersigned counsel or by consulting the website maintained by the Debtor's noticing agent at http://dm.epiq11.com/nirvanix.

40.     The Debtor submits that the foregoing notices comply fully with Bankruptcy Rule 2002 and are reasonably calculated to provide timely and adequate notice of the Bidding Procedures, Auction(s) and Sale(s), and Sale Hearing to the Debtor's creditors and other parties in interests as well as to those who have expressed an interest or are likely to express an interest in bidding on the Assets.  Based on the foregoing, the Debtor respectfully requests that this Court approve these proposed notice procedures.

## Sale Hearing

41.     At the Sale Hearing, the Debtor will seek Court approval of the Sale(s) to the Successful Bidder, free and clear of all liens, claims and encumbrances pursuant to section 363 of the Bankruptcy Code, with all liens, claims and encumbrances to attach to the Sale Proceeds with the same validity and in the same order of priority as they attached to the Assets prior to the Sale(s), including the assumption by the Debtor and assignment to the Successful Bidder(s) of the assumed Contracts and Leases pursuant to section 365 of the Bankruptcy Code.  The Debtor will submit and present additional evidence, as necessary, at the Sale Hearing demonstrating that the Sale(s) is fair, reasonable and in the best interest of the Debtor's estate and all interested parties.

19

**Procedures for the Assumption and Assignment of Assumed Contracts and Leases**

42.    As noted above, the Debtor will seek to assume and assign certain Contracts and Leases to be identified on schedules to the Lot 1 Stalking Horse Agreement or on schedules to any Purchase Agreement for the Lot 2 Assets, other than those agreements excluded by the Successful Bidder pursuant to such bidder's Purchase Agreement (collectively, the "Assumed Executory Contracts").

43.    At least initially, the Assumed Executory Contracts will be those Contracts and Leases that the Debtor believes may be assumed and assigned as part of the orderly transfer of the Assets.  The Successful Bidder may choose to exclude (or to add) certain Contracts or Leases to the list of Assumed Executory Contracts, subject to further notice.

44.    In the interim, the Debtor will serve the Motion and the Cure Notice, substantially in the form of Exhibit E hereto, upon each counterparty to the Assumed Executory Contracts by no later than October 29, 2013.  The Cure Notice will state the date, time and place of the Sale Hearing as well as the date by which any objection to the assumption and assignment of Assumed Executory Contracts must be filed and served.  The Cure Notice also will identify the amounts, if any, that the Debtor believes are owed to each counterparty to an Assumed Executory Contract in order to cure any defaults that exist under such contract (the "Cure Amounts").  If a Contract or Lease is assumed and assigned pursuant to Court Order, then unless the Assumed Executory Contract counterparty properly files and serves an objection to the Cure Amount contained in the Cure Notice, the Assumed Executory Contract counterparty will receive at the time of the Closing of the Sale(s) (or as soon as reasonably practicable thereafter), the Cure Amount as set forth in the Cure Notice, if any, with payment to be made pursuant to the terms of the Successful Bidder's Purchase Agreement.  Any non-Debtor

20

counterparty to an Assumed Executory Contract that fails to timely file and serve an objection

to the Cure Amounts will be forever barred from asserting that a Cure Amount (or any other

claim arising out of the Assumed Executory Contract prior to the date of assumption) is owed in

excess of the amount, if any, set forth in the Cure Notice.  If an objection is filed by a

counterparty to an Assumed Executory Contract, the Debtor proposes that such objection must

set forth a specific default in any executory contract or unexpired lease and claim a specific

monetary amount that differs from the amount, if any, specified by the Debtor in the Cure

Notice.  To the extent there is a contract to be assumed pursuant to the Successful Bidder's

Purchase Agreement, this Motion constitutes a separate motion to assume and assign that

contract to the Successful Bidder pursuant to section 365 of the Bankruptcy Code; each such

contract will be listed on an exhibit to the Successful Bidder's Purchase Agreement, and will be

given a separate Cure Notice.

45.    If any counterparty objects for any reason to the assumption and assignment of

an Assumed Executory Contract (a "Cure Amount Objection"), the Debtor proposes that the

counterparty must file the objection by no later than (i) 4:00 p.m. (prevailing Eastern Time) on

November 12, 2013 or (ii) the date otherwise specified in the Cure Notice (or, alternatively, the

date set forth in the motion to assume such Assumed Executory Contract if such contract is to

be assumed and assigned after the Auction(s)), *provided*, *however*, that any counterparty may

raise at the Sale Hearing an objection to the assumption and assignment of the Assumed

Executory Contract solely with respect to the ability of the Successful Bidder(s) (if the

Successful Bidder(s) is a party other than the Lot 1 Stalking Horse Bidder as to the Lot 1

Assets) to provide adequate assurance of future performance under the Assumed Executory

Contract.  After receipt of a Cure Amount Objection, the Debtor will attempt to reconcile any

21

differences in the Cure Amount. In the event that the Debtor and the non-Debtor counterparty cannot resolve the Cure Amount Objection, and the Court does not otherwise make a determination at the Sale Hearing, the Debtor may, in its discretion, segregate any disputed Cure Amounts pending the resolution of any such disputes by the Court or mutual agreement of the parties.

46. The Successful Bidder(s) shall be responsible for satisfying any requirements regarding adequate assurance of future performance that may be imposed under section 365(b) of the Bankruptcy Code in connection with the proposed assignment of any Assumed Executory Contract, and the failure to provide adequate assurance of future performance to any counterparty to any Assumed Executory Contract shall not excuse the Successful Bidder(s) from performance of any and all of its obligations pursuant to the Successful Bidder's Purchase Agreement. The Debtor proposes that the Court make its determinations concerning adequate assurance of future performance under the Assumed Executory Contacts pursuant to section 365(b) of the Bankruptcy Code at the Sale Hearing. Cure Amounts disputed by any counterparty will be resolved by the Court at the Sale Hearing or such later date as may be agreed to or ordered by the Court.

47. Except to the extent otherwise provided in the Successful Bidder's Purchase Agreement, the Debtor and the Debtor's estate shall be relieved of all liability accruing or arising after the assumption and assignment of the Assumed Executory Contracts pursuant to section 365(k) of the Bankruptcy Code.

**The Court Should Authorize the United States Trustee to Appoint a**
**Consumer Privacy Ombudsman no later than 3 Days Before the Sale Hearing**

48.    Section 363(b)(1) generally allows a debtor to sell property of the estate outside

the ordinary course of business after notice and hearing except that, if a debtor maintains a

privacy policy in effect as of the commencement of the case with respect to customers'

personally identifiable information, such personally identifiable information cannot be sold

unless—

(a)    such sale is consistent with the debtor's prepetition privacy policy, or

(b)    after appointment of a consumer privacy ombudsman in accordance with
section 332 of the Bankruptcy Code and after notice and a hearing, the
court approves such sale (i) giving due consideration to the facts,
circumstances and conditions of the sale and (ii) finding that no showing
was made that such sale would violate applicable nonbankruptcy law.

11 U.S.C. § 363(B)(1).

49.    In an abundance of caution, the Debtor requests that this Court authorize the

appointment of a consumer privacy ombudsman.  Accordingly, the Debtor respectfully requests

that a consumer privacy ombudsman be appointed by the United States Trustee no later than 3

days before the Sale Hearing.

## II.    APPLICABLE AUTHORITY

### A.    The Sale(s) of the Assets is Authorized by Section 363 as a Sound Exercise of the Debtor's Business Judgment

50.    In accordance with Bankruptcy Rule 6004, sales of property rights outside the

ordinary course of business may be by private sale or public auction.   The Debtor has

determined that the Sale(s) of the Assets by public auction will enable it to obtain the highest

and best offer for these assets (thereby maximizing the value of its estate) and is in the best

interests of the Debtor's creditors.  In particular, the Lot 1 Stalking Horse Agreement is the

result of comprehensive, arm's length negotiations for the Sale of the Lot 1 Assets, and the Sale of the Lot 1 Assets pursuant to the terms of the Lot 1 Stalking Horse Agreement, subject to higher or otherwise better offers at the respective Auction, will provide a greater recovery for the Debtor's creditors than would be provided by any other existing alternative for the Lot 1 Assets.

51.    Section 363 of the Bankruptcy Code provides that a trustee, "after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b).  Although section 363 of the Bankruptcy Code does not specify a standard for determining when it is appropriate for a court to authorize the use, sale or lease of property of the estate, a sale of a debtor's assets should be authorized if a sound business purpose exists for doing so.  See, e.g., Meyers v. Martin (In re Martin), 91 F.3d 289, 295 (3d Cir. 1996); In re Abbotts Dairies of Pennsylvania, Inc., 788 F.2d 143 (3d Cir. 1986); In re Titusville Country Club, 128 BR. 396 (W.D. Pa. 1991); In re Delaware & Hudson Ry. Co., 124 BR. 169, 176 D. Del. 1991); see also Official Committee of Unsecured Creditors v. The LTV Corp. (In re Chateaugay Corp.), 973 F.2d 141, 143 (2d Cir. 1992); Committee of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.), 722 F.2d 1063, 1070 (2d Cir. 1983); Committee of Asbestos-Related Litigants and/or Creditors v. Johns-Manville Corp. (In re Johns-Manville Corp.), 60 B.R. 612, 616 (Bankr. S.D.N.Y. 1986).

52.    The paramount goal in any proposed sale of property of the estate is to maximize the proceeds received by the estate.  See, e.g., In re Food Barn Stores, Inc., 107 F.3d 558, 564-65 (8th Cir. 1997) (in bankruptcy sales, "a primary objective of the Code [is] to enhance the value of the estate at hand"); Official Comm. of Subordinated Bondholders v. Integrated Res., Inc. (In re Integrated Resources, Inc.), 147 B.R. 650, 659 (S.D.N.Y. 1992) ("It is a

24

well-established principle of bankruptcy law that the. . . [trustee's] duty with respect to such sales is to obtain the highest price or greatest overall benefit possible for the estate.") (quoting In re Atlanta Packaging Prods., Inc., 99 BR. 124, 130 (Bankr. N.D. Ga. 1988)).  As long as the sale appears to enhance a debtor's estate, court approval of a trustee's decision to sell should only be withheld if the trustee's judgment is clearly erroneous, too speculative, or contrary to the provisions of the Bankruptcy Code.  GBL Holding Co., Inc. v. Blackburn/Travis/Cole, Ltd., 331 B.R. 251, 255 (N.D. Tex. 2005); In re Lajijani, 325 B.R. 282, 289 (9th Cir. B.A.P. 2005); In re WPRV-TV, Inc., 143 B.R. 315, 319 (D. P.R. 1991) ("The trustee has ample discretion to administer the estate, including authority to conduct public or private sales of estate property. Courts have much discretion on whether to approve proposed sales, but the trustee's business judgment is subject to great judicial deference.").

53.     Applying section 363, the proposed Sale(s) of the Assets should be approved. As set forth above, the Debtor has determined that the best method of maximizing the recovery of the Debtor's creditors would be through the Sale(s) of the Assets.  The fairness and reasonableness of the consideration to be paid by the Successful Bidder will be demonstrated by adequate "market exposure" and an open and fair auction process — the best means for establishing whether a fair and reasonable price is being paid.

**B.     The Bidding Procedures Are Appropriate and Will Maximize the Value Received for the Assets.**

54.     As noted above, the paramount goal in any proposed sale of property of the estate is to maximize the proceeds received by the estate.  To that end, courts uniformly recognize that procedures intended to enhance competitive bidding are consistent with the goal of maximizing the value received by the estate and therefore are appropriate in the context of

25

bankruptcy sales.    See, e.g., In re Fin'l News Network, Inc., 126 B.R. 152, 156 (Bankr. S.D.N.Y. 1991) ("court-imposed rules for the disposition of assets . . . [should] provide an adequate basis for comparison of offers, and [should] provide for a fair and efficient resolution of bankrupt estates").

55.    The Debtor believes that the Bidding Procedures will establish the parameters under which the value of each Lot of the Assets may be tested at an auction and through the ensuing Sale Hearing.  Such procedures will increase the likelihood that the Debtor's creditors will receive the greatest possible consideration for their assets because they will ensure a competitive and fair bidding process.  They also allow the Debtor to undertake an auction in as expeditious and efficient manner as possible, which the Debtor believes is essential to maximizing the value of the Debtor's estate for its creditors.

56.    The Debtor also believes that the proposed Bidding Procedures will promote active bidding from seriously interested parties and will dispel any doubt as to the best and highest offer reasonably available for the Debtor's assets.  In particular, the proposed Bidding Procedures will allow the Debtor to conduct an auction in a controlled, fair and open fashion that will encourage participation by financially capable bidders who demonstrate the ability to close a transaction.

57.    In sum, the Debtor believes that the Bidding Procedures will encourage bidding for the Assets and are consistent with the relevant standards governing auction proceedings and bidding incentives in bankruptcy proceedings.  Accordingly, the proposed Bidding Procedures are reasonable, appropriate and within the Debtor's sound business judgment.

26

C.    **The Sale of the Acquired Assets Free and Clear of Liens and Other Interests is Authorized by Sections 363(f)**

58.    The Debtor further submits that it is appropriate to sell the Assets free and clear of liens pursuant to section 363(f) of the Bankruptcy Code, with any such liens attaching to the Sale Proceeds of the Assets to the extent applicable.  Section 363(f) of the Bankruptcy Code authorizes a trustee to sell assets free and clear of liens, claims, interests and encumbrances if:

(1)    applicable nonbankruptcy law permits sale of such property free and clear of such interests;

(2)    such entity consents;

(3)    such interest is a lien and the price at which such property is to be sold is greater than the value of all liens on such property;

(4)    such interest is in bona fide dispute; or

(5)    such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.  11 U.S.C. § 363(f).

59.    This provision is supplemented by section 105(a) of the Bankruptcy Code, which provides that "[t]he Court may issue any order, process or judgment that is necessary or appropriate to carry out the provisions of [the Bankruptcy Code]." 11 U.S.C. § 105(a).

60.    Because section 363(f) of the Bankruptcy Code is drafted in the disjunctive, satisfaction of any one of its five requirements will suffice to permit the sale of the Acquired Assets "free and clear" of liens and interests.  In re Dundee Equity Corp., 1992 Bankr. LEXIS 436, at *12 (Bankr. S.D.N.Y. March 6, 1992) ("[s]ection 363(f) is in the disjunctive, such that the sale free of the interest concerned may occur if any one of the conditions of § 363(f) have been met."); In re Bygaph, Inc., 56 B.R. 596, 606 n.8 (Bankr. S.D.N.Y. 1986) (same); Michigan Employment Sec. Comm'n v. Wolverine Radio Co. (In re Wolverine Radio Co.), 930 F.2d 1132, 1147 n.24 (6th Cir. 1991) (stating that Bankruptcy Code section 363(f) is written in the

27

disjunctive; holding that the court may approve the sale "free and clear" provided at least one of the subsections of Bankruptcy Code section 363(f) is met).

61.     The Debtor believes that one or more of the tests of section 363(f) will be satisfied with respect to both the transfer of the Lot 1 Assets pursuant to the Lot 1 Stalking Horse Agreement and with regard to any Sale of the Lot 2 Assets.  The Debtor will file with the Court further support of the Debtor's compliance with the requirements of section 363(f) of the Bankruptcy in order to sell the Assets "free and clear" prior to the Sale(s) Hearing.

**D.     The Proposed Notice of Bidding Procedures and Auction Is Appropriate**

62.     The Debtor believes that it will obtain the maximum recovery for creditors of the Debtor's estate if the Assets of the Debtor are sold through a well-advertised sale and auction. The Debtor has already taken significant steps to identify potential purchasers.

63.     Under Bankruptcy Rules 2002(a) and (c), the Debtor is required to notify creditors of the proposed sale of the Debtor's assets, including a disclosure of the time and place of an auction, the terms and conditions of a sale, and the deadline for filing any objections.  The Debtor submits that the notice procedures herein comply fully with Bankruptcy Rule 2002 and are reasonably calculated to provide timely and adequate notice of the sale by auction to the Debtor's creditors and other interested parties, as well as to those parties who have expressed an interest, or may express an interest, in bidding on the Assets.  The proposed time frame between the filing of this Motion, the commencement of the bidding process and the Auction should provide interested purchasers ample time to participate in the Auction.

**E.     The Lot 1 Stalking Horse Protections Are Appropriate Under the Circumstances**

64.     As noted above, the Lot 1 Stalking Horse Bidder proceeded in reliance on promises by the Debtor to seek the Lot 1 Stalking Horse Protections and in reasonable

expectation that this Court would enter an order providing such relief.  The Debtor submits that the Lot 1 Stalking Horse Protections are a normal and oftentimes necessary component of sales outside the ordinary course of business under section 363 of the Bankruptcy Code.    In particular, such protections encourage a potential purchaser to invest the requisite time, money and effort to conduct due diligence and sale negotiations with a debtor despite the inherent risks and uncertainties of the chapter 11 process.  See, e.g., In re Comdisco, Inc., Case No. 01-24795 (RB) (Bankr. N.D. Ill. Aug. 9, 2002) (approving a termination fee as, inter alia, an actual and necessary cost and expense of preserving the debtor's estate, of substantial benefit to the debtor's estate and a necessary inducement for, and a condition to, the proposed purchaser's entry into the purchase agreement); Integrated Resources, 147 B.R. at 660 (noting that fees may be legitimately necessary to convince a "white knight" to offer an initial bid by providing some form of compensation for the expenses such bidder incurs and the risks such bidder faces by having its offer held open, subject to higher and better offers); In re Hupp Indus., 140 B.R. 191, 194 (Bankr. N.D. Ohio 1997) (without any reimbursement, "bidders would be reluctant to make an initial bid for fear that their first bid will be shopped around for a higher bid from another bidder who would capitalize on the initial bidder's. . . due diligence"); In re Marrose Corp., 1992 WL 33848, at *5 (Bankr. S.D.N.Y. 1992) (stating that "agreements to provide reimbursement of fees and expenses are meant to compensate the potential acquirer who serves as a catalyst or 'stalking horse' which attracts more favorable offers"); In re 995 Fifth Ave. Assocs., 96 B.R. 24, 28 (Bankr. S.D.N.Y. 1989) (finding that bidding incentives may be "legitimately necessary to convince a white knight to enter the bidding by providing some form of compensation for the risks it is undertaking") (citations omitted).

29

65.     Moreover, bid protections, similar to the Lot 1 Stalking Horse Protections sought to be approved by this Motion, have been approved in other chapter 11 cases in this Court. See, e.g., In re Conex Holdings, LLC, Case No. 11-10501 (CSS) (Bankr. D. Del. Sept. 14, 2011) (approving break-up fee of 3% of final purchase price); In re Nortel Networks Inc., Case No. 09-10138 (KG) (Bankr. D. Del. Feb. 27, 2009) (approving $650,000 break-up fee in connection with $17.65 million sale, or 5.9%); In re Tallygenicom, L.P., Case No. 09-10266 (CSS) (Bankr. D. Del. Feb. 19, 2009) (approving $2 million break-up fee in connection with $36.6275 million sale, or 5.5%); In re Fluid Routing Solutions Intermediate Holding Corp., Case No. 09-10384 (CSS) (Bankr. D. Del. Feb. 19, 2009) (court approved expense reimbursement of up to $1.25 million in connection with a $11 million sale, or up to 11.4%); In re Archway Cookies, LLC, Case No. 08-12323 (CSS) (Bankr. D. Del. Dec. 3, 2008) (approving $750,000 break-up fee in connection with a $25 million sale, or 3.8%); In re Wickes Holdings, LLC, et al., Case No. 08-10212 (KJC) (Bankr. D. Del. Feb. 19, 2008) (authorizing debtor to enter into stalking horse agreement providing break-up fee of up to 3%); In re Tweeter Home Entm't Group, Inc., Ch. 11 Case No. 07-10787 (PJW) (Bankr. D. Del. July 13, 2007) (authorizing debtor to pay stalking horse's termination fee); In re Radnor Holdings, Case No. 06-10110 (CSS) (Bankr. D. Del. Sept. 22, 2006) (aggregate fee and expense reimbursement of 3% permitted).

66.     A proposed bidding incentive, such as the Lot 1 Break-Up Fee and Expense Reimbursement, should be approved when it is in the best interests of the estate. In re S.N.A. Nut Co., 186 B.R. 98, 104 (Bankr. N.D. Ill. 1995); see also In re America West Airlines, Inc., 166 B.R. 908 (Bankr. D. Ariz. 1994); In re Hupp Indus., Inc., 140 B.R. 191 (Bankr. N.D. Ohio 1992). Typically, this requires that the bidding incentive provide some benefit to the debtor's estate. Calpine Corp. v. O'Brien Envtl. Energy, Inc. (In re O'Brien Envtl. Energy, Inc.), 181

30

F.3d 527, 533 (3d Cir. 1999) (holding even though bidding incentives are measured against a business judgment standard in non-bankruptcy transactions the administrative expense provisions of Bankruptcy Code section 503(b) govern in the bankruptcy context).

67.     In Calpine Corp. v. O'Brien Envtl. Energy, Inc. (In re O'Brien Envtl. Energy), the Third Circuit found that whether break-up fees and expenses could be paid to Calpine Corp. ("Calpine") as a "stalking horse" depended on whether such fees were necessary to preserve the value of the estate.  O'Brien Envtl. Energy, 181 F.3d at 536.  The court determined that Calpine's right to break-up fees and expenses depended on whether it provided a benefit to the debtor's estate by promoting competitive bidding or researching the value of the assets at issue to increase the likelihood that the selling price reflected the true value of the company.  Id. at 537.  The Debtor believes that approval of the Lot 1 Stalking Horse Protections will create such a competitive bidding process.

68.     First, the Lot 1 Break-Up Fee induced the Lot 1 Stalking Horse Bidder to submit a bid that will serve as a minimum floor bid upon which other bidders may rely.  Therefore, the Lot 1 Stalking Horse Bidder has provided a material benefit to the Debtor, its estate and its respective creditors by encouraging bidding and increasing the likelihood that the best possible price for the Lot 1 Assets will be received.  See, e.g., In re Comdisco, Inc., Case No. 01-24795 (RB) (Bankr. 8. N.D. Ill. Aug. 9, 2002) (finding proposed termination fee to be of substantial benefit to the debtor's estate); In re Kmart Corp., Case No. 02-02474 (SPS) (Bankr. N.D. Ill. May 10, 2002); Integrated Resources, 147 B.R. at 659 (noting that termination payment is an "important tool to encourage bidding and to maximize the value of the debtor's assets").

69.     Second, the Debtor believes that the proposed Expense Reimbursement is fair and reasonably compensates the Lot 1 Stalking Horse Bidder for taking actions that will benefit

31

the Debtor's estate.  The Expense Reimbursement compensates the Lot 1 Stalking Horse Bidder for diligence and professional fees incurred in performing diligence and in negotiating the terms of the Lot 1 Stalking Horse Agreement.

70.    Third, the proposed Lot 1 Stalking Horse Protections are the result of an arm's-length negotiated agreement between the Debtor and the Lot 1 Stalking Horse Bidder. There is no evidence or reason to believe that the relationship between the Debtor and the Lot 1 Stalking Horse Bidder has been tainted by self-dealing or manipulation.

71.    Fourth, the Debtor does not believe that the Lot 1 Stalking Horse Protections will have a chilling effect on the sale process.  Rather, the Lot 1 Stalking Horse Bidder will increase the likelihood that the best possible price for the Lot 1 Assets will be received, by permitting other qualified bidders to rely on the diligence performed by the Lot 1 Stalking Horse Bidder, and moreover, by allowing qualified bidders to utilize the Lot 1 Stalking Horse Agreement as a platform for negotiations and modifications in the context of a competitive bidding process.

72.    In sum, the Lot 1 Stalking Horse Protections are reasonable under the circumstances and will enable the Debtor to maximize the value for the Lot 1 Assets while limiting any chilling effect in the Sale Process.

**F.    Assumption and Assignment of Certain Executory Contracts and Unexpired Leases**

73.    Section 365(a) of the Bankruptcy Code provides that, subject to the court's approval, a trustee "may assume or reject any executory contracts or unexpired leases of the debtor." 11 U.S.C. § 365(a).  Upon finding that a trustee has exercised its sound business judgment in determining to assume an executory contract or unexpired lease, courts will approve the assumption under section 365(a) of the Bankruptcy Code.  See Nostas Assocs. v.

32

Costich (In re Klein Sleep Prods., Inc.), 78 F.3d 18, 25 (2d Cir. 1996); Orion Pictures Corp. v.

Showtime Networks, Inc. (In re Orion Pictures Corp.), 4 F.3d 1095, 1099 (2d Cir. 1993).

74.    Pursuant to section 365(f)(2) of the Bankruptcy Code, a trustee may assign an

executory contract or unexpired lease of nonresidential real property if:

> (A)    the trustee assumes such contract or lease in accordance with the provisions of this section; and
>
> (B)    adequate assurance of future performance by the assignee of such contract or lease is provided, whether or not there has been a default in such contract or lease.

11 U.S.C. § 365(f)(2).

75.    The meaning of "adequate assurance of future performance" depends on the facts

and circumstances of each case, but should be given "practical, pragmatic construction." See

Carlisle Homes, Inc. v. Arrari (In re Carlisle Homes, Inc.), 103 B.R. 524, 538 (Bankr. D.N.J.

1989); see also In re Natco Indus., Inc., 54 B.R. 436, 440 (Bankr. S.D.N.Y. 1985) (adequate

assurance of future performance does not mean absolute assurance that debtor will thrive and

pay rent); In re Bon Ton Rest. & Pastry Shop, Inc., 53 B.R. 789, 803 (Bankr. N.D. Ill. 1985)

("Although no single solution will satisfy every case, the required assurance will fall

considerably short of an absolute guarantee of performance.").

76.    Among other things, adequate assurance may be given by demonstrating the

assignee's financial health and experience in managing the type of enterprise or property

assigned. In re Bygaph, Inc., 56 B.R. 596, 605-06 (Bankr. S.D.N.Y. 1986) (adequate assurance

of future performance is present when prospective assignee of lease has financial resources and

expressed willingness to devote sufficient funding to business to give it strong likelihood of

succeeding; chief determinant of adequate assurance is whether rent will be paid).

33

77.     The Debtor and the Successful Bidder(s) will present evidence at the Sale Hearing to prove the financial credibility, willingness and ability of the Successful Bidder(s) to perform under the Contracts or Leases.  The Court and other interested parties therefore will have the opportunity to evaluate the ability of any Successful Bidder(s) to provide adequate assurance of future performance under the Contracts or Leases, as required by section 365(b)(1)(C) of the Bankruptcy Code.

78.     In addition, the Cure Procedures are appropriate and consistent with section 365 of the Bankruptcy Code.  To the extent that any defaults exist under any Assumed Executory Contracts, any such defaults will be cured pursuant to the Successful Bidder's Purchase Agreement.  Any provision in the Assumed Executory Contracts that would restrict, condition, or prohibit an assignment of such contracts will be deemed unenforceable pursuant to section 365(f)(1) of the Bankruptcy Code.

79.     Accordingly, the Debtor submits that the Cure Procedures for effectuating the assumption and assignment of the Assigned Contracts as set forth herein are appropriate and should be approved.

**G.      The Successful Bidder(s) should be Afforded All Protections Under Section 363(m) as A Good Faith Purchaser**

80.     Section 363(m) of the Bankruptcy Code protects a good-faith purchaser's interest in property purchased from the debtor's estate notwithstanding that the sale conducted under section 363(b) is later reversed or modified on appeal.  Specifically, section 363(m) states that:

> The reversal or modification on appeal of an authorization under [section 363(b)] . . . does not affect the validity of a sale . . . to an entity that purchased . . . such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale were stayed pending appeal.

34

11 U.S.C. § 363(m).  Section 363(m) "fosters the 'policy of not only affording finality to the judgment of the bankruptcy court, but particularly to give finality to those orders and judgments upon which third parties rely.'"  <u>In re Chateaugay Corp.</u>, 1993 U.S. Dist. Lexis 6130, *9 (S.D.N.Y. 1993) (quoting <u>In re Abbotts Dairies of Penn., Inc.</u>, 788 F.2d 143, 147 (3d Cir. 1986)); <u>see also</u> <u>Allstate Ins. Co. v. Hughes</u>, 174 BR. 884, 888 (S.D.N.Y. 1994) ("Section 363(m) . . . provides that good faith transfers of property will not be affected by the reversal or modification on appeal of an unstayed order, whether or not the transferee knew of the pendency of the appeal"); <u>In re Stein & Day, Inc.</u>, 113 B.R. 157, 162 (Bankr. S.D.N.Y. 1990) ("pursuant to 11 U.S.C. § 363(m), good faith purchasers are protected from the reversal of a sale on appeal unless there is a stay pending appeal").

81.     The selection of the Successful Bidder(s) will be the product of arm's-length, good faith negotiations in an anticipated competitive purchasing process.  The Debtor intends to request at the Sale Hearing a finding that the Successful Bidder(s) is a good faith purchaser entitled to the protections of section 363(m) of the Bankruptcy Code.

**H.    Relief from the Fourteen Day Waiting Period Under Bankruptcy Rules 6004(h) and 6006(d) is Appropriate.**

82.     Bankruptcy Rule 6004(h) provides that an "order authorizing the use, sale, or lease of property . . . is stayed until the expiration of 14 days after entry of the order, unless the court orders otherwise."  Similarly, Bankruptcy Rule 6006(d) provides that an "order authorizing the trustee to assign an executory contract or unexpired lease . . . is stayed until the expiration of 14 days after the entry of the order, unless the court orders otherwise."  The Debtor requests that the Order be effective immediately by providing that the ten (14) day stays under Bankruptcy Rules 6004(h) and 6006(d) are waived.

35

83.    The purpose of Bankruptcy Rules 6004(h) and 6006(d) is to provide sufficient time for an objecting party to appeal before an order can be implemented.    See Advisory Committee Notes to Fed. R. Bankr. P. 6004(h) and 6006(d).    Although Bankruptcy Rules 6004(h) and 6006(d) and the Advisory Committee Notes are silent as to when a court should "order otherwise" and eliminate or reduce the fourteen (14) day stay period, Collier suggests that the fourteen (14) day stay period should be eliminated to allow a sale or other transaction to close immediately "where there has been no objection to the procedure." Collier on Bankruptcy P 6004.11 (Alan N. Resnick & Henry J. Sommer eds., 16th ed.).    Furthermore, Collier provides that if an objection is filed and overruled, and the objecting party informs the court of its intent to appeal, the stay may be reduced to the amount of time actually necessary to file such appeal. Id.

84.    The Debtor hereby requests that the Court waive the fourteen-day stay period under Bankruptcy Rules 6004(h) and 6006(d) or, in the alternative, if an objection to the Sale(s) is filed, reduce the stay period to the minimum amount of time needed by the objecting party to file its appeal.

## Notice

85.    Notice of this Motion has been given to the following parties or, in lieu thereof, to their counsel, if known: (a) the Office of the United States Trustee, (b) the parties listed on the Debtor's list of twenty largest unsecured creditors, (c) counsel to the Stalking Horse Purchaser, and (d) the DIP Lenders.

*[remainder of this page intentionally left blank]*

36

WHEREFORE, the Debtor respectfully requests that the Court enter orders substantially in the form attached hereto as Exhibit C and Exhibit F: (a) granting the relief requested herein and (b) granting to the Debtor such other and further relief as the Court may deem proper.

Dated:  October 7, 2013                    Respectfully submitted,
         Wilmington, Delaware

                                            **COLE, SCHOTZ, MEISEL,**
                                            **FORMAN & LEONARD, P.A.**

                                            By: _____
                                            Norman L. Pernick (No. 2290)
                                            Marion M. Quirk (No. 4136)
                                            Patrick J. Reilley (No. 4451)
                                            500 Delaware Avenue, Suite 1410
                                            Wilmington, DE  19801
                                            Tel: (302) 652-3131
                                            Fax: (302) 652-3117

                                            Proposed Counsel for the Debtor
                                            and Debtor-in-Possession