**<u>EXHIBIT B</u>**

**and**

**<u>EXHIBIT C</u>**

**<u>Schedule 1(a) to Exhibit 1</u>**

ASSET PURCHASE AGREEMENT

dated as of

October 10, 2013

by and among

NIRVANIX, INC.

as the Seller,

ACME ACQUISITION LLC

as the Purchaser,

and (solely for purposes of Section 7.9)

the Guarantors named herein

TABLE OF CONTENTS

Page

ARTICLE I    DEFINED TERMS; RULES OF CONSTRUCTION .......................................1
    1.1    Defined Terms ....................................................................................1
    1.2    Rules of Construction ......................................................................11

ARTICLE II    PURCHASE AND SALE OF ASSETS; CLOSING;
               CONSIDERATION ..............................................................................12
    2.1    Purchase and Sale of Assets............................................................12
    2.2    Excluded Assets ...............................................................................13
    2.3    Assumed Liabilities .........................................................................14
    2.4    Retained Liabilities .........................................................................14
    2.5    Purchase Price; Deposit; Closing.....................................................14
    2.6    Transaction Documents ...................................................................15
    2.7    Closing.............................................................................................15
    2.8    Delivery...........................................................................................16
    2.9    Cure Amounts ..................................................................................16
    2.10   Further Conveyances and Assumptions............................................16
    2.11   Bulk Sales Law ...............................................................................17
    2.12   Withholding .....................................................................................17

ARTICLE III    REPRESENTATIONS AND WARRANTIES OF THE SELLER ................17
    3.1    Organization, Power, Authority, and Good Standing .......................17
    3.2    Authority, Execution, Enforceability and No Conflicts....................18
    3.3    Consents...........................................................................................18
    3.4    Subsidiaries .....................................................................................19
    3.5    Seller Capital Structure ...................................................................19
    3.6    Seller Financial Statements..............................................................20
    3.7    Liabilities ........................................................................................20
    3.8    Absence of Certain Changes ............................................................21
    3.9    Restrictions on Business Activities..................................................22
    3.10   Assets and Absence of Encumbrances..............................................22
    3.11   Intellectual Property........................................................................22
    3.12   Product Warranties...........................................................................26

i

TABLE OF CONTENTS
(continued)

| | | Page |
|---|---|---|
| 3.13 | Seller Contracts | 27 |
| 3.14 | Change in Control Agreements | 29 |
| 3.15 | Compliance with Laws | 29 |
| 3.16 | Litigation | 30 |
| 3.17 | Brokers' and Finders' Fees | 30 |
| 3.18 | Employee Benefit Plans | 30 |
| 3.19 | Employment Matters | 31 |
| 3.20 | Tax Matters | 31 |
| 3.21 | Governmental Authorization | 32 |
| 3.22 | Corrupt Practices | 32 |
| 3.23 | Security | 33 |
| 3.24 | Representations Complete | 33 |
| ARTICLE IV | REPRESENTATIONS AND WARRANTIES OF THE PURCHASER | 33 |
| 4.1 | Organization; Good Standing | 33 |
| 4.2 | Authorization, Execution, Enforceability and No Conflicts | 33 |
| 4.3 | Purchaser's Financial Condition | 34 |
| ARTICLE V | COVENANTS AND AGREEMENTS | 34 |
| 5.1 | Access to Records and Properties of the Seller | 34 |
| 5.2 | Conduct Pending Closing | 35 |
| 5.3 | Efforts to Consummate | 36 |
| 5.4 | Notice of Prospective Breach | 36 |
| 5.5 | Patent Filings and Payments | 36 |
| 5.6 | Cooperation and Further Assurances | 36 |
| 5.7 | Public Announcements | 37 |
| 5.8 | Seller Non-Compete | 37 |
| 5.9 | Tax Matters | 38 |
| 5.10 | Post-Closing Conduct of the Seller's Business | 39 |
| 5.11 | Use of Name/Trademarks | 39 |
| 5.12 | Transaction Expenses | 39 |
| 5.13 | Seller License | 40 |

US_ACTIVE:\44326725\16\66385.0034

TABLE OF CONTENTS
(continued)

Page

5.14    Removal of Third Party Software ................................................................41

ARTICLE VI    CONDITIONS TO THE CLOSING................................................42
6.1    Conditions to the Obligations of the Purchaser .............................42
6.2    Conditions to Obligations of the Seller........................................44

ARTICLE VII    INDEMNIFICATION; INDEMNITY ESCROW ARRANGEMENT ..........44
7.1    Survival of Representations, Warranties, Agreements and Covenants, Etc ...................................................................................44
7.2    Indemnification ...............................................................................45
7.3    Limitations .......................................................................................46
7.4    Procedures........................................................................................47
7.5    Purchase Price Adjustment .............................................................48
7.6    No Subrogation ................................................................................49
7.7    No Prejudice.....................................................................................49
7.8    Recoupment against Escrow Fund; No Bar .....................................49
7.9    Guarantees........................................................................................49

ARTICLE VIII    TERMINATION .............................................................................50
8.1    Termination.......................................................................................50
8.2    Procedure Upon Termination; Effect of Termination......................51

ARTICLE IX    BANKRUPTCY COURT MATTERS .............................................52
9.1    Approval of Break-Up Fee and Expense Reimbursement................52
9.2    Bidding Procedures...........................................................................53
9.3    Non-Solicitation Period ...................................................................54
9.4    The Sale Order ..................................................................................55
9.5    Bankruptcy Court Approval..............................................................56

ARTICLE X    MISCELLANEOUS ..........................................................................57
10.1    Fees and Expenses ...........................................................................57
10.2    Remedies...........................................................................................57
10.3    Successors and Assigns.....................................................................57
10.4    Entire Agreement ..............................................................................58
10.5    Notices ..............................................................................................58

iii

TABLE OF CONTENTS
(continued)

| | | Page |
|---|---|---|
| 10.6 | Amendments, Modifications and Waivers | 60 |
| 10.7 | Governing Law; Disputes; Consent to Jurisdiction; Waiver of Jury Trial | 60 |
| 10.8 | No Third Party Reliance | 61 |
| 10.9 | Severability | 61 |
| 10.10 | Independence of Agreements, Covenants, Representations and Warranties | 62 |
| 10.11 | Counterparts; Facsimile Signatures | 62 |
| 10.12 | Non-Recourse | 62 |

Exhibit A – Form of Deposit Escrow Agreement
Exhibit B – Form of Bill of Sale, Assignment and Assumption Agreement
Exhibit C – Form of Assignment of Trademarks
Exhibit D – Form of Assignment of Patents
Exhibit E – Form of Unregistered Intellectual Property Assignment
Schedule 2.1(d) – Acquired Contracts
Schedule I – Disclosure Schedule

US_ACTIVE:\44326725\16\66385.0034

## ASSET PURCHASE AGREEMENT

This Asset Purchase Agreement is entered into this 10th day of October, 2013 (the "Agreement Date"), by and between Nirvanix, Inc., a Delaware corporation (the "Seller"), and Acme Acquisition LLC, a Delaware limited liability company (the "Purchaser"). Each of TriplePoint Capital LLC, a Delaware limited liability company ("TriplePoint") and Khosla Ventures IV, LP, a Delaware limited partnership (each, a "Guarantor"), is a party hereto solely for purposes of Section 7.9.

### RECITALS

WHEREAS, the Seller is a debtor-in-possession under title 11 of the United States Code, 11 U.S.C. § 101 et seq. (the "Bankruptcy Code"), and filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code on October 1, 2013 in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court") (Case No. 13-12595) (the "Bankruptcy Case"); and

WHEREAS, the Seller desires to sell to the Purchaser, and the Purchaser desires to purchase from the Seller, certain Assets of the Seller.

NOW, THEREFORE, in consideration of the foregoing and the covenants, agreements, representations and warranties contained in this Agreement, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged by the parties, the parties hereto, intending to be legally bound, hereby agree as follows:

### ARTICLE I

### DEFINED TERMS; RULES OF CONSTRUCTION

1.1    Defined Terms.  The following terms used in this Agreement shall have the following meanings:

"Acquired Assets" has the meaning set forth in Section 2.1.

"Acquired Contracts" means the Contracts set forth on Schedule 2.1(d).  The Purchaser shall have the right, by written notice delivered to the Seller at any time during the period from and after the date hereof and until the Closing Date to delete any Contract from Schedule 2.1(e) 2.1(d) (it being understood that any such Contract deleted by the Purchaser from such schedule may subsequently be rejected by the Seller in the Bankruptcy Case).  The Purchaser shall also have the right by written notice delivered to the Seller at any time during the period from and after the date hereof and until the Closing Date to add any Contract to Schedule 2.1(d); provided that such Contract has not been previously rejected in the Bankruptcy Case. Schedule 2.1(d) also sets forth the estimated amounts (as of the date hereof) which the Seller expects will be payable pursuant to Section 365(b) of the Bankruptcy Code on account of the assumption and assignment of any Acquired Contract.

"Affiliate" of a Person means any affiliate, as defined in Rule 12b-2 under the Exchange Act.

"Agreed Claims" has the meaning set forth in Section 7.4(e).

"Agreement" means this Asset Purchase Agreement together with all Schedules and Exhibits hereto, as the same may from time to time be amended, modified, supplemented or restated in accordance with the terms hereof.

"Agreement Date" has the meaning set forth in the preamble of this Agreement.

"Alternative Transaction" has the meaning set forth in Section 9.2.

"Applicable Article III Provision" has the meaning set forth in Article III.

"Assets" means, with respect to any Person, all businesses, properties, assets, machinery, equipment, furniture, fixtures, licenses, permits, franchises, goodwill and rights of such Person, of every nature, kind and description, tangible and intangible, owned or leased, wheresoever located (whether in the United States or otherwise) and whether or not carried or reflected on the books or records of such Person, used, held for use, or useful in connection with the operation of the businesses of such Person.

"Assumed Liabilities" has the meaning set forth in Section 2.3.

"Auction" has the meaning set forth in Section 9.2(b).

"Balance Sheet Date" has the meaning set forth in Section 3.6.

"Bankruptcy Case" has the meaning set forth in the Recitals of this Agreement.

"Bankruptcy Code" has the meaning set forth in the Recitals of this Agreement.

"Bankruptcy Court" has the meaning set forth in the Recitals of this Agreement.

"Bid Deadline" has the meaning set forth in Section 9.2(a).

"Bidding Procedures Motion" means the motion to be filed with the Bankruptcy Court seeking approval of the Break-Up Fee and the Expense Reimbursement and the establishment of bidding procedures as contemplated pursuant to Article IX.

"Bidding Procedures Order" means the order, in form and substance reasonably acceptable to the Purchaser, entered by the Bankruptcy Court with respect to the Bidding Procedures Motion and more fully described in Section 9.2.

"Break-Up Fee" means the fee to be paid by the Seller to the Purchaser in accordance with the provisions of Section 9.1.

"Business" means the business of the Seller as currently conducted.

"Business Day" means any day that is not a Saturday, Sunday, legal holiday or other day on which banks are required to be closed in the State of California.

"Cash Purchase Price" has the meaning set forth in Section 2.5(a)(ii).

"Change in Control Agreement" has the meaning set forth in Section 3.14.

"Claim" means any claim, demand, Order or Proceeding.

"Claim Certificate" has the meaning set forth in Section 7.4(a).

"Closing" has the meaning set forth in Section 2.7.

"Closing Date" has the meaning set forth in Section 2.7.

"Code" means the Internal Revenue Code of 1986, as amended (including corresponding provisions of subsequent or successor revenue laws).

"Confidentiality Agreement" has the meaning set forth in Section 5.1(c).

"Continuation Period" has the meaning set forth in Section 5.10(a).

"Contract" means any and all written or oral contracts or other agreements or understandings (including all schedules, annexes and exhibits thereto, and all amendments, waivers, change orders and statements of work or the like related thereto), of any nature, including evidences of indebtedness, loans, letters of credit, guarantees, leases, notes, indentures, security or pledge agreements, franchise agreements, master service contracts, purchase orders, work orders, statements of work, nondisclosure agreements, alliance/partner agreements, licenses, easements, permits, instruments, commitments, arrangements, understandings, powers of attorney, covenants not to compete, covenants not to sue, change of control agreements, employment agreements or settlement agreements to which the Seller is a party or by which any of the Seller's Assets are bound.

"Control" (including, with correlative meaning, the terms "controlling," "controlled by" and "under common control with") means the possession, directly or indirectly, of the power to direct the affairs of an entity by reason of ownership of equity securities, by contract or otherwise.

"Cure Amounts" has the meaning set forth in Section 2.9.

"Deposit Escrow Agreement" means the Escrow Agreement of even date herewith by and among the Seller, the Purchaser and the Escrow Agent in substantially the form of Exhibit A.

"Deposit Escrow Fund" means the Purchase Price Deposit together with any and all interest or income actually earned thereon pursuant to the Deposit Escrow Agreement.

"Deposits" has the meaning set forth in Section 2.1(c).

"Disclosable Contract" has the meaning set forth in Section 3.13(b).

"Disclosure Schedule" has the meaning set forth in Article III.

3

"Employee" means any current or former employee, officer, manager, independent contractor or director of the Seller.

"Employment Agreement" means each management, employment, severance, compensation, retention, change-in-control, consulting, relocation, repatriation, expatriation, assignment letter, visa, work permit or similar Contract between the Seller, any of its Affiliates and any Employee, consultant, contractor or advisor.

"Encumbrance" means and includes any security interest, mortgage, lien, pledge, claim (including any and all "claims" as defined in section 101(5) of the Bankruptcy Code), charge, escrow, encumbrance, cloud, option, security agreement or other similar agreement, arrangement, Contract, understanding or obligation, whether written or oral and whether or not relating in any way to credit or the borrowing of money.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended, or any similar federal law then in force, and the rules and regulations promulgated thereunder, all as the same may from time to time be in effect.

"ERISA Affiliate" means any Person that, together with the Seller, would be treated as a single employer under Section 414 of the Code or Section 4001 of ERISA.

"Escrow Agent" means Wells Fargo Bank, National Association.

"Exchange Act" means the Securities Exchange Act of 1934, as amended.

"Excluded Assets" has the meaning set forth in Section 2.2.

"Excluded Contract" has the meaning set forth in Section 2.2(d).

"Existing Business Wind-Down" means the wind-down and discontinuation of the Business, including the continued operation of the Business to the extent necessary, over such period, not to exceed six (6) months from the Closing Date, as the Seller may deem reasonable.

"Existing Customers" has the meaning set forth in Section 5.13(d).

"Expense Reimbursement" means the fee to be paid by the Seller to the Purchaser in accordance with the provisions of Section 9.1(a).

"Final Order" means any order or judgment which has not been reversed, vacated, or stayed, and as to which (a) the time to appeal, petition for certiorari, or move for a new trial, reargument, or rehearing has expired, and as to which no appeal, petition for certiorari, or other proceedings for a new trial, reargument, or rehearing shall then be pending, or (b) if an appeal, writ of certiorari, new trial, reargument, or rehearing thereof has been sought, such order or judgment shall have been affirmed by the highest court to which such order was appealed, or certiorari shall have been denied, or a new trial, reargument, or rehearing shall have been denied or resulted in no modification of such order, and the time to take any further appeal, petition for certiorari or move for a new trial, reargument, or rehearing shall have expired; provided that the

4

possibility that a motion under Rule 59 or Rule 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Bankruptcy Rules, may be filed relating to such order shall not cause such order to not be a Final Order.

"Fundamental Representations" has the meaning set forth in Section 7.1(a).

"GAAP" has the meaning set forth in Section 3.6.

"Government Contract" means any Contract between, on the one hand, the Seller, and, on the other hand: (a) the United States government or any other Governmental Entity, (b) any prime contractor to the United States government or any other Governmental Entity or (c) any subcontractor with respect to any Contract described in clauses (a) or (b).

"Governmental Entity" means any (a) federal, state, local, foreign or other Governmental Entity, including any nation, state, commonwealth, province, territory, county, municipality, district or other juridical or political body; (ii) public primary, secondary or higher educational institution; or (iii) other governmental, self-regulatory or quasi-Governmental Entity of any nature (including any governmental division, department, agency, commission, instrumentality, official, organization, unit, body or entity and any court or other tribunal).

"Guarantor" has the meaning set forth in the preamble of this Agreement.

"Indebtedness" of any Person means, without duplication, (a) all obligations of such Person for borrowed money or with respect to deposits or advances of any kind, (b) all obligations of such Person evidenced by (or which customarily would be evidenced by) bonds, debentures, notes or similar instruments, (c) all reimbursement obligations of such Person with respect to letters of credit and similar instruments, (d) all obligations of such Person under conditional sale or other title retention agreements relating to Assets purchased by such Person, (e) all obligations of such Person incurred, issued or assumed as the deferred purchase price of property other than accounts payable incurred and paid on terms customary in the business of such Person (it being understood that the "deferred purchase price" in connection with any purchase of Assets shall include only that portion of the purchase price which shall be deferred beyond the date on which the purchase is actually consummated), (f) all obligations secured by (or for which the holder of such Indebtedness has an existing right, contingent or otherwise, to be secured by) any lien on property owned or acquired by such Person, whether or not the obligations secured thereby have been assumed, (g) all obligations of such Person under forward sales, futures, options, swaps, collars, caps and other similar hedging arrangements (including interest rate hedging or protection agreements), (h) all obligations of such Person to purchase or otherwise pay for merchandise, materials, supplies, services or other property under an arrangement which provides that payment for such merchandise, materials, supplies, services or other property shall be made regardless of whether delivery of such merchandise, materials, supplies, services or other property is ever made or tendered, (i) all guaranties by such Person of obligations of others, (j) all amounts due and payable as royalties to any third party and (j) all capitalized lease obligations of such Person.

"Indemnified Parties" has the meaning set forth in Section 7.2.

"Indemnity Escrow Agreement" means the Indemnity Escrow Agreement, to be entered into by and among the Seller, the Purchaser and the Escrow Agent.

"Indemnity Escrow Amount" has the meaning set forth in Section 2.5(c).

"Indemnity Escrow Fund" has the meaning set forth in Section 2.5(c).

"Intellectual Property" any or all of the following and all rights in, arising out of, or associated therewith: (a) all United States, international and foreign patents and applications therefor and all reissues, divisions, divisionals, renewals, extensions, provisionals, continuations and continuations-in-part thereof, and all patents, applications, documents and filings claiming priority to or serving as a basis for priority thereof; (b) all inventions (whether or not patentable), invention disclosures, improvements, trade secrets, proprietary information, know how, Software, technology, business methods, technical data and customer lists, tangible or intangible proprietary information, and all documentation relating to any of the foregoing; (c) all copyrights, copyrights registrations and applications therefor, and all other rights corresponding thereto throughout the world; (d) all industrial designs and any registrations and applications therefor throughout the world; (e) all trade names, logos, common law trademarks and service marks, trademark and service mark registrations and applications therefor throughout the world; (f) all databases and data collections and all rights therein throughout the world; (g) all moral and economic rights of authors and inventors, however denominated, throughout the world; (h) all Web addresses, sites and domain names and numbers; and (i) any similar or equivalent rights to any of the foregoing anywhere in the world.

"Laws" means, as to any Person, all federal, state, local or foreign laws, statutes, rules, regulations, ordinances, Permits, Orders, certificates, requirements, regulations, administrative interpretations and restrictions of any Governmental Entity, in each case, applicable to such Person or any of its Assets.

"Liability" means any and all direct or indirect debts, liabilities, payables, commitments, obligations, losses, damages, costs or expenses, whether absolute or contingent, liquidated or unliquidated, secured or unsecured, known or suspected or unknown, matured or unmatured, determined or undeterminable, and whether or not accrued or reflected on a balance sheet, including those arising under any Law or Claim and those arising under any Contract.

"Losses" has the meaning set forth in Section 7.2.

"Material Adverse Effect" means a material adverse effect on (a) the Acquired Assets or (b) the ability of the Seller to perform its obligations pursuant to this Agreement and to consummate the Transactions in a timely manner.

"Non-Assignable Acquired Contract" means any Acquired Contract that is not capable of being transferred by the Seller to the Purchaser pursuant to this Agreement without the consent, approval or waiver of a third party, and such consent, approval or waiver has not been obtained prior to the Closing or if such transfer or attempted transfer would constitute a breach of such Acquired Contract or a violation of any Law.

"Non-Assignable Assets" has the meaning set forth in Section 2.10(b).

6

"Non-Solicitation Period" has the meaning set forth in Section 9.3(a).

"Orders" means any judgments, writs, decisions, decrees, injunctions, orders, compliance agreements or settlement agreements of or with any Governmental Entities or arbitrator.

"Organizational Documents" means, with respect to any Person (other than an individual), (a) the certificate or articles of association or incorporation or organization or limited partnership or limited liability company, and any joint venture, limited liability company, operating or partnership agreement and other similar documents adopted or filed in connection with the creation, formation or organization of such Person and (b) all by-laws, regulations, voting agreements, statutory books and registers, resolutions and similar documents, instruments or Contracts relating to the organization or governance of such Person, in each case, as amended or supplemented.

"Permits" means all permits, licenses, authorizations, registrations, franchises, approvals, consents, certificates, variances and similar rights obtained, or required to be obtained, from any Governmental Entity.

"Person" means any individual, corporation, limited liability company, partnership, trust, unincorporated organization, joint venture, association, joint-stock company, Governmental Entity or other entity.

"Post-Closing Tax Period" means any Tax period and the portion of any Straddle Period that begins on any day after the Closing Date.

"Pre-Closing Tax Period" means any Tax period ending on or before the Closing Date, and for any Tax period that includes (but does not end on) the Closing Date (a "Straddle Period"), the portion of the Straddle Period that ends on the Closing Date.

"Pre-Closing Taxable Events" means any transaction or event occurring on or before the Closing Date, the occurrence of which results in the imposition of a Tax on the Seller, including the consummation of the Transactions.

"Pre-Closing Taxes" means all Liabilities for Taxes of the Seller for Pre-Closing Tax Periods and Pre-Closing Taxable Events, regardless of whether the Taxes for such events are incurred prior to or after the Closing Date, determined without regard to any carryback of a loss or credit arising after the Closing Date.

"Proceeding" means any action, suit, proceeding, complaint, charge, hearing, inquiry or investigation before or by a Governmental Entity.

"Purchase Price" has the meaning set forth in Section 2.5(a).

"Purchase Price Deposit" has the meaning set forth in Section 2.5(b).

"Purchaser" has the meaning set forth in the preamble of this Agreement.

7

"Qualified Bid" has the meaning set forth in Section 9.2(a).

"Qualified Bidders" has the meaning set forth in Section 9.2(c).

"Registered Intellectual Property" means all United States, international and foreign: (a) patents and patent applications (including provisional applications and design patents and applications) and all reissues, divisions, divisionals, renewals, extensions, counterparts, continuations and continuations-in-part thereof, and all patents, applications, documents and filings claiming priority thereto or serving as a basis for priority thereof; (b) registered trademarks, service marks, applications to register trademarks, applications to register service marks, intent-to-use applications, or other registrations or applications related to trademarks; (c) registered copyrights and applications for copyright registration; (d) domain name registrations and Internet number assignments; and (e) any other Intellectual Property that is the subject of an application, certificate, filing, registration or other document issued, filed with, or recorded by any Governmental Entity.

"Representatives" has the meaning set forth in Section 9.3(a).

"Restructuring Transaction" means (a) a recapitalization transaction involving, in whole or in part, the Seller and its existing security holders or creditors, (b) any merger, consolidation, share exchange, business combination or other similar transaction with the Seller, (c) any tender offer or exchange offer for 10% or more of the outstanding shares of the Seller's common stock or any class of Seller's debt securities or the filing of a registration statement under the Securities Act in connection therewith, (d) the acquisition of beneficial ownership or a right to acquire beneficial ownership of, or the formation of any "group" (as defined under Section 13(d)(3) of the Exchange Act) which beneficially owns or has the right to acquire beneficial ownership of 10% or more of the then outstanding shares of any class of the Seller's common stock or any class of the Seller's debt securities or (e) the sale of a material portion of the Assets of the Seller.

"Retained Liabilities" has the meaning set forth in Section 2.4.

"Sale Motion" means the motion to be filed with the Bankruptcy Court by the Seller seeking (a) approval of the terms and provisions of this Agreement, (b) authorization for (i) the sale of the Acquired Assets pursuant to Section 363 of the Bankruptcy Code and (ii) the assumption and assignment of the Acquired Assets that are executory contracts pursuant to Section 365 of the Bankruptcy Code and (c) any other provisions acceptable to the Purchaser.

"Sale Order" means the order of the Bankruptcy Court, in form and substance reasonably acceptable to the Purchaser, granting the relief requested in the Sale Motion and authorizing the sale of the Acquired Assets pursuant to Section 363 of the Bankruptcy Code and the assumption and assignment of the Acquired Assets that are executory contracts pursuant to Section 365 of the Bankruptcy Code, free and clear of all Encumbrances and as more fully described in Section 9.4.

"Securities" means, with respect to any Person, such Person's "securities" as defined in Section 2(1) of the Securities Act and shall include such Person's capital stock, membership interests, partnership interests or other equity interests or any options, warrants or

8

other securities or rights that are directly or indirectly convertible into, or exercisable or exchangeable for, such Person's capital stock, membership interests, partnership interests or other equity interests.

"Securities Act" means the Securities Act of 1933, as amended, and the rules and regulations promulgated thereunder, as the same may be amended from time to time.

"Seller" has the meaning set forth in the preamble of this Agreement.

"Seller Authorizations" has the meaning set forth in Section 3.21.

"Seller Balance Sheet" has the meaning set forth in Section 3.6.

"Seller Common Stock" means the common stock, $0.0001 par value per share, of the Seller.

"Seller Employee Plan" means any scheme, plan, program, policy, practice, Contract or other arrangement (whether written or oral) providing for deferred compensation, profit sharing, bonus, severance, termination pay, time in lieu of pay, performance awards, stock or stock-related awards, fringe benefits, group or individual health, dental, medical, retiree medical, life insurance, short or long term disability insurance, accidental death and dismemberment insurance, survivor benefits, welfare, pension or other employee benefits or remuneration of any kind, whether formal or informal, funded or unfunded, including each "employee benefit plan" within the meaning of Section 3(3) of ERISA, which is or has been maintained, contributed to, or required to be contributed to, by the Seller or any of its ERISA Affiliates for the benefit of any Employee, or pursuant to which the Seller has or may have any material liability, contingent or otherwise.

"Seller Financial Statements" has the meaning set forth in Section 3.6.

"Seller Intellectual Property" means any Intellectual Property that has been used, is used, or is held for use in the Business.

"Seller License" has the meaning set forth in Section 5.13.

"Seller Option Plan" has the meaning set forth in Section 3.5(b).

"Seller Patents" has the meaning set forth in Section 3.11(a).

"Seller Preferred Stock" means the preferred stock, $0.0001 par value per share, of the Seller.

"Seller Products" has the meaning set forth in Section 3.12.

"Seller Registered Intellectual Property" means all of the Registered Intellectual Property (a) owned by, under obligation of assignment to, or filed in the name of, the Seller or (b) owned by, under obligation of assignment to, or filed in the name of any stockholder of the

9

Seller or any Affiliate of any such stockholder (other than the Seller) and included in the Seller Intellectual Property.

"Seller Securities" means all outstanding shares of Seller Common Stock and Seller Preferred Stock, and any other outstanding voting securities or other equity or ownership interests of the Seller.

"Seller's Knowledge" (including any derivation thereof such as "known" or "knowing") means the actual knowledge, after due inquiry, of any of the executive officers and directors of the Seller, or any facts or circumstances that would be known after due inquiry by a Person holding a comparable office or job with comparable experience and responsibility of any of the foregoing persons.

"Seller Warrant" has the meaning set forth in Section 3.5(b).

"Software" means any computer program, operating system, applications system, firmware or software of any nature, whether operational, under development or inactive including all object code, source code, comment code, algorithms, menu structures or arrangements, icons, operational instructions, scripts, commands, syntax, screen designs, reports, designs, concepts, technical manuals, test scripts, test programs, testing environments, user manuals and other documentation therefor, whether in machine-readable form, programming language or any other language or symbols, and whether stored, encoded, recorded or written on disk, tape, film, memory device, paper or other media of any nature and all data bases necessary or appropriate to operate any such computer program, operating system, applications system, firmware or software.

"Starting Auction Bid" has the meaning set forth in Section 9.2(d).

"Subsidiary" means, with respect to any Person, any and all corporations, partnerships, limited liability companies, joint ventures, associations and other entities or organizations Controlled directly or indirectly by such Person.

"Tax" means any Taxes and the term "Taxes" means, with respect to any Person, all income taxes (including any tax on or based upon net income, or gross income, or income as specially defined, or earnings, or profits, or selected items of income, earnings or profits) and all gross receipts, sales, use, ad valorem, value added, transfer, franchise, license, withholding, payroll, employment, excise, severance, stamp, occupation, premium, property or windfall profits taxes, alternative or add-on minimum taxes, customs duties or other taxes, fees, assessments or charges of any kind whatsoever, together with any inflation indexation, interest and any penalties, additions to tax or additional amounts imposed by any taxing authority (domestic or foreign) on such Person.

"Tax Returns" means any return, declaration, report, claim for refund or information return or statement relating to Taxes, including any schedule or attachment thereto and any amendment thereof.

"Termination Date" has the meaning set forth in Section 8.1(b).

US_ACTIVE:\44326725\16\66385.0034

"Third-Party Acquisition" has the meaning set forth in Section 9.3(a).

"Third-Party Claim" has the meaning set forth in Section 7.4(c).

"Third Party Software" means any software (including object code, binary code, source code, libraries, routines, subroutines or other code, and including commercial, open-source and freeware software) and any documentation or other material related to such software, and any derivative of any of the foregoing, that is (a) not solely owned by the Seller and (b) incorporated in, distributed with, or required, necessary or depended upon for the development, use or commercialization of, any Seller Product. Third Party Software includes any and all of the following, to the extent not solely owned by the Seller: (i) software that is provided to the Seller's end-users in any manner, whether for free or for a fee, whether distributed or hosted, and whether embedded or incorporated in or bundled with any Seller Product or on a standalone basis, (ii) software that is used for development, maintenance and/or support of any Seller Product, including development tools such as compilers, converters, debuggers or parsers, tracking and database tools such as project management software, source code control and bug tracking software, and software used for internal testing purposes, (iii) software that is used to generate code or other software that is described in clauses (i) or (ii), and (iv) software that is used for the Seller's internal business purposes, including accounting software, human resources software, customer relationship management software and similar software.

"Transaction" and "Transactions" mean the transactions contemplated by the Transaction Documents.

"Transaction Documents" has the meaning set forth in Section 2.6.

"Transaction Event" means, with respect to any Acquired Contract, any assignment or other transfer of such Acquired Contract after the Closing within, to or among the Purchaser or any of its Affiliates.

"Transaction Expenses" has the meaning set forth in Section 10.1.

"Transfer Taxes" has the meaning set forth in Section 5.9(a).

"Transferee" has the meaning set forth in Section 5.13(d).

"TriplePoint" has the meaning set forth in the preamble of this Agreement.

1.2    Rules of Construction. The use in this Agreement of the term "including" means "including, without limitation." The words "herein," "hereof," "hereunder" and other words of similar import refer to this Agreement as a whole, including the Schedules and Exhibits, as the same may from time to time be amended, modified, supplemented or restated, and not to any particular section, subsection, paragraph, subparagraph or clause contained in this Agreement. All references to Articles, Sections, Schedules and Exhibits mean the Articles and Sections of this Agreement and the Schedules and Exhibits attached to this Agreement, except where otherwise stated. The title of and the section and paragraph headings in this Agreement are for convenience of reference only and shall not govern or affect the interpretation of any of the terms or provisions of this Agreement. The use herein of the masculine, feminine or neuter forms shall

11

also denote the other forms, as in each case the context may require or permit. The singular or plural includes the other, as the context requires or permits. Where specific language is used to clarify by example a general statement contained herein, such specific language shall not be deemed to modify, limit or restrict in any manner the construction of the general statement to which it relates. The language used in this Agreement has been chosen by the parties to express their mutual intent, and no rule of strict construction shall be applied against any party. Unless expressly provided otherwise, the measure of a period of one month or year for purposes of this Agreement shall be that date of the following month or year corresponding to the starting date, provided that if no corresponding date exists, the measure shall be that date of the following month or year corresponding to the next day following the starting date. For example, one month following February 18 is March 18, and one month following March 31 is May 1.

ARTICLE II

PURCHASE AND SALE OF ASSETS; CLOSING; CONSIDERATION

2.1    Purchase and Sale of Assets.  On the terms and subject to the conditions and other provisions set forth in this Agreement, at the Closing, the Seller shall sell, assign, transfer, convey and deliver to the Purchaser, and the Purchaser shall purchase, acquire and accept from the Seller, free and clear of all Encumbrances, the following Assets of the Seller (collectively, the "Acquired Assets"):

(a)    all Software owned, marketed, licensed, supported, maintained, used or under development by the Seller, including all Software embodied in or related to the Seller Products, and all Intellectual Property rights therein, excluding Third-Party Software licensed to the Seller pursuant to Excluded Contracts

(b)    all other Seller Intellectual Property, including all Seller Registered Intellectual Property;

(c)    all deposits, security deposits, advances, earnest payments, performance bonds, security payments or deposits, prepayments, prepaid expenses, credits or other similar Assets of any kind owned or controlled by the Seller and relating to the Assumed Liabilities, but only to the extent relating to the use or ownership of the Acquired Assets (including Liabilities arising under the Acquired Contracts) after the Closing (the "Deposits");

(d)    the Acquired Contracts;

(e)    all rights, remedies, defenses, Claims (including Claims for refunds or adjustments and Claims for breach of express or implied warranties), recoveries, rights to offset, and causes of action against customers, suppliers, insurers or any other Person, whether known or unknown, under the Acquired Contracts or of any nature relating to the Acquired Assets or Assumed Liabilities, including all rights to enforce any assignment of, license to, or confidentiality covenant with respect to, any Seller Intellectual Property regardless of whether such rights arise under an Acquired Contract or Excluded Contract; and

(f)    subject to Section 2.2(e), all customer support data, "bug" databases, and all operating records, data and other materials maintained by the Seller, including research and

12

development materials, service and warranty records, operating guides and manuals, creative materials, intellectual property materials, studies, cost and pricing information, supplier lists and records and business plans, and other similar materials, documents and other records, or copies thereof, (whether in written or other form) of any kind presently in or hereafter coming into the care, custody or control of the Seller (including any such records held by others on behalf of the Seller).

 2.2 <u>Excluded Assets</u>.  All Assets of the Seller other than the Acquired Assets are excluded from the purchase and sale of Assets pursuant to <u>Section 2.1</u>, including the following (the "<u>Excluded Assets</u>"):

 (a) any cash in any of the Seller's bank accounts;

 (b) any accounts receivable;

 (c) all of the Seller's Permits;

 (d) any Contract that is not an Acquired Contract, including any Contract under which the Seller holds rights to any Third Party Software (each an "<u>Excluded Contract</u>");

 (e) any books and records of account, financial records and other records, all customer lists and records, customer prospect lists and records, and referral sources, and all books and records relating to or comprising the Seller's corporate charter, qualifications to do business as a corporation, taxpayer and other identification numbers, minute books, seal, stock record books, transfer records and such other documents relating to the organization, maintenance and existence of the Seller as a legal entity;

 (f) any prepayment, refund, claim, offset or other right of the Seller related to any Tax arising from or in connection with the ownership of the Acquired Assets or operation of the Business during the Pre-Closing Tax Period;

 (g) any interest in real property however held and wherever located;

 (h) any (i) Seller Employee Plans and related agreements and any associated funding media, assets, reserves, credits and service or other agreements and all books, records, files and documents created, filed or maintained in connection with such Seller Employee Plans, and any assets, bonds, insurance policies, trust agreements and service contracts relating thereto, and (ii) employment, severance, individual compensation or similar agreements;

 (i) all tangible personal property;

 (j) all rights and recoveries involving insurance policies;

 (k) all claims and causes of action under chapter 5 of the Bankruptcy Code;

 (l) all rights of the Seller, including Intellectual Property rights, to the name "Nirvanix"; and

13

(m)    all rights of the Seller in, to and under the Transaction Documents.

2.3    <u>Assumed Liabilities</u>.  Subject to the terms and conditions of this Agreement, at the Closing, the Seller shall assign to the Purchaser, and the Purchaser shall assume and agree to perform and discharge only the following Liabilities of the Seller (the "<u>Assumed Liabilities</u>"): Liabilities arising out of the use or ownership of the Acquired Assets (including Liabilities arising under the Acquired Contracts) after the Closing, to the extent relating solely to facts and circumstances first arising after the Closing and not related to any breach, nonperformance, wrongdoing or misconduct by the Seller whether before or after the Closing, and provided that the incurrence or existence of such Liability does not constitute a breach or failure of, or a default under, any representation, warranty or covenant of the Seller under this Agreement or any other Transaction Document.

2.4    <u>Retained Liabilities</u>.  Except for the Assumed Liabilities, the Purchaser is not assuming (and nothing in this Agreement shall be construed as causing or requiring the Purchaser to assume), and will not be liable for any Liabilities of any kind or nature whatsoever of the Seller or related to or arising from the Acquired Assets, whether existing on or arising after the Closing Date or, regardless of when asserted, related to periods prior to the Closing Date, including Pre-Closing Taxes (all of such liabilities, the "<u>Retained Liabilities</u>"). The Seller shall remain fully and solely liable with respect to all of the Retained Liabilities.  For the avoidance of doubt, the Retained Liabilities shall include any and all Liabilities arising from employment or provision of services, or the termination of such employment or services, with the Seller or any of its Affiliates, including any Liabilities associated with any claims for wages, bonuses, vacation or other compensation, workers' compensation, obligations to provide continued health coverage or other similar payments or obligations, and including Liabilities for or in respect of Employees, Employment Agreements or Seller Employee Plans.

2.5    <u>Purchase Price; Deposit; Closing</u>.

(a)    Subject to the terms and conditions set forth herein, the aggregate consideration for the sale of the Acquired Assets to the Purchaser (the "<u>Purchase Price</u>") will consist of (i) the Purchaser's assumption of the Assumed Liabilities and (ii) $2,800,000 in cash (without interest) (the "<u>Cash Purchase Price</u>").

(b)    Upon the execution of this Agreement, the Purchaser shall immediately deposit with the Escrow Agent under the Deposit Escrow Agreement the sum of $280,000 by wire transfer of immediately available funds (the "<u>Purchase Price Deposit</u>").  Upon the terms and subject to the conditions of the Deposit Escrow Agreement, the Deposit Escrow Fund shall be distributed as follows: (i) if the Closing shall occur, the Deposit Escrow Fund shall be applied towards the Purchase Price payable by the Purchaser to the Seller pursuant to <u>Section 2.5(d)</u>; (ii) if this Agreement is terminated by the Seller pursuant to <u>Section 8.1(e)</u>, the Deposit Escrow Fund shall be delivered to the Seller; or (iii) if this Agreement is terminated other than pursuant to <u>Section 8.1(e)</u>, the Deposit Escrow Fund shall be delivered to the Purchaser.  Each party hereto covenants and agrees to deliver to the Escrow Agent a joint written instruction directing release of the Deposit Escrow Fund in accordance with the immediately preceding sentence upon the occurrence of the applicable event.

US_ACTIVE:\44326725\16\66385.0034

(c)     At the Closing, the Purchaser will pay on behalf of the Seller fifteen percent (15%) of the Cash Purchase Price (the "Indemnity Escrow Amount") by wire transfer of immediately available funds to the Escrow Agent to serve as a source of indemnification for the Indemnified Parties pursuant to Article VII and to be held and released under the terms of the Indemnity Escrow Agreement. The Indemnity Escrow Amount shall be held for a period of twelve (12) months (or such longer period as is required to satisfy any unresolved claims as provided in the Indemnity Escrow Agreement), and distributed pursuant to the terms and conditions set forth in the Indemnity Escrow Agreement. Except as otherwise set forth in the Indemnity Escrow Agreement, all fees and expenses of the Escrow Agent under the Escrow Agreement shall be the responsibility of the Purchaser. The portion of the Indemnity Escrow Amount held by the Escrow Agent from time to time pursuant to the terms of the Indemnity Escrow Agreement is sometimes referred to herein as the "Indemnity Escrow Fund."

(d)     At the Closing, the Purchaser will pay the Purchase Price (less the Deposit Escrow Fund and the Indemnity Escrow Amount) to the Seller, by wire transfer of immediately available funds to a bank account designated by the Seller in writing at least three (3) Business Days prior to the Closing Date.

2.6     Transaction Documents.  At the Closing, the Seller and the Purchaser and certain other parties identified therein shall execute and deliver to the other, as applicable, the following additional agreements (collectively with this Agreement, the "Transaction Documents"):

(a)     the Indemnity Escrow Agreement;

(b)     a Bill of Sale and Assignment and Assumption Agreement, substantially in the form attached hereto as Exhibit B;

(c)     an Assignment of Trademarks, substantially in the form attached hereto as Exhibit C;

(d)     an Assignment of Patents, substantially in the form attached hereto as Exhibit D;

(e)     an Assignment of Unregistered Intellectual Property, substantially in the form attached hereto as Exhibit E; and

(f)     such other documents, deeds, instruments and assignments identified in Article VI or as may otherwise be reasonably requested by the Purchaser.

2.7     Closing.  The closing of the purchase and sale of the Acquired Assets (the "Closing") will take place remotely via the exchange of documents and signatures as promptly as practicable, but no later than three (3) Business Days, following the satisfaction or waiver of the conditions set forth in Article VI (other than conditions that by their nature are to be satisfied at the Closing, but subject to the satisfaction or waiver of such conditions), unless another place or date is agreed to by the Purchaser and the Seller.  If under the immediately preceding sentence the Closing would fall between (a) November 15, 2013 and November 30, 2013 or (b) February 13, 2014 and February 28, 2014, then the Closing shall instead take place on the Business Day immediately following the last day of the applicable period, or at such other time as the

15

Purchaser and the Seller may agree. The date upon which the Closing occurs is herein referred to as the "Closing Date."

2.8    Delivery. At the Closing, subject to the terms and conditions hereof, the Seller will convey the Acquired Assets to the Purchaser by delivery of the executed Transaction Documents, against payment by the Purchaser (including by release of the Deposit Escrow Fund) of the Cash Purchase Price. The Seller will convey the Acquired Assets by (a) delivery of the tangible Acquired Assets in the manner designated by the Purchaser and (b) electronic delivery of the Software and Seller Intellectual Property that is in intangible form in the manner designated by the Purchaser. The Seller shall, to the extent possible, deliver all software and other Intellectual Property to the Purchaser by means of ftp transfer or other mutually agreed means of electronic delivery. To the extent such delivery by means of telecommunications is infeasible, the Seller shall deliver to the Purchaser the software and Intellectual Property by means of the "load and leave" delivery method in accordance with California Sales & Use Regulation § 1502.

2.9    Cure Amounts. At the Closing and pursuant to Section 365 of the Bankruptcy Code, the Seller shall assume and assign to the Purchaser the Acquired Contracts. The cure amounts, as determined by the Bankruptcy Court, if any (the "Cure Amounts"), necessary to cure all defaults, if any, and to pay all actual or pecuniary losses that have resulted from such defaults under the Acquired Contract shall be paid by the Purchaser, on or before the Closing, and not by the Seller and the Seller shall have no liability therefor; provided that with respect to any Contract added to Schedule 2.1(d) following the date hereof that was not made available to the Purchaser prior to the date hereof, the Seller shall (a) except as set forth in clause (b) below, pay eighty percent (80%) (with the Purchaser paying the balance) of the Cure Amounts with respect to any such Contracts and (b) pay one hundred percent (100%) of the Cure Amounts with respect to any such Contracts that are (i) employee invention assignment agreements, (ii) patent invention assignment agreements or (iii) settlement agreements related to the Acquired Assets.

2.10    Further Conveyances and Assumptions.

(a)    From time to time following the Closing, the Seller and the Purchaser shall, and shall cause their respective Affiliates to, execute, acknowledge and deliver all such further conveyances, notices, assumptions, releases and acquaintances and such other instruments, and shall take such further actions, as may be necessary or appropriate to assure fully to the Purchaser and its respective successors or assigns, all of the properties, rights, titles, interests, estates, remedies, powers and privileges intended to be conveyed to the Purchaser under this Agreement and to assure fully to the Seller and its Affiliates and their successors and assigns, the assumption of the liabilities and obligations intended to be assumed by the Purchaser under this Agreement, and to otherwise make effective the Transactions.

(b)    Neither this Agreement nor the consummation of the Transactions shall be construed as an attempt or agreement to transfer or assign any Acquired Asset, including any Non-Assignable Acquired Contract, (i) that is not capable of being assigned pursuant to Section 365 of the Bankruptcy Code or transferred pursuant to Section 363 of the Bankruptcy Code to the Purchaser at the Closing or (ii) the transfer or assignment of which would result in a violation of any applicable Law, if the consent of a third party is not obtained prior to such transfer or

16

assignment ("Non-Assignable Assets") unless and until such consent shall have been obtained. The Seller shall use its commercially reasonable efforts, with which the Purchaser shall cooperate, in endeavoring to obtain such consents; provided that no party shall be obligated to incur any costs or provide any financial accommodation or other consideration of any nature to any Person to facilitate obtaining such consent to transfer any Non-Assignable Asset.

2.11    Bulk Sales Law. The Purchaser hereby waives compliance by the Seller with the requirements and provisions of any "bulk-transfer" Laws of any jurisdiction that may otherwise be applicable with respect to the sale of any or all of the Acquired Assets to the Purchaser. Pursuant to Section 363(f) of the Bankruptcy Code, the transfer of the Acquired Assets shall be free and clear of any liens on and security interests in the Acquired Assets, including any Encumbrances arising out of the bulk transfer laws, and the parties hereto shall take such steps as may be necessary or appropriate to so provide in the Sale Order.

2.12    Withholding. If the Purchaser is required by applicable Laws to withhold or deduct any amount of Tax from the payment of the Purchase Price hereunder, then the Purchaser shall withhold or deduct (and, to the extent required by applicable Laws, remit to the appropriate Governmental Entity) the amount of any such Tax and such withheld amount shall be treated for all purposes of this Agreement as having been paid to the Seller.

## ARTICLE III

## REPRESENTATIONS AND WARRANTIES OF THE SELLER

Subject to such exceptions as are disclosed in the disclosure schedule dated as of the Agreement Date and delivered herewith by the Seller to the Purchaser (the "Disclosure Schedule") corresponding to the applicable section and subsection or clause of this Article III (the "Applicable Article III Provision") (or disclosed in any other section, subsection or clause of the Disclosure Schedule; provided, that it is clear on its face, upon a reading of the disclosure without any independent knowledge on the part of the reader regarding the matter disclosed, that such disclosure is responsive to the Applicable Article III Provision), the Seller hereby represents and warrants to the Purchaser as of the Agreement Date and as of the Closing as follows:

3.1    Organization, Power, Authority, and Good Standing. The Seller is a corporation duly organized, validly existing and in good standing under the Laws of the State of Delaware. The Seller has all requisite corporate power and authority to own, lease and operate its Assets and to carry on its business as currently conducted, subject to the limitations imposed on the Seller as a result of having filed a petition for relief under the Bankruptcy Code or pursuant to any Order entered by the Bankruptcy Court. The Seller is duly qualified or licensed to do business and is in good standing as a foreign corporation in each jurisdiction listed on Schedule 3.1(a), which constitute all of the jurisdictions in which the conduct of its business or the ownership, leasing, holding or use of its Assets makes such qualification necessary, except such other jurisdictions where the failure to be so qualified or licensed or in good standing would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect. The Seller has delivered to the Purchaser an accurate and complete copy of the Seller's Organizational Documents, each as amended as of the Agreement Date and in full force and effect on the Agreement Date. The Seller has not violated its Organizational Documents in any

US_ACTIVE:\44326725\16\66385.0034

material respect. Schedule 3.1(b) lists every state or foreign jurisdiction in which the Seller has or had facilities, maintains or maintained an office, branch or permanent establishment or has or had an Employee, agent, consultant or contractor. Neither the Seller nor its predecessors has conducted any business under or otherwise used for any purpose in any jurisdiction any fictitious name, assumed name, "d/b/a", trade name or other name.

3.2    Authority, Execution, Enforceability and No Conflicts.

(a)    Subject to obtaining Bankruptcy Court approval pursuant to the Bidding Procedures Order and, as applicable, the Sale Order, the Seller has all requisite corporate power and authority to enter into this Agreement and each of the other Transaction Documents to which it is or will be a party, to perform its obligations hereunder and thereunder and to consummate the Transactions. The Board of Directors of the Seller has unanimously (i) determined that this Agreement and the transactions contemplated hereby, including the purchase of the Acquired Assets by Purchaser, are advisable, fair to and in the best interests of those Persons to whom the directors owe fiduciary duties under applicable Law, (ii) determined that an immediate sale of the Acquired Assets pursuant to Section 363 of the Bankruptcy Code is necessary and urgent as the value of the Acquired Assets and, therefore, the value ultimately available to the creditors and equityholders of the Seller, is rapidly deteriorating, and (iii) approved this Agreement and the Transactions.

(b)    Each of this Agreement and the Deposit Escrow Agreement has been, and each of the other Transaction Agreements to which the Seller is a party will be at the Closing, duly executed and delivered by the Seller and, assuming due authorization, execution and delivery by the other parties hereto and thereto (other than the Seller), following the approval of this Agreement and the Transactions by the Bankruptcy Court pursuant to the Bidding Procedures Order and, as applicable, the Sale Order, each of this Agreement and the Deposit Escrow Agreement constitutes, and in the case of the other Transaction Agreements they will at Closing constitute, valid, legal and binding obligations of the Seller, enforceable against the Seller in accordance with their respective terms, except as such enforceability may be subject to applicable bankruptcy, reorganization, insolvency, moratorium and similar Laws affecting the enforcement of creditors' rights generally and by general principles of equity.

(c)    Assuming the consents, waivers and approvals set forth on Schedule 3.2(c) are obtained, the execution, delivery and performance by the Seller of this Agreement and the other Transaction Agreements to which the Seller is a party, and the consummation of the Transactions, do not and will not conflict with or result in any material violation of or material default under (with or without notice or lapse of time, or both) or give rise to a right of termination, cancellation, modification or acceleration of any material obligation or loss of any material benefit under, or result in the imposition or creation of any material Encumbrance upon any of the Acquired Assets under (a) any provision of the Organizational Documents of the Seller, (b) any material Contract to which the Seller is a party or by which it or any of the Acquired Assets is bound, (c) any Seller Authorization or (d) any Law applicable to the Seller or any of its Assets.

3.3    Consents.

(a)    Except as a result of the Bankruptcy Case, none of the execution and delivery by the Seller of this Agreement or the other Transaction Documents, the consummation of the Transactions, or compliance by the Seller with any of the provisions hereof or thereof will conflict with, or result in any violation of or default (with or without notice or lapse of time, or both) under, or give rise to a right of termination, cancellation or acceleration of any obligation or to loss of a material benefit under, or give rise to any obligation of the Seller to make any payment under, or to the increased, additional, accelerated or guaranteed rights or entitlements of any Person under, or result in the creation of any Encumbrance upon any of the Acquired Assets under any provision of (i) Organizational Documents of the Seller; (ii) subject to entry of the Sale Order, any Contract or Permit to which the Seller is a party or by which any of the Acquired Assets are bound; (iii) subject to entry of the Sale Order, any Order of any court, Governmental Entity or arbitrator applicable to the Seller or any of the Assets of the Seller; or (iv) subject to entry of the Bidding Procedures Order and the Sale Order, any applicable Law.

(b)    No consent, waiver, approval, Order, Permit or authorization of, or declaration or filing with, or notification to, any Person or Governmental Entity is required on the part of the Seller (i) in connection with the execution and delivery of this Agreement or the other Transaction Documents, the compliance by the Seller with any of the provisions hereof or thereof, the consummation of the Transactions or the taking by the Seller of any other action contemplated hereby, or (ii) the continuing validity and effectiveness immediately following the Closing of any Acquired Contract, except for entry of the Bidding Procedures Order, entry of the Sale Order and filing assignments of intellectual property with the appropriate agency, as applicable.

3.4    <u>Subsidiaries</u>.  The Seller has no Subsidiaries and does not own, and has never otherwise owned, directly or indirectly, any capital stock of or any other equity or ownership interest in, or controlled, directly or indirectly, any other Person.

3.5    <u>Seller Capital Structure</u>.

(a)    The authorized capital stock of the Seller consists of (i) 340,000,000 shares of Seller Common Stock, of which 12,671,901 shares are issued and outstanding as of the Agreement Date and (ii) 215,000,000 shares of Seller Preferred Stock, consisting of (A) 75,000,000 shares of Junior Preferred Stock (as defined in the certificate of incorporation of the Seller), of which 70,879,853 shares are issued and outstanding as of the Agreement Date, and (B) 140,000,000 shares of Series 1 Preferred Stock (as defined in the certificate of incorporation of the Seller), of which 90,997,471 shares are issued and outstanding as of the Agreement Date. The Seller does not have any other shares capital stock or any other equity or ownership interests of any kind authorized, designated, issued or outstanding. All preferential rights of the Seller Preferred Stock in connection with the sale of substantially all of the assets of the Company, a merger or any other change in control transaction (including a deemed liquidation or dissolution) involving the Company are set forth in the certificate of incorporation of the Seller

(b)    (i)    Seller has duly adopted the Nirvanix, Inc. 2009 Equity Incentive Plan (as in effect on the Agreement Date, the "<u>Seller Option Plan</u>").

(ii)    The Seller has outstanding warrants (each a "Seller Warrant") for the purchase of an aggregate of 250,458 shares of Seller Common Stock and 3,201,184 shares of Seller Preferred Stock.

(iii)    Except for the options issued under the Seller Option Plan and Seller Warrants, there are no outstanding Security Rights for or related to any Seller Security, whether or not currently exercisable, and the Seller has not and is not bound by any (A) promise or commitment to issue, deliver, sell or cause to be issued, delivered or sold any Seller Security or (B) obligation to grant or otherwise enter into any Security Right for or related to any Seller Security.

(c)    There are no (i) voting trusts, proxies or other Contracts or understandings with respect to any Seller Securities to which the Seller is a party, by which the Seller is bound, or which exist to the Seller's Knowledge, or (ii) Contracts or understandings to which the Seller is a party, by which the Seller is bound, or which exist to the Seller's Knowledge relating to the voting, registration, sale or transfer (including Contracts relating to rights of first refusal, "co-sale" rights or "drag-along" rights) of any Seller Securities. The execution, delivery and performance of this Agreement and the Related Agreements and the consummation of the Transactions by the Seller does not breach or violate any rights or obligations under the Investor Agreements that have not been complied with or waived.

3.6    Seller Financial Statements. Schedule 3.6 sets forth (i) the unaudited balance sheets and the related unaudited statements of operations, changes in stockholders' equity and cash flows of the Seller for the fiscal years ended December 31, 2012 and December 31, 2011 and (ii) the unaudited balance sheet (the "Seller Balance Sheet") of the Seller as of June 30, 2013 (the "Balance Sheet Date") and the related unaudited statements of operations, changes in stockholders' equity and cash flows of the Seller for the six (6)-month period then ended (the financial statements referred to in items (i) and (ii), collectively, the "Seller Financial Statements"). The Seller Financial Statements are accurate and complete in all material respects and have been prepared from the books and records of the Seller and in accordance with generally accepted accounting principles effective in the United States ("GAAP") applied on a consistent basis throughout the periods indicated and consistent with each other, except for the absence of footnotes in the case of the unaudited Seller Financial Statements. The Seller Financial Statements present fairly, in all material respects, the financial position, results of operations and cash flows of the Seller as of the dates and for the periods indicated therein, subject, in the case of the unaudited interim Seller Financial Statements, to normal year-end adjustments, which are not material in amount or significance. The Seller's revenue recognition policy is consistent with GAAP

3.7    Liabilities.

(a)    Except liabilities: (i) recorded or reserved against on the Seller Balance Sheet or (ii) incurred since the Balance Sheet Date in the ordinary course of business, consistent with prior practice, the Seller does not have any material debts, liabilities, demands or obligations of any nature (whether known or unknown, accrued or fixed, absolute or contingent, matured or unmatured, determined or determinable, or as a guarantor or otherwise). The Seller

US_ACTIVE:\44326725\16\66385.0034

does not have any "off-balance sheet arrangements" (as such term is defined in Item 303(a)(4) of Regulation S-K promulgated under the Exchange Act).

(b)    Schedule 3.7(b) lists: (i) all accounts payable of the Seller as of the Balance Sheet Date and the aging thereof, and (ii) any customer deposits or other deposits held by the Seller as of the Agreement Date.  All accounts payable of the Seller that arose after the Balance Sheet Date have been recorded on the accounting books and records of the Seller.  All outstanding accounts payable of the Seller represent valid obligations arising from bona fide purchases of assets or services, which assets or services have been delivered to the Seller.

(c)    Schedule 3.7(c) lists:  (i) each item of Indebtedness of the Seller and sets forth each Contract in effect with respect thereto and the holder thereof and (ii) each Encumbrance to which the Seller or any of its Assets is subject or bound and each Contract with respect thereto.

(d)    Except for the Bankruptcy Case, the Seller has not, at any time: (i) made a general assignment for the benefit of creditors; (ii) filed, or had filed against it, any bankruptcy petition or similar filing; (iii) suffered the attachment or other judicial seizure of all or a substantial portion of its assets; (iv) admitted in writing its inability to pay its debts as they become due; or (v) been convicted of, or pleaded guilty or no contest to, any felony.

3.8    Absence of Certain Changes.  Except as a result of the Bankruptcy Case or as specifically contemplated by this Agreement, since the Balance Sheet Date through and including the Agreement Date there has not been, occurred or arisen any:

(a)    sale, lease, license or other disposition of any of the material Assets of the Seller or creation of any Encumbrance in such Assets, except sales or non-exclusive licenses of Seller Products in the ordinary course of business consistent with prior practice;

(b)    commencement, or notice or threat of commencement of any Proceeding against or of the Seller or its affairs, or commencement of any Proceeding by the Seller, or settlement of any Proceeding (regardless of the party initiating the same);

(c)    transfer, sale or abandonment by the Seller of any rights to the Seller Intellectual Property or the entering into of any license agreement (other than non-exclusive end-user license agreements entered into by the Seller in the ordinary course of business consistent with prior practices that do not include any rights with respect to source code), distribution agreement (including any VAR, OEM or similar agreement), reseller agreement, security agreement, assignment or other conveyance, or option for any of the foregoing, with respect to the Seller Intellectual Property with any Person, (ii) purchase or other acquisition of any Intellectual Property or the entering into of any license agreement, distribution agreement (including any VAR, OEM or similar agreement), reseller agreement, security agreement, assignment or other conveyance, or option for any of the foregoing, with respect to the Intellectual Property of any Person (other than off-the-shelf shrink wrap, click through or similar licenses for commercially available software, in each case with no recurring license fee) or (iii) entering into, or amendment of, any Contract with respect to the development of any Intellectual Property with a third Person;

21

(d)     event, occurrence, change, effect or condition of any character that, individually or in the aggregate, has had or reasonably would be expected to have a Material Adverse Effect;

(e)     voluntary prepayment or other non-mandatory payment of, or in respect of, any Indebtedness or any Lien; or

(f)     Contract by the Seller, or any Employees thereof, to do any of the things described in the preceding clauses (a) through (e) (other than negotiations with the Purchaser and its representatives regarding the Transactions).

3.9     <u>Restrictions on Business Activities</u>. The Seller has not entered into any Contract that will bind the Purchaser or any of its Affiliates with respect to the Purchaser's or the Purchaser's Affiliates' own customers, products or services.

3.10     <u>Assets and Absence of Encumbrances</u>. The Seller has good and valid title to all of the Acquired Assets, free and clear of any Encumbrances.

3.11     <u>Intellectual Property</u>.

(a)     (i)     <u>Schedule 3.11(a)</u> lists and separately identifies: (x) all Seller Registered Intellectual Property (setting forth, for each item, the full legal name of the owner of record, applicable jurisdiction, status, application or registration number, and date of application, registration or issuance, as applicable, and including the following information: (A) for each Seller Patent, all upcoming due dates and filing deadlines up to and including the date that is nine (9) months after the Agreement Date; (B) for each registered trademark, trade name or service mark, the class of goods and services covered; (C) for each URL or domain name, any renewal date and the name of the relevant registry; and (D) for each registered mask work, the date of first commercial exploitation); and (y) all hardware products and tools, software and firmware products and tools, and services that are currently sold, published, offered for sale, or under development by the Seller with the intent that such products or tools be sold, published or otherwise offered for sale.

(ii)     The Seller has complied with all the requirements of all United States and foreign patent offices and all other applicable Governmental Entities to maintain the Seller Patents in full force and effect, including payment of all required fees when due to such offices or entities. Other than prior art references cited in the applicable patent office file history of any Seller Patent (a complete copy of which the Seller has delivered to Parent), to the Seller's Knowledge there are no prior art references or prior public uses, sales, offers for sale or disclosures that could reasonably be expected to invalidate the Seller Patents or any claim thereof, or of any conduct the result of which could reasonably be expected to render the Seller Patents or any claim thereof invalid or unenforceable.

(iii)     The original, first and joint inventors of the subject matter claimed in the patents and patent applications included in the Seller Registered Intellectual Property (the "Seller Patents") are properly named in the Seller Patents.

22

(b)     Each item of Seller Intellectual Property is either: (i) owned solely by the Seller free and clear of any Liens, or (ii) rightfully used and authorized for use by the Seller and its permitted successors pursuant to a valid and enforceable written license. The Seller had all rights in the Seller Intellectual Property necessary to carry out the Seller's former activities and has all rights in the Seller Intellectual Property necessary to carry out the Seller's current activities with respect to the Seller Products, including in each case rights to make, use, reproduce, modify, adapt, create derivative works based on, translate, distribute (directly and indirectly), transmit, display and perform publicly, license, sublicense, rent, lease, assign and sell the Seller Intellectual Property in all geographic locations and fields of use. Title to all Seller Intellectual Property owned or purported to be owned by the Seller, whether beneficially or otherwise, is held by and in the name of the Seller.

(c)     The Seller is in compliance with and has not materially breached, violated or defaulted under, or received written notice that they have materially breached, violated or defaulted under, any of the terms or conditions of any license, sublicense or other Contract to which the Seller is a party or is otherwise bound relating to any of the Seller Intellectual Property and that is an Acquired Contract, nor to the Seller's Knowledge has there been or is there any event or occurrence that would reasonably be expected to constitute such a breach, violation or default (with or without the lapse of time, giving of notice or both). Each such Acquired Contract is in full force and effect. No such Acquired Contract grants or could compel any of the Seller or Purchaser to grant or offer to any third party any license or right in or to any Intellectual Property other than Seller Intellectual Property, including any right to use or access any product or service of Purchaser, whether as a result of this Agreement, the Transactions, any Transaction Event or otherwise. The Seller is not obligated to provide any consideration (whether financial or otherwise) to any third Person, nor is any third Person otherwise entitled to any consideration, with respect to any exercise of rights by the Seller or the Purchaser or any of its Affiliates in the Seller Intellectual Property.

(d)     Neither the Seller Products nor the conduct of the business of the Seller as conducted to date, including the development, marketing, sale, support and use of the Seller Products, have infringed or do infringe any other Person's copyrights, trade secret rights, right of privacy, right in personal data, moral right, patent, trademark, service mark, trade name, firm name, logo, trade dress, mask work or other intellectual property right, or give rise to any claim of unfair competition under any applicable Law. The Seller has not received a written notice of any claim (i) challenging the validity, enforceability, effectiveness or ownership by the Seller of any of the Seller Intellectual Property owned or purported to be owned by the Seller or (ii) to the effect that any Seller Product or the conduct of the Seller's business, including the development, marketing, sale and support of the Seller Products, has infringed or does or will infringe or constitute a misappropriation of any intellectual property or other proprietary or personal right of any Person, nor to the Seller's Knowledge does there exist any valid basis for such a claim. There are no Proceedings, including interference, re-examination, reissue, opposition, nullity, or cancellation Proceedings pending that relate to any of the Seller Registered Intellectual Property, other than review of pending patent and trademark applications, and to the Seller's Knowledge no such Proceedings are threatened or contemplated by any Governmental Entity or any other Person. All Seller Registered Intellectual Property is valid and subsisting.

23

(e)    The Seller has obtained from all parties (including Employees and current or former consultants and subcontractors) who have created any portion of, or otherwise who would have any rights in or to, the Seller Intellectual Property owned by the Seller valid and enforceable written assignments of any such work, invention, improvement or other rights to the Seller and have delivered true and complete copies of such assignments to Parent. No Employee, consultant or former consultant of the Seller has ever excluded any Intellectual Property from any written assignment executed by any such Person in connection with work performed for or on behalf of the Seller. All amounts payable by the Seller to consultants and former consultants involved in the development of any Seller Intellectual Property owned or purported to be owned by the Seller have been paid in full, other than amounts currently due in the ordinary course of business and consistent with prior practice and not delinquent.

(f)    The Transactions will not alter, impair or otherwise affect any right or interest of the Seller in any Seller Intellectual Property.

(g)    The Seller has not disclosed or delivered to any escrow agent or any other Person any of the source code relating to any Seller Intellectual Property, and no other Person has the right, contingent or otherwise, to obtain access to or use any such source code. No event has occurred, and no circumstance or condition exists, that (with or without notice or lapse of time or both) will, or could reasonably be expected to, result in the delivery, license, or disclosure of any such source code to any Person who is not, as of the Agreement Date, a current Employee.

(h)    The Seller has not made any of its trade secrets or other confidential or proprietary information that it intended to maintain as confidential (including source code with respect to Seller Intellectual Property owned or purported to be owned by Seller) available to any other Person except pursuant to written agreements requiring such Person to maintain the confidentiality of such information. Schedule 3.11(h) lists all such agreements. No such agreement (i) obligates the Seller to make available any confidential or proprietary information, (ii) grants any right (whether contingent or otherwise, including pursuant to any "residual information," "residual knowledge" or similar clause) to use or practice any rights under any Seller Intellectual Property, other than a non-exclusive limited right to evaluate any confidential and proprietary information made available thereunder and which right is freely terminable by the Seller at any time without penalty or other liability, or (iii) confers upon any Person other than the Seller any ownership right, exclusive license or other exclusive right with respect to any Intellectual Property developed or delivered in connection with such agreement.

(i)    To the Seller's Knowledge, the Seller Intellectual Property does not contain (i) any instructions, algorithms, computer code or other device or feature designed to disrupt, disable, prevent or harm in any manner the operation of any software, data or hardware, including any lockout or similar license control functionality except authentication and other security functionality consistent with those commonly used in the industry or (ii) any unauthorized instructions, algorithms, computer code or other device or feature (including any worm, bomb, backdoor, clock, timer, drop dead device, or other disabling device, code, design or routine) that maliciously causes or is intended to cause harm to any software, data or hardware, including any such device or feature intended to (A) cause any software, data or hardware to be erased, modified, damaged, or rendered inoperable or otherwise incapable of being used, as

24

applicable, (B) replicate or propagate itself throughout other software, data or hardware, (C) alter or usurp the normal operation of any software or hardware, (D) search for and consume memory within a computer or system or (E) transmit data, in each case, either automatically, with the passage of time or upon command by any Person other than the proper user.

(j)    Schedule 3.11(j) sets forth an accurate and complete list of all Contracts pursuant to which the Seller grants any right (whether contingent or otherwise) to use or practice any rights under any Seller Intellectual Property.

(k)    Schedule 3.11(k) sets forth all Contracts pursuant to which the Seller holds any rights to any third-party Intellectual Property other than (i) Third Party Software and (ii) generally commercially available software licensed by the Seller for a total contract price of $25,000 or less.

(l)    Schedule 3.11(l) sets forth all Third Party Software setting forth for each such item (i) the name and version of such item, (ii) the name of the owner and/or licensor of such item, (iii) all licenses and other agreements pursuant to which the Seller holds rights to such item, (iv) the Seller Product(s), including version numbers, to which such item relates, if any (v) whether such item is used internally by or on behalf of the Seller, (vi) whether such item is distributed by or on behalf of the Seller (whether on a standalone basis or as an embedded or bundled component) and, if so, whether such item is distributed in source, binary or other form, (vii) whether such item is hosted, offered as a service or made available in a service bureau or in any similar manner by or on behalf of the Seller (whether on a standalone basis or as an embedded or bundled component), (viii) whether the Seller permits any third party to host, offer as a service or make available in a service bureau or in any similar manner such item (whether on a standalone basis or as an embedded or bundled component), (ix) whether such item has been modified by or on behalf of the Seller, (x) whether such item is used by or on behalf of the Seller to generate code or other material, and if so, a description (consistent with the disclosure requirements under clauses (v) through (ix) above) of the use, modification, hosting and/or distribution of such generated code or other material and (xi) whether such item is used, held for use or required (or generates code or other material that is used, held for use or required) to satisfy any obligation under any Support Agreement.  For purposes of this Section 3.11(l), "Seller Product" includes any Seller Product under development.  The Seller has not been subjected to an audit of any kind in connection with any license or other Contract pursuant to which the Seller holds rights to any Third Party Software, nor received any notice of intent to conduct any such audit.  The Seller has not incorporated into any Seller Product or otherwise accessed, used, modified or distributed any Third Party Software, in whole or in part, in a manner that may (A) require any Seller Intellectual Property owned or purported to be owned by the Seller to be licensed, sold, disclosed, distributed, hosted or otherwise made available, including in source code form and/or for the purpose of making derivative works, for any reason, (B) grant, or require the Seller to grant, the right to decompile, disassemble, reverse engineer or otherwise derive the source code or underlying structure of any Seller Intellectual Property owned or purported to be owned by the Seller, or (C) limit in any manner the ability to charge license fees or otherwise seek compensation in connection with marketing, licensing or distribution of any Seller Intellectual Property, and the Seller has no plans to do any of the foregoing.

25

(m)    None of the Seller's Contracts (including any Contract for the performance of professional services by or on behalf of the Seller) confers upon any Person other than the Seller any ownership right, exclusive license or other exclusive right with respect to any Intellectual Property developed or delivered in connection with such Contract.

(n)    The Seller has not entered into any Contract that will require the Purchaser to provide custom coding, new features or functionality or other custom development with respect to any Seller Product.

(o)    The Seller has not (i) transferred ownership of, or granted any exclusive license with respect to, any Seller Intellectual Property owned or purported to be owned by the Seller to any other Person or (ii) granted any customer the right to use any Seller Product or portion thereof on anything other than a non-exclusive basis or for anything other than such customer's internal business purposes.

(p)    No funding, facilities or personnel of any educational institution or Governmental Entity were used, directly or indirectly, to develop or create, in whole or in part, any Seller Intellectual Property owned or purported to be owned by the Seller, including any portion of a Seller Product. The Seller is not nor has ever been a member or promoter of, or a contributor to, any industry standards body or similar organization that could compel the Seller to grant or offer to any third Person any license or right to such Seller Intellectual Property. Schedule 3.11(p) sets forth a complete and accurate list of (i) any and all grants and similar funding received by the Seller (including its predecessors), including the name of the granting authority and the status and material terms thereof and (ii) any standards bodies or similar organizations of which the Seller (or any of its predecessors) has ever been a member, promoter or contributor. To the Seller's Knowledge, no current or former Employee, consultant or independent contractor of the Seller who was involved in, or contributed to, the creation or development of any Seller Intellectual Property owned or purported to be owned by the Seller has performed services for any Governmental Entity, for a university, college or other educational institution or research center immediately prior to or during a period of time during which such Employee, consultant or independent contractor was also performing services for the Seller. The Seller has not provided Seller Intellectual Property to any Governmental Entity, under Contract or otherwise, in any manner that gives such Governmental Entity any additional or different rights than those contained in the Seller's standard form license terms.

(q)    There is no governmental prohibition or restriction on the use of any Seller Intellectual Property owned or purported to be owned by the Seller in any jurisdiction in which the Seller currently conducts or has conducted business or on the export or import of any of the Seller Intellectual Property owned or purported to be owned by Seller from or to any such jurisdiction.

(r)    Schedule 3.11(r) lists all Contracts pursuant to which the Seller is obligated to provide maintenance, support or similar services.

3.12    Product Warranties. Each product (including any software product) or service developed, manufactured, sold, licensed, leased or delivered by the Seller (collectively, the "Seller Products") conforms and has been in conformity in all material respects with the

26

specifications for such Seller Product, all applicable contractual commitments and all applicable express and implied warranties. No Seller Product has been the subject of any voluntary or involuntary recall, market withdrawal, safety alert or similar action and no event has occurred, and, to the Seller's Knowledge, no condition or circumstance exists, that might reasonably be expected to (with or without notice or lapse of time or both) directly or indirectly give rise to or serve as a basis for any such recall or similar action relating to any Seller Product. To the Seller's Knowledge, no component, assembly, part, product or other hardware purchased, licensed, leased or otherwise acquired or obtained from any manufacturer, supplier or other Person and incorporated into any Seller Product has been or is subject to any voluntary or involuntary recall, market withdrawal, safety alert or similar action

3.13    Seller Contracts.

(a)    Schedule 3.13 sets forth each of the following Contracts, identifying specifically each amendment, extension, exhibit, attachment, addendum, appendix, statement of work, change order and any other similar instrument or document relating thereto, to which the Seller is a party or by which it or its Assets are bound:

(i)    any Employment Agreement;

(ii)    any Contract whereby the Seller has guaranteed or otherwise agreed to cause, insure or become liable for, or pledged any of its assets to secure, the performance or payment of, any obligation or other liability of any Person;

(iii)    any Contract containing any covenant limiting the freedom of the Seller or any of its present or future Affiliates to (A) engage in any line of business or in any geographic territory or to compete with any Person, or which grants to any Person any exclusivity with respect to any geographic territory, any customer, or any product or service or (B) solicit for employment, hire or employ any Person;

(iv)    any Contract relating to capital expenditures and involving future payments in excess of $10,000 in any individual case or $25,000 in the aggregate;

(v)    any Contract relating to the acquisition or disposition of assets or any interest in any business enterprise outside the ordinary course of the Seller's business;

(vi)    any Contract relating to the borrowing of money or the extension of credit or any Indebtedness or Encumbrance;

(vii)    any unpaid or unperformed purchase order or Contract (including for services) involving in excess of $10,000 in any individual case or $25,000 in the aggregate with any single counter-party;

(viii)    any joint development agreement, joint venture agreement, collaboration agreement, strategic alliance agreement or similar Contract involving the sharing of profits, losses, costs or liabilities with any other Person;

27

(ix)    any Contract granting any other Person the right to market, distribute or resell (including as an OEM or value-added reseller) any of the Seller's technology, products or services;

(x)    any Contract granting the Seller the right to market, distribute or resell (including as an OEM or value-added reseller) any technology, products or services of any other Person;

(xi)    any Contract with any customer or third Person to deliver products or services, including all end-user licenses and all Services Agreements;

(xii)    (A) any Government Contract and (B) any bid, offer, proposal, term sheet or other instrument that, if accepted or awarded, could reasonably be expected to lead to a Government Contract, in each case that is currently in effect or is outstanding or within the past five (5) years has been in effect or outstanding;

(xiii)    any currently outstanding bid, offer, proposal, term sheet or similar document that has been submitted by the Seller that, if accepted by the receiving party, would obligate the Seller thereunder;

(xiv)    any Contract pursuant to which the Seller or has agreed to provide "most favored nation" pricing or other similar terms and conditions to any Person with respect to the Seller's sale, distribution, license or support of any Seller Products or Services;

(xv)    any Contract pursuant to which the Seller has agreed to create or maintain interoperability or compatibility of any of the Seller's technology, products or services with any technology, products or services of any other Person;

(xvi)    any Contract with any Person with respect to any services provided to the Seller which services are necessary for the Seller's continuity of product development with respect to Seller Products;

(xvii)    any Contract pursuant to which the Seller has the right to (A) access any other Person's website, software as a service, platform as a service, infrastructure as a service, cloud service or similar service, or (B) access, link to or otherwise use data, content or other assets from any such website or service; and

(xviii)    any other Contract that involves outstanding or future payment obligations of $10,000 or more and is not cancelable by the Seller without penalty within sixty (60) days.

(b)    Each Contract set forth or required to be set forth on Schedule 3.11, Schedule 3.12, Schedule 3.13 or a Schedule cross-referenced within any of such Schedules (each a "Disclosable Contract") is in full force and effect and is valid, binding and enforceable in accordance with its terms. The Seller is in compliance in all material respects with and has not breached, violated or defaulted under, or received notice that it has breached, violated or defaulted under, in any material respect, any of the terms or conditions of any Disclosable Contract, nor to the Seller's Knowledge has there occurred any event or occurrence that would

constitute such a breach, violation or default (with or without the lapse of time, giving of notice or both) or any default by any third Person. The Seller has delivered to the Purchaser accurate and complete copies of all Disclosable Contracts.

3.14    Change in Control Agreements.  Schedule 3.14 sets forth (a) each plan, Contract, scheme or Seller Employee Plan of the Seller (each a "Change in Control Agreement") (i) pursuant to which any amounts may become payable (whether currently or in the future) to any Person (including any Employee) as a result of or in connection with the Transactions or (ii) which provides for the acceleration or early vesting of any right or benefit or lapse of any restriction as a result of or in connection with the Transactions, in each case including any such plan, scheme, Contract or Seller Employee Plan with respect to which the Transactions constitute a "trigger" without regard to whether such plan, scheme, Contract or Seller Employee Plan is a "single trigger" or "double trigger" plan and (b) a summary of the nature and amounts that may become payable pursuant to each such Change in Control Agreement.

3.15    Compliance with Laws.

(a)    The Seller has complied and is in compliance in all material respects with, has not materially violated and is not in material violation of, and has not received any notices of material non-compliance or violation or alleged material non-compliance or violation with respect to, any Law.

(b)    The Seller has complied with, is in compliance with and has not taken any action that has violated or would reasonably be expected to result in a violation of any Law related to the import and export of commodities, services, software, hardware, technology or other Intellectual Property or other custom Laws, including the USA Patriot Act, the Export Administration Act, the Export Administration Regulations, the Arms Export Control Act, the International Traffic in Arms Regulations, the Arms Export Control Act, the International Emergency Economic Powers Act, the Trading with the Enemy Act, the Foreign Asset Control Regulations, customs Laws and any rules and regulations issued under any of the foregoing.  For purposes of this Section 3.15, the Seller shall be deemed to be fully subject to the Laws of the United States as if its operations were currently fully conducted from within the United States by a United States resident company headquartered in the United States and incorporated in one of the several States of the United States.  Each Contract pursuant to which the Seller sells, resells, distributes, licenses, sublicenses or otherwise distributes Seller Intellectual Property, Seller Products or services includes a provision requiring all third Persons subject thereto to comply with all applicable Laws related to the import and export of commodities, software, technology or other Intellectual Property, and all applicable customs Laws.  No Proceeding or notice has been filed or commenced against the Seller alleging any failure to comply with any such Laws.

(c)    Neither the Seller, nor any of its directors or officers, has been debarred, suspended, proposed for debarment, or excluded from participation in the bidding for or award of a Government Contract.  There is no Proceeding pending or, to the Seller's Knowledge, threatened against the Seller, under the United States False Claims Act, the United States Procurement Integrity Act, the United States Truth in Negotiations Act, the United States Contract Disputes Act or any other federal Law.  To the Seller's Knowledge, there is no qui tam suit pending against the Seller.  The Seller is not subject to any audit or investigation pertaining

29

to a Government Contract. No cost or charge pertaining to any Government Contract is the subject of any audit or investigation or has been disallowed by any Governmental Entity. The Seller is in compliance in all respects with all material representations and certifications made to Governmental Entities in response to requests for proposals pursuant to which the Government Contracts were awarded.

      3.16    <u>Litigation</u>. There is no Proceeding of any nature (a) pending or, to the Seller's Knowledge, threatened against the Seller with respect to the Acquired Assets or (b) to the Seller's Knowledge, pending or threatened against any of the Seller's Employees with respect to the Acquired Assets. Neither the Seller nor its properties is subject to any order that materially impairs the Acquired Assets or the Purchaser's ability to operate them after the Closing. Neither the Seller nor its properties is subject to any order that materially impairs the Acquired Assets or the Purchaser's ability to operate them after the Closing. <u>Schedule 3.16</u> lists each Proceeding that has ever been commenced by or against the Seller.

      3.17    <u>Brokers' and Finders' Fees</u>. The Seller has not incurred, and will not incur, directly or indirectly, any liability for brokerage or finders' fees or agents' commissions or any similar charges in connection with this Agreement or the Transactions, and no engagement letter or similar Contract with respect to the Transactions or any other sale, transfer or other disposition of the Acquired Assets is in effect.

      3.18    <u>Employee Benefit Plans</u>.

          (a)    <u>Employee Plan Compliance</u>. Neither the Seller nor any ERISA Affiliate is subject to any penalty or Tax with respect to any Seller Employee Plan under Section 502(i) of ERISA or Section 4975 through 4980D of the Code or any similar Laws of other jurisdictions applicable to the Seller and no Seller Employee Plan is sponsored or maintained by any Person that is or was considered to be a co-employer with the Seller.

          (b)    <u>Plan Status</u>. Neither the Seller nor any ERISA Affiliate has now, or ever, maintained, established, sponsored, participated in or contributed to any plan that is subject to Title IV of ERISA or Section 412 of the Code. Neither the Seller nor any ERISA Affiliate has incurred, nor do they reasonably expect to incur, any liability with respect to any transaction described in Section 4069 of ERISA. No Seller Employee Plan is a multiple employer plan as defined in Section 210 of ERISA, Section 413 of the Code or any similar concept under any other applicable Law.

          (c)    <u>No Post-Employment Obligations</u>. No Seller Employee Plan provides or will operate to provide that the Purchaser has or will have any liability in respect of life insurance, medical or other employee welfare benefits to any Employee upon or after his or her retirement or termination of employment for any reason, except as may be required by Law, and the Seller has never represented, promised or contracted (whether in oral or written form) to any Employee (either individually or to Employees as a group) that such Employee(s) would be provided by the Purchaser with life insurance, medical or other employee welfare benefits upon or after their retirement or termination of employment, except to the extent required by Law.

30

(d)     Effect of Transactions.  The execution, delivery and performance by the Seller of this Agreement and any other Transaction Document to which the Seller is a party, and the consummation of the Transactions, will not conflict with or result in any violation of or default under (with or without notice or lapse of time, or both), or give rise to a right of termination, cancellation, modification or acceleration of any obligation or loss of any benefit under any Seller Employee Plan, trust or loan that would reasonably be expected to result in any payment by the Purchaser (whether of severance pay or otherwise), acceleration, forgiveness of indebtedness, vesting, distribution, increase in benefits or obligation to fund benefits with respect to any Employee.

(e)     No Liability.  The Purchaser will have no liability under any Seller Employee Plan.

3.19     Employment Matters.

(a)     Schedule 3.19(a) contains a list of individuals who are currently performing services for the Seller and are classified as "consultants" or "contract labor" or "independent contractors," the respective compensation of each such "consultant" or "contract laborer" or "independent contractor" and whether the Seller is party to a consulting or contract labor or independent contractor Contract with the individual or an entity with which such individual is an employee.  Any such Contracts have been delivered to the Purchaser and are set forth on Schedule 3.19(a).

(b)     (i) To the Seller's Knowledge, no Employee, contractor or consultant is in violation of any term of any employment agreement, patent disclosure agreement, non-competition agreement, or any other restrictive covenant to a former employer or entity relating to the right of any such Employee, contractor or consultant to be employed or retained by the Seller, as the case may be; and (ii) the Seller is not nor has ever been engaged in any dispute or litigation with any Employee regarding intellectual property matters.

(c)     The Seller has obtained all required approvals, consents, and more generally taken all necessary steps with the Employees or its representatives and/or Governmental Entities, such as collective or individual consultation, information, notification or negotiations, as may be required by Law such that this Agreement shall have full force and effect at Closing on the Employees (to the extent, if any, that this Agreement is intended to have effect on Employees) and the parties hereto.

3.20     Tax Matters.

(a)     The Seller has properly and timely filed all Tax Returns required to be filed (determined without regard to extensions).  The Seller has timely paid all Taxes owed (whether or not shown, or required to be shown, on any Tax Returns).  The Seller has timely collected, withheld and paid all Taxes required to have been collected, withheld and paid.  All Tax Returns filed by the Seller were and remain complete and correct in all material respects, and such Tax Returns correctly reflected the facts regarding the income, profits, gain, business, assets, operations, activities, status and other matters of the Seller and any other information

required to be shown thereon.  There are no Encumbrances for Taxes upon any of the Seller's Assets, other than Encumbrances for ad valorem Taxes not yet due and payable.

(b)    None of the Tax Returns filed by the Seller nor Taxes payable by the Seller have been the subject of a Proceeding, enquiry, deficiency or assessment by any Governmental Entity that has not been resolved or fully paid, and no such Proceeding, enquiry, deficiency or assessment is currently pending or threatened in writing.

(c)    The Seller has not waived any statute of limitation with respect to any Tax or agreed to any extension of time with respect to a Tax assessment or deficiency.

(d)    No claim has ever been made by a Governmental Entity in a jurisdiction where the Seller does not file Tax Returns that the Seller is or may be subject to Tax in that jurisdiction nor is there a reasonable basis for any such claim.

(e)    The Seller has timely withheld all amounts required by Law or Contract to be withheld from the wages, salaries or other payments to Employees of or consultants or contractors to the Seller, has filed returns and deposits with the relevant Governmental Entity where applicable, and is not liable for any arrears of wages, compensation, Taxes, penalties or other sums for failure to comply with any of the foregoing.

(f)    None of the Acquired Assets is (i) property required to be treated as being owned by another Person pursuant to the provisions of Section 168(f)(8) of the Internal Revenue Code of 1954, as amended and in effect immediately prior to the enactment of the Tax Reform Act of 1986, (ii) "tax-exempt use property" within the meaning of Section 168(h)(1) of the Code, (iii) "tax-exempt bond financed property" within the meaning of Section 168(g)(5) of the Code, (iv) "limited use property" within the meaning of Rev. Proc. 2001-28, (v) described in Section 168(g)(1)(A) of the Code, (vi) subject to a "section 467 rental agreement" as defined in Section 467 of the Code or (vii) subject to any provision of Law comparable to any of the provisions listed above

3.21    Governmental Authorization.  The Seller or its Employees hold all certifications, approvals, registrations, consents, licenses, permits, grants, exemptions, variances, orders or other authorizations issued or granted by a Governmental Entity that are required for the operation of its business as currently conducted or as currently proposed to be conducted or the holding of any such interest (collectively, the "Seller Authorizations").  The Seller Authorizations are in full force and effect and constitute all Seller Authorizations required to permit the Seller to operate or conduct its business as currently conducted or as currently proposed to be conducted or to hold any interest in its Assets.  Neither the Seller nor any Employee is in violation of any Seller Authorization in any material respect.

3.22    Corrupt Practices.  The Seller and, to the Seller's Knowledge, each Employee, contractor, consultant or agent of the Seller, has complied with and is in compliance with, and none of them has taken any action that has violated or would reasonably be expected to result in a failure to comply with or a violation of the Foreign Corrupt Practices Act of 1977, as amended, and the rules and regulations thereunder, the OECD Convention on Combating Bribery of Foreign Public Officials in International Transactions, dated 21 November 1977, the UK Bribery

32

Act 2010, any other Laws that prohibit commercial bribery, domestic corruption or money laundering, and the standards established by the Financial Action Task Force on Money Laundering. The books and records of the Seller have been and are maintained in compliance with the applicable requirements of the Foreign Corrupt Practices Act of 1977, as amended, and the rules and regulations thereunder

3.23    Security. To the Seller's Knowledge, none of the Seller's systems, products or services has been subject to a security breach or other unauthorized access or intrusion by any Person, including any such systems owned, operated or controlled by any other Person

3.24    Representations Complete. The representations and warranties made by the Seller in this Agreement and the statements made in the Disclosure Schedule or any certificate furnished by the Seller pursuant to this Agreement, when taken together, do not contain any untrue statement of a material fact or omit to state any material fact necessary in order to make the statements contained herein or therein, in the light of the circumstances under which they were made, not misleading.

ARTICLE IV

REPRESENTATIONS AND WARRANTIES OF THE PURCHASER

As a material inducement to the Seller to enter into and perform its obligations under this Agreement, the Purchaser represents and warrants to the Seller as follows:

4.1    Organization; Good Standing. The Purchaser is duly organized, validly existing and in good standing under the Laws of the state of Delaware.

4.2    Authorization, Execution, Enforceability and No Conflicts.

(a)    The Purchaser has all requisite limited liability company power and authority to execute and deliver this Agreement and each other Transaction Document to which it is a party and any and all instruments necessary or appropriate in order to effectuate fully the terms and conditions of each such Transaction Document and to perform and consummate its obligations under each such Transaction Document. Each of this Agreement and the Deposit Escrow Agreement has been, and each of the other Transaction Agreements to which the Purchaser is a party will be at the Closing, duly executed and delivered by the Purchaser and, assuming due authorization, execution and delivery by the other parties hereto and thereto (other than the Seller), each of this Agreement and the Deposit Escrow Agreement constitutes, and in the case of the other Transaction Agreements they will at Closing constitute, valid, legal and binding obligations of the Purchaser, enforceable against the Purchaser in accordance with their respective terms, except as such enforceability may be subject to applicable bankruptcy, reorganization, insolvency, moratorium and similar Laws affecting the enforcement of creditors' rights generally and by general principles of equity.

(b)    The execution, delivery and performance by the Purchaser of this Agreement and the other the Transaction Documents to which it is a party, and the consummation of the Transactions, will not (i) violate any Law applicable to the Purchaser or any of its Assets or (ii) conflict with or result in any violation or breach of, any of the terms,

US_ACTIVE:\44326725\16\66385.0034

conditions or provisions of, or constitute (with due notice or lapse of time, or both) a default under, or give rise to any right of termination, cancellation or acceleration or result in the creation of any Encumbrance upon any of the Assets of the Purchaser or under any provisions of the Transaction Documents, the Purchaser's Organizational Documents, any Permit or any other material Contracts to which it is a party or by which it or any of its material Assets is or may be bound, in each case, which would prohibit the Purchaser from consummating the Transaction. The Purchaser has not been or is not required to give any notice to, or make any filing with, any Governmental Entity or any other Person, or obtain any Permit, in each case for the valid execution, delivery and performance by the Purchaser of the Transaction Documents to which it is a party.

    4.3    <u>Purchaser's Financial Condition</u>.

    (a)    The Purchaser is a newly-formed limited liability company, has never engaged in any business activity, has no material liabilities and has no material obligations other than those created by this Agreement.

    (b)    The Purchaser will be, as of the Closing, capable of satisfying the conditions contained in Sections 365(b)(1)(C) and 365(f) of the Bankruptcy Code with respect to the Acquired Contracts.

## ARTICLE V

## COVENANTS AND AGREEMENTS

    5.1    <u>Access to Records and Properties of the Seller</u>.

    (a)    From and after the date hereof until the earlier of the Closing and the termination of this Agreement in accordance with its terms, the Seller shall afford (i) to the Purchaser and its Affiliates and their respective authorized representatives, including accountants, consultants and attorneys, free and full access at all reasonable times to the assets, business, facilities, properties, books, records, customers, consultants, and employees of or relating to the Seller or its business in order that the Purchaser shall have full opportunity to make such investigation as it shall reasonably desire, and the Seller shall cooperate fully in connection therewith, and (ii) to the independent certified public accountants of the Purchaser, free and full access at all reasonable times to the records of the independent certified public accountants of the Seller. The investigation contemplated by this <u>Section 5.1</u> shall not affect or otherwise diminish or obviate in any respect any of the representations and warranties or the indemnification rights of the Indemnified Parties contained in this Agreement.

    (b)    From and after the date hereof until the earlier of the Closing and the termination of this Agreement in accordance with its terms, the Seller shall promptly deliver to the Purchaser copies of all pleadings, motions, notices, statements, schedules, applications, reports and other papers filed by the Seller in the Bankruptcy Case; <u>provided</u> that if any such documents relate to the Transaction, then prior to effecting any filing thereof, the Seller shall provide the Purchaser with the opportunity to reasonably comment on such filings, and to approve the applicable filing with respect to the proposed Sale Order and the Bidding Procedures

Order. The Seller shall promptly provide to the Purchaser all documents and materials relating to the proposed sale of the Acquired Assets or any portion thereof, including with respect to competing offers or proposals, and otherwise cooperate with the Purchaser, to the extent reasonably necessary in connection with Purchaser's preparation for or participation in any part of the Bankruptcy Case in which the Purchaser's participation is necessary, required or reasonably appropriate. The Seller shall promptly deliver to the Purchaser all pleadings, motions, notices, statements, schedules, applications, reports and other papers filed in any other judicial or administrative proceeding as the Purchaser may reasonably request. In addition, the Seller shall consult with the Purchaser with respect to any written or oral communication concerning, in whole or in part, the Transactions.

(c)     The Seller and an Affiliate of the Purchaser have previously executed a Confidential Disclosure Agreement dated August 20, 2013 (the "Confidentiality Agreement"), which Confidentiality Agreement will continue in full force and effect as to the Seller in accordance with its terms, but terminates as to any restrictions applicable to such Affiliate (or any of its Affiliates) as of the Closing Date.

5.2     Conduct Pending Closing.

(a)     From and after the date hereof until the earlier of the Closing or the termination of this Agreement in accordance with its terms, the Seller shall pursue the Existing Business Wind-Down.

(b)     From and after the date hereof until the earlier of the Closing or the termination of this Agreement in accordance with its terms, the Seller shall not, directly or indirectly, without the prior written consent of the Purchaser:

(i)     take or omit to take any action that would result in the representations and warranties contained in the Transaction Documents being untrue on the Closing Date, other than such action as shall have been previously agreed to in writing by the parties hereto (including as contemplated by this Agreement);

(ii)     sell, lease, license, transfer or otherwise dispose of or mortgage, pledge, impair or otherwise suffer to be created any Encumbrance on any of the Acquired Assets, except pursuant to the terms of this Agreement or sales of Assets in the ordinary course of business consistent with past practice;

(iii)     modify, amend or terminate any Acquired Contract or any other Contract that relates to any Acquired Asset, or waive, release or assign any material rights or material claims thereunder;

(iv)     grant any new license of any of the Seller Intellectual Property to any Person;

(v)     waive or release any material right of Seller included in the Acquired Assets except in the ordinary course of business consistent with past practice;

US_ACTIVE:\44326725\16\66385.0034

(vi)    take any action which would adversely affect the ability of the parties to consummate the Transactions; or

(vii)    agree or otherwise commit to take any of the actions set forth in the preceding clauses (i) through (vi).

5.3    Efforts to Consummate.

(a)    Subject to the terms and conditions of this Agreement, the Seller and the Purchaser shall use their respective commercially reasonable efforts to take or cause to be taken all actions and do or cause to be done all things required under all applicable Laws, in order to consummate the Transaction.

(b)    From and after the date hereof until the earlier of the Closing or the termination of this Agreement in accordance with its terms, the Seller and the Purchaser shall each use their respective commercially reasonable efforts to satisfy each of the closing conditions set forth in this Agreement to the extent such satisfaction is within their power.

5.4    Notice of Prospective Breach.  The Seller shall immediately notify the Purchaser in writing upon the occurrence, or failure to occur, of any event, which occurrence or failure to occur would be reasonably likely to cause any representation or warranty of the Seller that is contained in any Transaction Document to be untrue or inaccurate in any material respect at any time from the date hereof to the Closing if such representation and warranty were made at such time. In addition, the Seller shall immediately notify the Purchaser in writing in the event it reasonably believes that any condition to Closing set forth in this Agreement cannot be satisfied.

5.5    Patent Filings and Payments.  From and after the date hereof until the earlier of the Closing or the termination of this Agreement in accordance with its terms, the Seller shall timely make all payments, file all documents and take all other actions necessary in connection with the prosecution or maintenance of the Seller Registered Intellectual Property in order to avoid any forfeiture, loss or diminution of the Seller's rights therein, including paying all fees (including issuance and publication fees) in response to the 7/12/13 Notice of Allowance and Fee(s) Due (completing the "Change in Entity Status" section 5 of the Part B Fee(s) Transmittal to "regular undiscounted" status instead of "small entity" status), filing a timely and complete response to the 8/26/13 Notice Requiring Inventor's Oath or Declaration,  and filing a continuation, all with respect to U.S. Patent App. No. 13/656,608 filed 10/19/2012 entitled "POLICY-BASED FILE MANAGEMENT FOR A STORAGE DELIVERY NETWORK," on or before October 15, 2013 and in a form satisfactory to and approved in advance by the Purchaser.

5.6    Cooperation and Further Assurances.

(a)    The Seller shall promptly apply for or otherwise seek and use its commercially reasonable efforts to promptly obtain all consents and approvals required to be obtained by it in connection with the Transaction, including all consents, waivers, or approvals under any of the Contracts. All such consents and approvals shall be in form and substance reasonably satisfactory to the Purchaser.

36

(b)    On and after the Closing Date, the Seller shall (i) fully cooperate with the Purchaser to assign, convey, transfer and deliver (to the extent any Acquired Assets were not assigned, conveyed, transferred or delivered at the Closing pursuant to Section 2.8) to the Purchaser any Assets held by the Seller or any Affiliate of the Seller that the Purchaser reasonably determines constitute Acquired Assets hereunder, including all Assets that constitute Seller Intellectual Property, and (ii) use its commercially reasonable efforts to take or cause to be taken all necessary or appropriate actions and do, or cause to be done, all things necessary or appropriate to consummate the Transactions, including the execution of any additional documents or instruments of any kind that may be necessary or appropriate to carry out the provisions of this Agreement and any other Transaction Document.

(c)    The Seller shall, and shall cause each of its Affiliates to, fully cooperate with the Purchaser and its Affiliates in connection with any Claim the Purchaser or any of its Affiliates may bring (whether as a direct claim, counterclaim or defense) against any third Person to assert or enforce any assignment of, or license to, Seller Intellectual Property (in favor of the Seller or any Affiliate of the Seller, and the Purchaser, as the successor-in-interest to the Seller Intellectual Property), provided that such Claim arises under an Acquired Contract, which cooperation shall include, at the Purchaser's request, the joining by the Seller or the applicable Affiliate of the Seller in any suit or action as may be deemed reasonably necessary by the Purchaser to confer standing to sue upon the Purchaser (or its applicable Affiliate).

5.7    Public Announcements. Each party agrees that, except (a) as otherwise required by any Law, Order or the Bankruptcy Court (with respect to filings to be made with the Bankruptcy Court, so long as the party intending to make such release shall use its commercially reasonable efforts consistent with such Bankruptcy Court requirement to consult with the other party with respect to the text thereof) and (b) for disclosure to its respective directors, officers, Employees, shareholders, partners, financial advisors, legal counsel, independent certified public accountants or other agents, advisors or representatives on a need-to-know basis and with whom such party has a confidential relationship, such party will not issue any reports, statements or releases, in each case pertaining to any Transaction Document to which it is a party or the Transaction, without the prior written consent of each party to this Agreement, which consent shall not be unreasonably withheld. Furthermore, any press release or other public announcement approved in accordance with the preceding sentence shall contain appropriate references to each such party to this Agreement who desires such references.

5.8    Seller Non-Compete.

(a)    During the period beginning on the date hereof and ending on the third anniversary of the Closing Date, except in order to effect the Existing Business Wind-Down, the Seller agrees to not, directly or indirectly, for itself or on behalf of or in conjunction with any Person, in each geographic area or part thereof in which the Purchaser or any of its Affiliates carries on a like business anywhere in the world, conduct, manage, operate, participate, or engage in, or have an ownership interest in, any business or enterprise engaged in, whether as principal, manager, agent, consultant, officer, employee, director, equity holder, partner, joint venturer, investor, lender or in any other capacity, any business or enterprise (or Subsidiary or division thereof) that is the same as, substantially similar to or competitive with the Business. Notwithstanding the foregoing, the ownership of not more than one percent (1%) of the publicly

37

traded securities of any Person shall not be a violation of this Section 5.8(a) even if such Person directly competes with the Business.

(b)    The Seller acknowledges that strict enforcement of the terms of this Section 5.8 is necessary for the purpose of ensuring the preservation, protection and continuity of the trade secrets and goodwill of the Seller that the Purchaser is acquiring hereunder and that, in furtherance of such purpose, the prohibition against competition imposed by this Section 5.8 is narrow, reasonable and fair. If any part of this Section 5.8 should be determined by a court of competent jurisdiction to be unreasonable in duration, geographic area, or scope, then the provisions of this Section 5.8 are intended to and shall extend only for such period of time, in such area and with respect to such activities as are determined to be reasonable under and subject to applicable Law. The Seller acknowledges that the Purchaser would be irreparably harmed by any breach of this Section 5.8 and that there would be no adequate remedy at law or in damages to compensate the Purchaser for any such breach. The Seller agrees that the Purchaser shall be entitled to injunctive relief requiring specific performance by the Seller of this Section 5.8, and the Seller consents to the entry thereof, all without the requirement of the Purchaser to post any bond.

5.9    Tax Matters.

(a)    All transfer, documentary, sales, use, stamp, registration and other such Taxes, duties and fees (including any penalties and interest) incurred in connection with the Transactions, whether imposed by Law on the Seller or the Purchaser or any Affiliate of the Purchaser (collectively, the "Transfer Taxes"), shall be paid by the Seller when due, and the Seller, at its own expense, shall file all necessary Tax Returns and other documentation with respect to all such Transfer Taxes, and, if required by applicable Law, the Purchaser will join in the execution of any such Tax Returns and other documentation. The parties will reasonably cooperate to minimize any such Taxes, including with respect to delivery location.

(b)    Without limiting any other provision of this Agreement, the Seller shall be solely liable for any Taxes imposed upon the Seller or any of its Affiliates and for all Pre-Closing Taxes.

(c)    The Seller will promptly provide or make available to the Purchaser copies of all Tax Returns, reports and information statements with respect to the Acquired Assets that are filed after the Closing Date.

(d)    After the Closing Date, the Purchaser and the Seller shall provide each other with such cooperation and information relating to the Acquired Assets as the other party may reasonably request in (i) filing any Tax Return, amended Tax Return or other Tax filing or claim for refund of Taxes, (ii) determining any Tax Liability or right to refund of Taxes, (iii) conducting or defending any audit or other proceeding in respect of Taxes, or (iv) effectuating the terms of this Agreement. The Purchaser and the Seller shall (A) retain all books and records in their respective possession with respect to Tax matters pertinent to the Acquired Assets relating to any taxable period beginning before the Closing Date until the expiration of the applicable statute of limitations (and, to the extent notified by the Purchaser or the Seller, any extensions thereof) of the respective taxable periods, and to abide by all record retention

US_ACTIVE:\44326725\16\66385.0034

agreements entered into with any Tax authority and (B) give the other party reasonable written notice prior to transferring, destroying or discarding any such books and records and, if the other party so requests, the Purchaser or the Seller, as the case may be, shall allow the other party to take possession of such books and records. Notwithstanding the foregoing, no party shall be unreasonably required to prepare any document, or determine any information, not then in its possession in response to a request under this Section 5.9(d). Any out-of-pocket expenses incurred in furnishing such information or assistance pursuant to this Section 5.9(d) shall be borne by the party requesting it.

(e)    Notwithstanding any of the foregoing, the Purchaser will have the right to conduct any Tax audit or other Tax contest relating to the Acquired Assets to the extent relating to any Post-Closing Tax Period.

(f)    Personal property Taxes, if any, for any taxable year in which the Closing occurs shall be prorated between the Purchaser and the Seller as of the Closing Date based upon the number of days elapsed in the calendar year prior to the Closing and the number of days remaining in the calendar year following the Closing.

5.10    Post-Closing Conduct of the Seller's Business.

(a)    The Seller agrees that it will maintain its corporate existence and remain in good standing under the Laws of the State of Delaware for no less than ninety (90) days following the Closing Date or such shorter period as may be determined by the Bankruptcy Court (the "Continuation Period").

(b)    The Seller agrees to properly and timely perform all of its obligations during the Continuation Period, including any obligations under any agreement to which it is a party, to the extent consistent with the requirements of the Bankruptcy Case.

(c)    The Seller hereby appoints the Guarantors, acting together, as its agent to give and receive notices and communications, on the Seller's behalf, to and from the Purchaser following the Continuation Period, including as to the adoption and management of a plan to wind-up the Seller's business and dissolve the Seller and as to the satisfaction of the Sellers's obligations under Article VII. Accordingly, any notice or other communication delivered by the Purchaser (or any other Purchaser Indemnified Party) to the Guarantors after the Continuation Period shall be deemed given to the Seller for all purposes of this Agreement and the other Transaction Documents.

5.11    Use of Name/Trademarks. The Seller agrees that from and after the Closing the Purchaser shall have all of the Seller's rights (if any) to use, and neither the Seller nor any of the Seller's Affiliates shall have the right to use, any trademarks included in the Acquired Assets, or any other name that incorporates or is deceptively or confusingly similar to any of such trademarks, in conducting any business endeavor or on any advertising, stationery, business cards, checks, purchase orders and acknowledgments, customer agreements or other contracts or business documents.

5.12    Transaction Expenses. The Seller shall pay in full all Transaction Expenses incurred by it.

US_ACTIVE:\44326725\16\66385.0034

5.13    Seller License.  Effective upon the Closing, the Purchaser hereby grants the Seller, under all Intellectual Property rights of the Purchaser, a paid-up, non-exclusive, term-limited, worldwide license (as further defined and limited in this Section 5.13, the "Seller License") to copy, install, run and use the Seller Intellectual Property (excluding any versions of the Seller Product beyond version 2.7.3) for the sole purpose of (x) fulfilling the Seller's existing obligations under Excluded Contracts to its current customers (the "Existing Customers") and (y) effecting the Existing Business Wind-Down, in each case subject to the following:

(a)    The scope of the Seller License shall be limited to the fulfillment of contractual obligations of the Seller to Existing Customers as expressly set forth in the applicable Excluded Contracts as of the Agreement Date, excluding any obligations arising after the Agreement Date such as obligations resulting from extensions or amendments entered into after the Agreement Date.

(b)    The scope of the Seller License shall be further limited, with respect to each Existing Customer, to such Existing Customer's storage usage limit in effect as of the Agreement Date, as set forth in the Seller's records on the Agreement Date.

(c)    The scope of the Seller License shall be further limited to the Existing Customers' use of the applicable Seller Product for such Existing Customer's internal use or as part of such Existing Customer's software-as-a-service offering and shall specifically exclude any right to license, sublicense, sell, resell, rent lease, transfer, assign distribute or otherwise commercially exploit any Seller Product and/or Seller Intellectual Property or make it available to any third party.

(d)    The Seller License shall be non-transferable and non-sublicensable (including by operation of law), except on a one-time basis to an acquirer of all or a substantial portion of the Seller's cloud storage network infrastructure assets remaining after giving effect to the Transactions (a "Transferee") for the purpose of such Transferee fulfilling the Seller's obligations under some or all of the Excluded Contracts and/or effecting the Existing Business Wind-Down, only to the extent and subject to the limitations set forth in this Section 5.13. A Transferee that enters into its own form of Contract for cloud storage services with an Existing Customer in place of an Excluded Contract (each, a "Replacement Contract") shall be deemed, for purposes of the Seller License, to be fulfilling the Seller's existing obligations under such Excluded Contract so long as such Existing Customer's storage usage limit complies with the above-described limitation, such Replacement Contract does not permit use or disclosure of any Seller Intellectual Property in any materially different way than such Excluded Contract or in any manner inconsistent with this Section 5.13.

(e)    With respect to the Seller, the Seller License shall not include the right to: (i) use or access, directly or indirectly, any source code or (ii) modify or create any derivative works of any portion of the Seller Intellectual Property, except, in either case, as necessary to maintain the Seller Intellectual Property (e.g., perform bug fixes) and provide technical support to the Existing Customers solely in connection with the Seller Intellectual Property. With respect to any Transferee, except with the Purchaser's prior consent, the Seller License shall not include the right to: (X) use or access, directly or indirectly, any source code or (Y) modify or create any derivative works of any portion of the Seller Intellectual Property.

(f)     The licenses expressly set forth in this Section 5.13 are the only licenses granted to the Seller by the Purchaser hereunder. No other licenses are intended or shall be implied or inferred, whether by implication, estoppel or otherwise.

(g)     The Seller License shall automatically terminate upon the date that is nine (9) months after the Closing. The Purchaser shall have the right (without limiting any other right or remedy) to terminate the Seller License upon written notice to the Seller in the event of any material breach of any of the terms hereof by the Seller that the Seller fails to cure within ten (10) business days after the Purchaser's written notice of such breach. Upon any termination of the Seller License, the Seller shall promptly return to the Purchaser, at the Seller's expense, any and all Seller Intellectual Property, all copies thereof, and any materials incorporating any portion thereof. Furthermore, the Seller shall promptly destroy all copies of Seller Intellectual Property (or components thereof) stored in any computer or other device. For purposes of this Section 5.13, all references to the Seller will be replaced with the term "Transferee" in the event that the Seller assigns rights to any Transferee in conformance with Section 5.13(d).

(h)     Notwithstanding any other representation, warranty, covenant or condition in this Agreement, the Seller shall be permitted prior to the Closing to grant, on a one-time basis to a Transferee, a license to copy, install, run and use the Seller Intellectual Property so long as such license is subject to all of the restrictions set forth in this Section 5.13.

(i)     THE SELLER LICENSE IS PROVIDED ON AN "AS IS" BASIS AND THE PURCHASER MAKES NO WARRANTY, REPRESENTATION, PROMISE OR GUARANTEE, EITHER EXPRESS, IMPLIED, STATUTORY OR OTHERWISE, WITH RESPECT THERETO, INCLUDING AS TO NON-INFRINGEMENT, QUALITY, PERFORMANCE, MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, OR THAT ANY SOFTWARE OR ITS OPERATION SHALL BE UNINTERRUPTED OR ERROR-FREE, ALL OF WHICH ARE EXPRESSLY DISCLAIMED. WHETHER OR NOT THE PURCHASER HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH LOSS, THE PURCHASER SHALL IN NO EVENT BE LIABLE IN RESPECT OF ANY BREACH OF ANY IMPLIED OR EXPRESSED WARRANTY OR CONDITION, OR OTHERWISE BE LIABLE IN CONTRACT, TORT, NEGLIGENCE, STRICT LIABILITY OR OTHERWISE, FOR LOSS OF REVENUE, LOSS OF PROFITS, LOSS OF BUSINESS OR GOODWILL, LOSS, DAMAGE TO OR CORRUPTION OF DATA, OR LOSS OF AVAILABILITY, OR ANY OTHER DIRECT, INDIRECT, SPECIAL, INCIDENTAL, CONSEQUENTIAL OR MONETARY LOSS, HOWEVER CAUSED, WHICH ARISES OUT OF OR IN CONNECTION WITH THE SELLER LICENSE.

5.14     Removal of Third Party Software. Notwithstanding anything to the contrary in this Agreement, to the fullest extent permitted under the Excluded Contracts, effective upon the Closing, the Seller hereby grants to the Purchaser the right and license to use and copy any Third Party Software that was licensed to the Seller under any Excluded Contract and that was incorporated in any version of the Seller's software for the purpose of removing such Third Party Software from the Seller's software and not for any other purpose.

US_ACTIVE\44326725\16\66385.0034

ARTICLE VI

CONDITIONS TO THE CLOSING

6.1    Conditions to the Obligations of the Purchaser.

The obligation of the Purchaser to consummate the Transaction at the Closing is subject to the satisfaction, prior to or at the Closing, of the following conditions unless waived (to the extent such conditions can be waived) by the Purchaser:

(a)    Transaction Documents. Each of the Transaction Documents and such other deeds, bills of sale, assignments and other instruments as shall be reasonably acceptable to the Purchaser to transfer title of the Acquired Assets to the Purchaser pursuant to this Agreement shall have been duly authorized, executed and delivered by the other parties thereto and shall be in full force and effect and enforceable against such other parties in accordance with their respective terms.

(b)    Representations and Warranties. Each of the representations and warranties of the Seller in the Transaction Documents shall be true and correct in all respects (disregarding any "material", "in all material respects", "Material Adverse Effect", "Seller's Knowledge", "knowledge" or similar qualification contained therein or with respect thereto) on and as of the date hereof and as of the Closing Date (except those representations and warranties which are made expressly only as of another date, which shall be true and correct as of such date) (disregarding any "material", "in all material respects", "Material Adverse Effect", "Seller's Knowledge", "knowledge" or similar qualification contained therein or with respect thereto), in each case except for such inaccuracies as, individually or in the aggregate, have not had and would not reasonably be expected to have a Material Adverse Effect, and the Purchaser shall have received a certificate signed by an authorized officer of the Seller to that effect.

(c)    Performance of Obligations. The Seller shall have performed or complied in all material respects with all obligations and covenants required to have been performed or complied with by the Seller under the Transaction Documents prior to or as of the Closing, and the Purchaser shall have received a certificate signed by an authorized officer of the Seller to that effect.

(d)    Governmental Filings. All filings or registrations with any Governmental Entity (including all filings or registrations with the applicable Taxing authorities) that are required to be made for or in connection with the execution and delivery of the Transaction Documents or the consummation of the Transaction at or prior to the Closing shall have been obtained or made and all applicable waiting periods (and extensions thereof), if any, shall have expired.

(e)    Absence of Changes. There shall not have occurred any Material Adverse Effect, and there shall not exist any facts or circumstances that, individually or in the aggregate, would reasonably be expected to have a Material Adverse Effect, and the Purchaser shall have received a certificate signed by an authorized officer of the Seller to that effect.

42

(f)    <u>Supporting Documents</u>. The Purchaser shall have received copies of the following supporting documents (in form and substance reasonably satisfactory to the Purchaser):

(i)    certificates of the Secretary of State of the state of incorporation, dated as of a recent date, as to the due incorporation and good standing of the Seller and listing all documents of the Seller on file with said Secretary;

(ii)    a certificate of the Secretary of the Seller, dated as of the Closing Date and certifying on behalf of the Seller: (A) that attached thereto is a true, correct and complete copy of each of the Organizational Documents of the Seller, as in effect on the date of such certification; (B) that attached thereto is a true, correct and complete copy of all resolutions adopted by the board of directors (and any committees thereof) authorizing the execution, delivery and performance of the Transaction Documents and the sale, transfer and delivery of the Acquired Assets, and that all such resolutions are still in full force and effect; and (C) the incumbency and specimen signature of all officers of the Seller executing the Transaction Documents and any certificate or instrument furnished pursuant hereto or thereto, and a certification by another officer of the Seller as to the incumbency and signature of the officer signing the certificate referred to in this clause (iii); and

(iii)    such additional supporting documents and other information with respect to the operations and affairs of the Seller as the Purchaser may reasonably request.

(g)    <u>Change in Law</u>. As of the Closing Date, there shall not have been any change in any Law that would prevent the consummation of the Transaction.

(h)    <u>Absence of Litigation</u>. As of the Closing Date, there shall not be (i) any Order of any nature issued by a Governmental Entity with competent jurisdiction directing that the transactions provided for herein or any aspect of them not be consummated as herein provided or (ii) any Proceeding (including any proceeding over which the Bankruptcy Court has jurisdiction under 28 U.S.C. § 157(b) and (c)) pending wherein an unfavorable Order would prevent the performance of any of the Transaction Documents or the consummation of any aspect of the Transaction, declare unlawful any aspect of the Transaction or cause any aspect of the Transaction to be rescinded.

(i)    <u>Bidding Procedures Order</u>. The Bankruptcy Court shall have entered the Bidding Procedures Order.

(j)    <u>Sale Order</u>. The Bankruptcy Court shall have entered the Sale Order within sixty (60) days after the date hereof and the Sale Order shall be a Final Order (a certified copy of which shall be delivered by the Seller to the Purchaser).

(k)    <u>Notices; Terminations</u>. The Seller shall have delivered the notice or effected the termination (or other resolution) or other action, as applicable, with respect to each contract set forth on, and in accordance with, <u>Schedule 6.1(k)</u>. The Seller hereby covenants and agrees to take such actions promptly following the date hereof.

US_ACTIVE\44326725\16\66385.0034

(l)  Closing Disk.  The Seller shall have delivered (and the Seller hereby covenants and agrees to deliver) to the Purchaser on one or more CD-Rom disks a complete and accurate (as of the Closing Date) electronic copy of the "data room," which disk(s) shall be delivered at least three (3) Business Days prior to the Closing Date.

6.2  Conditions to Obligations of the Seller.  The obligations of the Seller to deliver the Transaction Documents to the Purchaser, and to consummate the Transaction, at the Closing are subject to the satisfaction, prior to or at the Closing, of the following conditions unless waived (to the extent such conditions can be waived) by the Seller:

(a)  Transaction Documents.  Each of the Transaction Documents shall have been duly authorized, executed and delivered by the Purchaser and the other parties thereto, and shall be in full force and effect and enforceable against the Purchaser and such other parties, in accordance with their respective terms.

(b)  Representations and Warranties.  Each of the representations and warranties made by the Purchaser in Article IV shall be true and correct in all material respects on and as of the Closing Date.

(c)  Performance of Obligations.  The Purchaser shall have performed and complied in all material respects with all obligations and covenants required to have been performed or complied with by it under the Transaction Documents prior to or at the Closing.

(d)  Cure Amounts.  Except as provided in the proviso set forth in Section 2.9, the Purchaser shall have paid in full or otherwise satisfied all Cure Amounts with respect to the Acquired Contracts prior to or on the Closing Date.

(e)  Bidding Procedures Order.  The Bankruptcy Court shall have entered the Bidding Procedures Order.

(f)  Sale Order.  The Bankruptcy Court shall have entered the Sale Order and the Sale Order shall not be subject to a stay.

## ARTICLE VII

## INDEMNIFICATION; INDEMNITY ESCROW ARRANGEMENT

7.1  Survival of Representations, Warranties, Agreements and Covenants, Etc.

(a)  Seller Representations.  The representations and warranties of the Seller set forth in this Agreement or in any certificate, document or other instrument delivered by or on behalf of the Seller pursuant to this Agreement shall survive the execution and delivery of this Agreement, any investigation by or on behalf of the Purchaser and the Closing and shall terminate at 11:59 P.M. Pacific time on the date that is twelve (12) months after the Closing Date, except that (i) the representations and warranties of the Seller set forth in Sections 3.1 (Organization, Power, Authority, and Good Standing), 3.2 (Authority, Execution, Enforceability and No Conflicts) and 3.4 (Subsidiaries), and in any certificate, document or other instrument delivered by or on behalf of the Seller with respect to such representations and warranties

44

(collectively, the "Fundamental Representations") shall so survive but shall terminate at 11:59 P.M. Pacific time on the date on which all applicable statutes of limitation (as the same may be extended or waived), shall have expired, (ii) the representations and warranties of the Seller set forth in Section 3.11 (Intellectual Property) shall terminate at 11:59 P.M. Pacific time on the date that is eighteen (18) months after the Closing Date and (iii) in all cases, with respect to any Loss, claim or breach of which any Indemnified Party shall have provided written notice to the Seller prior to such termination.

(b)    Purchaser Representations.  The representations and warranties of the Purchaser set forth in this Agreement or in any certificate, document or other instrument delivered by or on behalf of the Purchaser pursuant to this Agreement shall terminate at the Closing.

(c)    Covenants.  The respective covenants, agreements and obligations of the Seller and the Purchaser set forth in this Agreement or in any certificate, document or other instrument delivered pursuant to this Agreement shall survive the execution and delivery of this Agreement, any investigation by or on behalf of any party hereto, and the Closing without limitation and shall terminate on the expiration of all applicable statutes of limitation (as the same may be extended or waived), except as otherwise expressly set forth in this Agreement or in such certificate, document or other instrument delivered pursuant to this Agreement.

(d)    Effect of Survival Periods.  The survival periods set forth in this Section 7.1 are intended to operate only as the time periods within which a party must deliver to the other party a written notice of a Loss, claim or breach, and following such delivery the notifying party shall be entitled to pursue its available remedies with respect thereto pursuant to the provisions of and subject to the limitations in this Agreement regardless of the survival periods set forth in this Section 7.1.

7.2    Indemnification.  As an integral term of the Transactions, the Seller shall indemnify, reimburse, compensate and hold harmless the Purchaser, its Affiliates and each of their respective officers, directors, employees, partners, members and agents (the "Indemnified Parties") against any and all claims, losses, royalties, Liabilities, damages (including solely with respect to Third-Party Claims and not with respect to any other claims, punitive, speculative, remote, exemplary or similar damages claimed by such third Person), deficiencies, Taxes, reduction of Tax attributes, diminution in value, interest and penalties, costs and expenses, including reasonable attorneys' fees and expenses, and expenses of investigation and defense (collectively "Losses") incurred or suffered by any such Indemnified Parties directly or indirectly as a result of, with respect to or in connection with:

(a)    the failure of any representation or warranty of the Seller set forth herein (including the Disclosure Schedule) or in any certificate, document or other instrument delivered pursuant to this Agreement to be true and correct in all respects as of the Agreement Date and as of the Closing (disregarding for purposes of this Section 7.2(a) any "material", "in all material respects", "Material Adverse Effect", "Seller's Knowledge", "knowledge" or similar qualification contained therein or with respect thereto both for purposes of determining whether a representation or warranty is true and correct and for purposes of calculating Losses);

(b)        any failure by the Seller to fully perform, fulfill or comply with any covenant or agreement set forth herein or in any certificate, document or other instrument delivered pursuant to this Agreement;

(c)        any and all Losses arising out of, based upon or relating to any Excluded Asset or any Retained Liability;

(d)        any claims by any current or former customers or partners of the Seller (or any of its predecessors) alleging a claim of ownership or other exclusive rights of any kind by any such Person of or in any Intellectual Property (including without limitation any software) included in the Acquired Assets;

(e)        any Third Party Claim (including Governmental Entities and any stockholder of the Seller) or any payment of any Loss by any Indemnified Party for, or that arose from or in connection with any Non-Assignable Acquired Contract, if such Claim or Loss arose in connection with such Non-Assignable Acquired Contract not being assigned to the Purchaser; and

(f)        defending any Third Party Claim alleging the occurrence of facts or circumstances or raising claims that, if true, regardless of the outcome of such defense, would entitle an Indemnified Party to indemnification pursuant to any of the other provisions of this Section 7.2.

The Indemnity Escrow Amount shall be available to reimburse the Indemnified Parties for any Losses for which they are entitled to be indemnified pursuant to this Section 7.2.

7.3        Limitations.

(a)        Threshold Amount.  No claim may be made by any Indemnified Party for indemnification pursuant to Section 7.2(a), other than a claim arising from any breach or inaccuracy of any of the Fundamental Representations or any representations and warranties set forth in Section 3.11 (for which a claim may be made without regard to the limitations in this Section 7.3(a)), unless and until the aggregate amount of Losses for which the Indemnified Parties seek to be indemnified pursuant to Section 7.2(a) exceeds $50,000, at which time the Indemnified Parties shall be entitled to indemnification for all such Losses (including all Losses included within such amount).

(b)        Cap.  The Seller shall not be required to indemnify any Indemnified Party under Section 7.2(a) for an aggregate amount of Losses exceeding fifteen percent (15%) of the Cash Purchase Price in connection with Losses related to the breach of any representation and warranty of the Seller in Article III, other than for the breach of (i) any Fundamental Representations, in which case such maximum amount shall be one hundred percent (100%) of the Cash Purchase Price and (ii) the representations and warranties of the Seller set forth in Section 3.11, in which case such maximum amount shall be fifty percent (50%) of the Cash Purchase Price.

(c)        Calculation.  Any Losses as to which indemnification provided for in Section 7.2 may apply shall be determined net of any cash recovery actually received by an

46

Indemnified Party with respect to insurance specifically with respect to the specific matter for which indemnification is sought, less any current or prospective costs associated with obtaining such recovery. This Section 7.3(c) shall not imply and shall not be construed to imply any obligation on the part of any Person to seek or pursue any such recovery and the failure to seek or pursue any such recovery shall not be a defense to any indemnification obligation hereunder.

(d)    Exclusive Remedy for Monetary Damages. Subject to Section 7.3(e), the Purchaser agrees that the sole and exclusive remedy for money damages for any matter arising under this Agreement shall be the rights to indemnification set forth in this Agreement and the rights set forth in Article VIII.

(e)    Fraud. Notwithstanding anything to the contrary in this Agreement, the limitations and thresholds and other provisions set forth in this Article VII and in Section 10.7(d) shall not apply with respect to (i) fraud, intentional misrepresentation or willful breach or misconduct or (ii) any equitable remedy, including a preliminary or permanent injunction or specific performance.

(f)    Effect of Disclosure Schedule. The disclosures set forth in the Disclosure Schedule (i) shall affect only the representations and warranties to which they relate and the indemnification provisions set forth in Section 7.2(a) and (ii) shall not have any effect on or in any other way limit the indemnification provisions set forth in Sections 7.2(b)-(f), which shall have independent effect regardless of any disclosure in the Disclosure Schedule or otherwise.

7.4    Procedures.

(a)    General. If an Indemnified Party desires to bring a claim for indemnification hereunder, such Indemnified Party (or the Purchaser, on such Indemnified Party's behalf) shall first deliver to the Seller a certificate (a "Claim Certificate") that:

(i)    states that the Indemnified Party has paid or properly accrued Losses, or reasonably anticipates that it may or will incur liability for Losses, for which such Indemnified Party may be entitled to indemnification pursuant to this Agreement; and

(ii)    specifies in reasonable detail, to the extent practicable and available, the Losses included in the amount so stated, the basis for any anticipated liability and the nature of the misrepresentation, default, breach of warranty or breach of covenant or claim to which each such item is related and, to the extent computable, the computation of the amount to which such Indemnified Party claims to be entitled hereunder.

(b)    Objection. If the Seller objects to the indemnification of an Indemnified Party in respect of any claim or claims specified in any Claim Certificate, the Seller shall deliver a written notice specifying in reasonable detail the basis for such objection and the amount in dispute to the Indemnified Party within thirty (30) days after receipt by the Seller of such Claim Certificate. Thereafter, the Seller and the Indemnified Party shall attempt in good faith to agree upon the rights of the respective parties for a period of not less than sixty (60) days after receipt by the Indemnified Party of such written objection with respect to each of such claims to which the Seller has objected. If the Indemnified Party and the Seller agree with respect to any of such claims, the Indemnified Party (or the Purchaser, on such Indemnified Party's behalf) and the

US_ACTIVE:\44326725\16\66385.0034

Seller shall promptly prepare and sign a memorandum setting forth such agreement and, if applicable, an instruction to the Escrow Agent. Should the Indemnified Party and the Seller fail to agree as to any particular item or items or amount or amounts within such sixty (60) day period, then either party shall be entitled to pursue its available remedies for resolving its claim for indemnification. Notwithstanding the foregoing, in the event that the Indemnified Party seeks recovery against the Indemnity Escrow Fund, the time periods set forth herein shall run concurrently with and be without duplication of the time periods set forth in the Indemnity Escrow Agreement.

(c)     Indemnified Party Defense; Settlement. The Indemnified Party shall have the right in its sole discretion to conduct the defense of any claim brought by any third party (a "Third-Party Claim"); provided that any settlement of any such Third-Party Claim shall be effected only with the prior written consent of the Seller, which consent shall not be unreasonably withheld, conditioned or delayed, but if such consent is unreasonably withheld, conditioned or delayed then such consent shall not be required. Consent shall be deemed "unreasonably withheld" if the proposed settlement would satisfy the requirements of good faith as that term is used in California Code of Civil Procedure Section 877.6 and construed in relevant case law. If any such claim is so settled or if there be a final judgment for the plaintiff in any such claim, the Indemnified Party shall be entitled to indemnification for the amount of any Loss relating thereto.

(d)     Seller Defense; Settlement. In the event the Indemnified Party elects not to defend the Third-Party Claim, the Seller may defend such claim at the Seller's sole cost and expense with counsel selected by the Seller, such counsel to be reasonably acceptable to the Indemnified Party. In such event, the Seller shall not have any right to settle, adjust or compromise any Third-Party Claim without the express written consent of the Indemnified Party against whom the Third-Party Claim has been asserted, which consent shall not be unreasonably withheld, conditioned or delayed.

(e)     Agreed Claims. Claims for Losses specified in any Claim Certificate to which the Seller did not object in writing by 11:59 PM Pacific time on the thirtieth (30th) day following the receipt by the Seller of such Claim Certificate, claims for Losses covered by a memorandum of agreement of the nature described in Section 7.4(b) and claims for Losses the validity and amount of which have been the subject of resolution by arbitration or of a final non-appealable judicial determination are hereinafter referred to, collectively, as "Agreed Claims." The Indemnified Party shall be entitled to payment for any Agreed Claim within ten (10) Business Days of the determination of the amount of any such Agreed Claim.

(f)     Timing of Claim Certificate. Subject to Section 7.1, the Indemnified Parties shall be entitled to determine the timing of delivery of any Claim Certificate in their sole discretion and no delay on the part of any Indemnified Party in notifying the Seller Representative shall relieve the Seller of any liability or obligation hereunder.

7.5     Purchase Price Adjustment. The Purchaser and the Seller agree to treat each indemnification payment pursuant to this Article VII as an adjustment to the Purchase Price for all Tax purposes and shall take no position contrary thereto unless required to do so by applicable Tax Law or pursuant to good faith resolution of a Tax contest.

48

7.6    <u>No Subrogation</u>.  Following the Closing, the Seller shall not have any right of indemnification, contribution or subrogation against any Indemnified Party with respect to any indemnification payment made by or on behalf of Seller under <u>Section 7.2</u>.

7.7    <u>No Prejudice</u>.  The representations, warranties, covenants and obligations of the Seller, and the rights and remedies that may be exercised by the Indemnified Parties based on such representations, warranties, covenants and obligations, will not be limited or affected by any investigation conducted by the Purchaser or any agent of the Purchaser with respect to, or any knowledge acquired (or capable of being acquired) by the Purchaser or any agent of the Purchaser at any time, whether before or after the execution and delivery of this Agreement or the Closing, with respect to the accuracy or inaccuracy of or compliance with or performance of any such representation, warranty, covenant or obligation, and no Indemnified Party shall be required to show that it relied on any (and each Indemnified Party shall be deemed to have relied on each) such representation, warranty, covenant or obligation of the Seller in order to be entitled to indemnification pursuant to this <u>Article VII</u>.  The waiver by the Purchaser of any of the conditions set forth in <u>Article VI</u> will not affect or limit the provisions of this <u>Article VII</u>.

7.8    <u>Recoupment against Escrow Fund; No Bar</u>.  The Purchaser and any other Indemnified Party may set off against and recoup from the Escrow Fund any and all Losses for which the Seller is responsible pursuant to this Agreement.  If the Escrow Fund is insufficient to satisfy any claim for Losses made by any Indemnified Party hereunder, then, subject to <u>Section 7.3</u>, such Indemnified Party may take any action or exercise any remedy available to it by appropriate legal proceedings to collect the full amount of such Losses and the Escrow Fund shall not serve as a bar to such collection efforts.

7.9    <u>Guarantees</u>.

(a)    From and after the Closing Date, Khosla Ventures IV, LP hereby severally, but not jointly, guarantees the due and punctual observance, performance and discharge of the obligations of the Seller under this <u>Article VII</u> to indemnify each Purchaser Indemnified Party for Losses related to the breach of any representation and warranty of the Seller in <u>Section 3.11</u> (for the avoidance of doubt, subject to the cap set forth in <u>Section 7.3(b)(ii)</u>), but only to the extent of fifty-seven percent (57%) of any amounts that may become payable by the Seller by reason of such obligations.

(b)    From and after the Closing Date, TriplePoint hereby severally, but not jointly, guarantees the due and punctual observance, performance and discharge of the obligations of the Seller under this <u>Article VII</u> to indemnify each Purchaser Indemnified Party for Losses related to the breach of any representation and warranty of the Seller in <u>Section 3.11</u> (for the avoidance of doubt, subject to the cap set forth in <u>Section 7.3(b)(ii)</u>), but only to the extent of forty-three percent (43%) of any amounts that may become payable by the Seller by reason of such obligations.

(c)    The guarantee by each Guarantor is an absolute and unconditional guarantee of payment and performance and not merely of collectability and is in no way conditioned or contingent upon any attempt to collect from, enforce performance or compliance

49

by, or otherwise seek remedies from, the Seller.  Each Guarantor hereby waives any and all defenses available to a surety.

ARTICLE VIII

TERMINATION

8.1    <u>Termination</u>.

This Agreement may be terminated and the transactions contemplated hereby abandoned at any time prior to the Closing Date:

(a)    by written agreement of the Seller and the Purchaser;

(b)    by either the Purchaser, on the one hand, or the Seller, on the other hand, if: (i) the Closing Date has not occurred by the date one hundred forty (140) days following the date hereof; <u>provided</u> that if the Closing shall not have occurred due to the failure of the Bankruptcy Court to enter the Sale Order and if all other conditions to the respective obligations of the parties to close hereunder that are capable of being fulfilled by the Termination Date shall have been so fulfilled or waived, then no party hereto may terminate this Agreement prior to the date that is one hundred eighty (180) days following the date hereof (as so extended, the "<u>Termination Date</u>"); <u>provided</u> <u>further</u> that the right to terminate this Agreement under this clause (i) shall not be available to any party whose failure to fulfill any obligation hereunder has been the cause of, or resulted in, the failure of the Closing Date to occur on or before the Termination Date and such action or failure constitutes a breach of this Agreement; (ii) there shall be a final nonappealable order of a Governmental Entity in effect preventing consummation of the Transactions; or (iii) there shall be any Law enacted, promulgated or issued or deemed applicable to Transactions by any Governmental Entity that would make consummation of the Transaction illegal;

(c)    by the Purchaser if there shall have been any action taken, or any Law enacted, promulgated or issued or deemed applicable to the Transactions, by any Governmental Entity, which would: (i) prohibit the Purchaser's ownership or operation of any portion of the Acquired Assets or (ii) compel the Purchaser to dispose of or hold separate, as a result of the Transaction, any portion of the Acquired Assets;

(d)    by the Purchaser if it is not in material breach of its obligations under this Agreement and there has been a breach of any representation, warranty, covenant or agreement contained in this Agreement on the part of the Seller and, as a result of such breach the conditions set forth in <u>Section 6.1</u> would not then be satisfied; <u>provided</u>, that if such breach is curable by the Seller prior to the Termination Date through the exercise of its commercially reasonable efforts, then the Purchaser may not terminate this Agreement under this <u>Section 8.1(d)</u> prior to the earlier of the Termination Date or that date which is fifteen (15) days following the Seller's receipt of written notice from the Purchaser of such breach, it being understood that the Purchaser may not terminate this Agreement pursuant to this <u>Section 8.1(d)</u> if such breach by the Seller is cured within such fifteen (15)-day period so that the conditions would then be satisfied;

50

(e)      by the Seller if it is not in material breach of its obligations under this Agreement and there has been a breach of any representation, warranty, covenant or agreement contained in this Agreement on the part of the Purchaser and as a result of such breach the conditions set forth in Section 6.2 would not then be satisfied; provided, that if such breach is curable by the Purchaser prior to the Termination Date through the exercise of its commercially reasonable efforts, then the Seller may not terminate this Agreement under this Section 8.1(e) prior to the earlier of the Termination Date or that date which is fifteen (15) days following the Purchaser's receipt of written notice from the Seller of such breach, it being understood that the Seller may not terminate this Agreement pursuant to this Section 8.1(e) if such breach by the Purchaser is cured within such fifteen (15)-day period so that the conditions would then be satisfied;

(f)      by the Purchaser if there is a Material Adverse Effect;

(g)      by the Seller or the Purchaser if the Bankruptcy Court approves an Alternative Transaction or a Restructuring Transaction (other than with the Purchaser or an Affiliate of the Purchaser); provided that no termination under this Section 8.1(g) shall be effective until the Break-Up Fee and the Expense Reimbursement set forth in Section 9.1 shall have been paid to the Purchaser;

(h)      by the Purchaser if the Bankruptcy Court denies that portion of the Bidding Procedures Motion with respect to the Break-Up Fee or the Expense Reimbursement, in whole or in part;

(i)      by the Purchaser if the Bidding Procedures Order (including the provisions set forth in Section 9.2) or the Sale Order is modified in any respect without the consent of the Purchaser;

(j)      by the Purchaser if the Bidding Procedures Order has not been entered by the Bankruptcy Court within sixty (60) days after the date hereof;

(k)      by the Purchaser if the Sale Order has not been entered by the Bankruptcy Court within one hundred twenty (120) days after the date hereof;

(l)      by the Purchaser if (i) the Bankruptcy Court enters an order appointing a trustee, examiner with expanded powers or responsible officer in the Bankruptcy Case, (ii) the Bankruptcy Case is converted to a case under chapter 7 of the Bankruptcy Code, or (iii) the Bankruptcy Case is dismissed; or

(m)      by the Purchaser if any secured creditor of the Seller obtains relief from the stay to foreclose on any of the Acquired Assets.

8.2      Procedure Upon Termination; Effect of Termination.  Any termination of this Agreement under Section 8.1 will be effective immediately upon the delivery of written notice by the terminating party to the other party hereto; provided that this Agreement shall in no event terminate with respect to the Seller unless and until any and all amounts payable to the Purchaser pursuant to Section 9.1 in connection with such proposed termination shall have been paid in full to the Purchaser.  In the event of the termination of this Agreement as provided in Section 8.1,

US_ACTIVE:\44326725\16\66385.0034

this Agreement shall be of no further force or effect, except (i) that Sections 5.1(c) and 5.7 (with respect to pre-termination breaches), this Section 8.2, Sections 9.1, 9.2(h), 9.2(i), 9.2(j) and 9.4(c) and Article X, shall survive the termination of this Agreement, and (ii) nothing herein shall relieve any party from liability for any breach of this Agreement. No termination of this Agreement shall affect the obligations of the parties contained in the Confidentiality Agreement, all of which obligations shall survive termination of this Agreement.

ARTICLE IX

BANKRUPTCY COURT MATTERS

9.1    Approval of Break-Up Fee and Expense Reimbursement.

(a)    The Seller acknowledges and agrees that the Purchaser has expended considerable time and expense in connection with this Agreement and the negotiation thereof and the identification and quantification of Assets of the Seller.  In consideration therefor, the Seller shall file with and seek the approval of the Bankruptcy Court of the Bidding Procedures Motion, including the Break-Up Fee and Expense Reimbursement, and the entry by the Bankruptcy Court of the Bidding Procedures Order approving the payment of the Break-Up Fee in an amount equal to $150,000 and the Expense Reimbursement in an amount not to exceed the lesser of $150,000 and the Purchaser's reasonable out-of-pocket documented expenses incurred in connection with the Transactions and deeming the Break-Up Fee and the Expense Reimbursement as administrative priority expenses under Sections 503(b) and 507(a)(1) of the Bankruptcy Code.

(b)    The Seller shall pay to the Purchaser the Break-Up Fee and the Expense Reimbursement on the first (1st) Business Day after the earlier to occur of any of the following events:

(i)    Seller voluntarily withdraws the Sale Motion other than in connection with Seller's termination of this Agreement in accordance with Section 8.1(e);

(ii)    the Bankruptcy Court approves an Alternative Transaction or Restructuring Transaction and such transaction closes and becomes effective;

(iii)    if the Seller is no longer under the jurisdiction of the Bankruptcy Court through either the dismissal of the Bankruptcy Case or the consummation of a plan of reorganization in the Bankruptcy Case, and the Seller consummates an Alternative Transaction or Restructuring Transaction prior to a date eighteen (18) months following the date hereof and such transaction closes and becomes effective; or

(iv)    the Purchaser terminates this Agreement in accordance with the provisions of Section 8.1(d).

(c)    The Seller shall pay to the Purchaser the Expense Reimbursement (unless previously paid to the Purchaser in accordance with Section 9.1(b)) on the first (1st) Business Day (i) after the Purchaser terminates this Agreement in accordance with the provisions of

Section 8.1 (other than Section 8.1(b)(i)) or (ii) after the Seller terminates this Agreement pursuant to Section 8.1(b)(ii).

9.2     Bidding Procedures.  This Agreement is subject to approval by the Bankruptcy Court and the consideration by the Seller of higher or better competing bids (each an "Alternative Transaction").  Prior to seeking approval of the sale of the Acquired Assets, the Seller shall seek the Bankruptcy Court's approval of the Bidding Procedures Order, which shall include the following procedures and overbid protections for the submission and consideration of qualified bids, along with such other bidding procedures as determined by the Seller to be appropriate:

(a)     In order for any Alternative Transaction to be a qualified bid (each a "Qualified Bid"), it must be:

(i)     in writing;

(ii)     received by the Seller no later than the deadline for submitting an Alternative Transaction established by the Bidding Procedures Order (the "Bid Deadline");

(iii)     a firm, unconditional bid to purchase the Acquired Assets, not subject to any contingencies as to the validity, effectiveness and/or binding nature of the offer, including further due diligence review or financing;

(iv)     a firm bid of at least $100,000 over the Purchase Price, plus the Break-Up Fee and the Expense Reimbursement under Section 9.1(a);

(v)     accompanied by sufficient information to demonstrate that the competing bidder has the financial wherewithal and ability to timely consummate the acquisition of the Acquired Assets on terms and conditions substantially the same as this Agreement, including evidence of adequate financing and a financial guaranty, if appropriate;

(vi)     accompanied by a signed contract substantially in the form of this Agreement, and marked to show any changes made to this Agreement; and

(vii)     accompanied by a good faith cash deposit in an amount equal to ten percent (10%) of the amount of the applicable bid, which shall be deposited with the Seller on or before the Bid Deadline;

(b)     if the Seller receives a Qualified Bid other than this Agreement, it will conduct the auction contemplated by the Bidding Procedures Order (the "Auction") on the date that is not less than three (3) Business days prior to the sale hearing;

(c)     the Seller shall promptly inform the Purchaser and all other parties who have submitted Qualified Bids (the "Qualified Bidders") of all Qualified Bids and any information received related to the terms and conditions of such Qualified Bids;

(d)     the Seller shall evaluate all Qualified Bids received and shall determine which Qualified Bid reflects the highest or best offer as the starting bid for the Acquired Assets

53

at the Auction (the "Starting Auction Bid").  The Seller shall announce its determination of the Starting Auction Bid at the commencement of the Auction;

(e)    the first incremental competitive bid at the Auction shall be at least $100,000 over the Starting Auction Bid;

(f)    no bids shall be considered by the Seller unless a party submitted a Qualified Bid and participates in the Auction;

(g)    all of the Acquired Assets shall be sold in a single lot;

(h)    when determining the highest or best bid, the Seller shall include the Break-Up Fee and the Expense Reimbursement in the Purchaser's last bid, which Break-Up Fee and Expense Reimbursement would otherwise be payable to the Purchaser;

(i)    the payment of the Break-Up Fee and the Expense Reimbursement to the Purchaser in accordance with Section 9.1;

(j)    in the event of an Alternative Transaction or Restructuring Transaction, the Break-Up Fee and Expense Reimbursement shall be payable to the Purchaser directly from the proceeds of, and made concurrently with the closing of, the Alternative Transaction or Restructuring Transaction, as applicable; and

(k)    in the event that the Seller determines in good faith that it has not received a Qualified Bid by the Bid Deadline, the Seller shall seek approval of this Agreement at the approval hearing without conducting an Auction and without further motion or adjournment.

9.3    Non-Solicitation Period.

(a)    From the date hereof until the Bankruptcy Court's entry of the Bidding Procedures Order (the "Non-Solicitation Period"), the Seller shall not, and shall cause its Affiliates and its and their respective directors, stockholders or advisors (including financial and legal advisors) (collectively, the "Representatives") not to, directly or indirectly, (i) solicit, initiate, entertain or agree to any inquiries, proposals or offers from any Person other than the Purchaser or its Affiliates relating to (A) any merger, share exchange, business combination, reorganization, consolidation or similar transaction involving the Seller, (B) the acquisition of ownership of any equity interest in the Seller, whether by issuance by the Seller or by purchase (through a tender offer, exchange offer, negotiated purchase or otherwise) from the Seller or otherwise or (C) the license or transfer of any Acquired Assets (any of the transactions described in clauses (A) through (C), a "Third-Party Acquisition"); or (ii) participate in any discussions or negotiations regarding, or furnish to any Person any information with respect to, or otherwise cooperate with, facilitate or encourage any effort or attempt by any Person to seek or agree to, a Third-Party Acquisition.  During the Non-Solicitation Period, so long as the Seller is not otherwise in breach of this Agreement (including the first sentence of this Section 9.3(a)) nothing in this Agreement shall prohibit the Seller or the Representatives from entering into confidentiality agreements with any entity or furnishing to any entity any information relating to the Acquired Assets with respect to any inquiry, proposal or offer that constitutes, or which may lead to, a Qualified Bid (provided that in no event shall the Seller execute any agreement with

54

respect to a Third-Party Acquisition prior to the Bankruptcy Court's entry of the Bidding Procedures Order). In the event the Seller or any Representative receives an unsolicited inquiry (and the Seller enters into a confidentiality agreement or furnishes information relating to the Acquired Assets to the party that makes such inquiry), proposal or offer relating to a Third-Party Acquisition during the Non-Solicitation Period, (i) the Seller will promptly, and in any event within one (1) Business Day, notify the Purchaser of the same and the material terms thereof (which need not include the identity of the third party), and include in such notice true and complete copies of any such inquiry, proposal or offer, and (ii) the Seller and the Representatives shall keep the Purchaser promptly informed of the status thereof and material changes thereto and be permitted to provide a response without breaching this <u>Section 9.3</u>.

(b)     Following entry of the Bidding Procedures Order until the Bid Deadline, the Seller and its Representatives shall not be subject to any restrictions with respect to the solicitation or encouragement of any entity concerning the potential or actual submission of a Qualified Bid; <u>provided</u> that within twenty four (24) hours after the Seller's receipt of any inquiry, proposal or offer relating to a Third-Party Acquisition, (i) the Seller will promptly, and in any event within one (1) Business Day, notify the Purchaser and any other Qualified Bidders of the same and the material terms thereof (including the identity of the third party), and include in such notice true and complete copies of any such inquiry, proposal or offer, and (ii) the Seller and the Representatives shall keep the Purchaser promptly informed of the status thereof and material changes thereto and be permitted to provide a response without breaching this <u>Section 9.3</u>.

(c)     Following completion of the Auction, the Seller shall not, and shall cause the Representatives not to, initiate contact with, solicit or encourage submission or any inquiries, proposals or offers by, any Person in connection with any Third-Party Acquisition. In addition, unless otherwise directed by the Bankruptcy Court, the Seller shall not, and shall cause its Representatives not to, after completion of the Auction, respond to any inquiries or offers from any Person in connection with any Third-Party Acquisition, or perform any other acts related thereto, including supplying information relating to the Business or Assets of the Seller to prospective purchasers. The restrictions imposed on the Seller pursuant to this <u>Section 9.3(c)</u> shall terminate upon the earlier to occur of (i) the termination of this Agreement, (ii) a Bankruptcy Court determination that the winning bidder announced at the Auction shall not be approved by the Bankruptcy Court, or (iii) order of the Bankruptcy Court relieving the Seller of such restrictions.

9.4     <u>The Sale Order</u>. The Seller shall use its commercially reasonable efforts to cause the Bankruptcy Court to enter a Sale Order which contains, among other provisions requested by the Purchaser, the following provisions (it being understood that certain of such provisions may be contained in either the findings of fact or conclusions of law to be made by the Bankruptcy Court as part of the Sale Order):

(a)     the sale of the Acquired Assets by the Seller to the Purchaser (i) are or will be legal, valid and effective transfers of the Acquired Assets; (ii) vest or will vest the Purchaser with all right, title and interest of the Seller to the Acquired Assets free and clear of all Encumbrances and claims pursuant to Section 363(f) of the Bankruptcy Code (other than Encumbrances created by the Purchaser); and (iii) constitute transfers for reasonably equivalent

55

value and fair consideration under the Bankruptcy Code and the laws of the states in which the Seller is incorporated and any other applicable non-bankruptcy laws;

(b)     all amounts to be paid to the Purchaser pursuant to this Agreement constitute administrative expenses under Sections 503(b) and 507(a)(1) of the Bankruptcy Code and are immediately payable if and when the obligations of the Seller arise under this Agreement, without any further order of the Bankruptcy Court;

(c)     provide that in the event of an Alternative Transaction or Restructuring Transaction, the Break-Up Fee and Expense Reimbursement shall be payable to the Purchaser directly from the proceeds of, and made concurrently with the closing of, the Alternative Transaction or Restructuring Transaction, as applicable;

(d)     the so-called "bulk sales" laws shall be waived in all necessary jurisdictions;

(e)     obligations of the Seller relating to Taxes, whether arising under Law, by this Agreement, or otherwise, shall be fulfilled by the Seller;

(f)     the provisions of the Sale Order are non-severable and mutually dependent;

(g)     provide that the Purchaser will not have any successor or transferee liability for liabilities of the Seller (whether under federal or state law or otherwise) as a result of the sale of the Acquired Assets;

(h)     the Purchaser has acted in good faith within the meaning of Section 363(m) of the Bankruptcy Code, the Transactions are undertaken by the Purchaser and the Seller at arm's length, without collusion and in good faith within the meaning of Section 363(m) of the Bankruptcy Code, and such parties are entitled to the protections of Section 363(m) of the Bankruptcy Code;

(i)     all Acquired Contracts shall be assumed by the Seller and assigned to the Purchaser pursuant to Section 365 of the Bankruptcy Code and, as required by this Agreement, the Purchaser shall be obligated to pay all Cure Amounts in respect thereof, except as provided in the proviso set forth in Section 2.9;

(j)     the Bankruptcy Court retains exclusive jurisdiction to interpret and enforce the provisions of this Agreement, the Bidding Procedures Order and the Sale Order in all respects; provided that in the event the Bankruptcy Court abstains from exercising or declines to exercise jurisdiction with respect to any matter provided for in this clause or is without jurisdiction, such abstention, refusal or lack of jurisdiction shall have no effect upon and shall not control, prohibit or limit the exercise of jurisdiction of any other court having competent jurisdiction with respect to any such matter; and

(k)     such other provisions to which the Purchaser may agree.

9.5     Bankruptcy Court Approval.

US_ACTIVE:\44326725\16\66385.0034

(a)     As promptly as practicable after the date of this Agreement, but in no event later than the date the Bidding Procedures Motion is filed, the Seller shall file, in a form reasonably satisfactory to the Purchaser, the Sale Motion.  At least fifteen (15) days prior to the hearing approving the Sale Order, the Seller shall serve a copy of the Sale Motion (along with a copy at the proposed Sale Order and the Bidding Procedures Order) on each jurisdiction where the Acquired Assets are subject to Tax.

(b)     The Seller shall use its commercially reasonable efforts to obtain entry by the Bankruptcy Court of the Sale Order no later than sixty (60) days after the date hereof.

(c)     The Seller shall cooperate with the Purchaser and its representatives in connection with the Sale Order, the Bidding Procedures Order and the bankruptcy proceedings in connection therewith.  Such cooperation shall include consulting with the Purchaser at the Purchaser's reasonable request concerning the status of such proceedings and providing the Purchaser with copies of requested pleadings, notices, proposed orders and other documents relating to such proceedings as soon as reasonably practicable prior to any submission thereof to the Bankruptcy Court.  The Seller further covenants and agrees that the terms of any plan it submits to the Bankruptcy Court for confirmation shall not conflict with, supersede, abrogate, nullify or restrict the terms of this Agreement, or in any way prevent or interfere with the consummation or performance of the Transactions, including any transaction contemplated by or approved pursuant to the Sale Order or the Bidding Procedures Order.

ARTICLE X

MISCELLANEOUS

10.1    Fees and Expenses.  Except as set forth in Sections 5.9(a) or 9.1, the parties hereto (a) will pay their own fees and expenses incurred in connection with the matters described herein, including all legal, financial, accounting, investment banking, broker's and finder's fees (collectively, "Transaction Expenses"), (b) will not look to the other parties for any contribution toward such fees and expenses and (c) will indemnify and hold harmless the other parties from any claim for any such fees or expenses arising out of the Transactions by any Person claiming to have been engaged by such party or its representatives.

10.2    Remedies.  The parties hereto shall each have and retain all other rights and remedies existing in their favor at law or equity, including any actions for specific performance and/or injunctive or other equitable relief (including the remedy of rescission) to enforce or prevent any violations of the provisions of this Agreement or any other Transaction Document.  Without limiting the generality of the foregoing, the Seller and the Purchaser hereby agree that in the event that the Seller shall fail to deliver any of the Acquired Assets to the Purchaser in accordance with the provisions of this Agreement, the remedy at law available to the Purchaser may be inadequate and, in such event, the Purchaser shall have the right, in addition to all other rights and remedies it may have, to specific performance of the obligations of the Seller to convey the applicable Acquired Assets to the Purchaser.

10.3    Successors and Assigns.  This Agreement shall bind and inure to the benefit of the Purchaser and the Seller and their respective successors, assigns and personal representatives.

No assignment of this Agreement or of any rights or obligations hereunder may be made by either the Seller or the Purchaser (by operation of law or otherwise) without the prior written consent of the other party hereto and any attempted assignment without the required consents shall be void; provided that (a) the Purchaser may assign this Agreement and any or all rights or obligations hereunder (including the Purchaser's rights to purchase the Acquired Assets and assume the Assumed Liabilities) to any Affiliate of the Purchaser, and (b) the Seller shall (i) assign and transfer all of its rights, remedies and other interests under this Agreement for collateral security purposes to TriplePoint (in its individual capacity and in its capacity as collateral agent), as a secured creditor, and TriplePoint may exercise all of the rights and remedies of the Seller under this Agreement but shall not be transferred any of its duties or other obligations (including indemnification or other obligations under Article VII, except as set forth in Section 7.9), and (ii) irrevocably authorize and empower TriplePoint or its agents to assert, either directly or on behalf of the Seller, any claims that the Seller may have with respect to this Agreement from time to time.  Upon any such permitted assignment by the Purchaser, the references in this Agreement to the Purchaser shall also apply to any such assignee unless the context otherwise requires.

10.4    Entire Agreement.  This Agreement, the other Transaction Documents, the Bidding Procedures Order, the Sale Order and the other writings referred to herein or therein delivered pursuant hereto or thereto which form a part hereof constitute the entire agreement among the parties hereto and thereto with respect to the subject matters addressed herein and therein and, except for the Confidentiality Agreement, supersede any prior understandings, agreements or representations, by or among such parties, written or oral, that may have related in any way to the subject matter of any Transaction Document, including the Letter of Intent, dated September 4, 2013, between the Seller and an Affiliate of the Purchaser (except for Section 3 thereof, which shall not be superseded).

10.5    Notices.  All notices, requests, demands, claims, consents and other communications which are required or otherwise delivered hereunder shall be in writing and shall be deemed to have been duly given if (i) personally delivered, (ii) sent by nationally recognized overnight courier, (iii) mailed by registered or certified mail with postage prepaid, return receipt requested, or (iv) transmitted by facsimile or email (with a copy of such transmission concurrently transmitted by registered or certified mail with postage prepaid, return receipt requested), to the parties hereto at the following addresses (or at such other address for a party as shall be specified by like notice):

(a)    if to the Seller, to:

Nirvanix, Inc.
9191 Towne Centre Drive, Suite 510
San Diego, CA 92122
Attention: Chief Executive Officer
Facsimile: (619) 374-7469
E-mail: debra.chrapaty@nirvanix.com

US_ACTIVE:\44326725\16\66385.0034

with a copy to:

    Cooley LLP
    101 California Street, Fifth Floor
    San Francisco, CA 94111
    Attention: Kenneth L. Guernsey
    Facsimile: (415) 693-2091
    E-mail: kguernsey@cooley.com

    and:

    Cole, Schotz, Meisel, Forman & Leonard, P.A.
    500 Delaware Avenue, Suite 1410
    Wilmington, DE 19801
    Attention: Patrick J. Reilley
    Facsimile: (302) 652-3117
    E-mail: preilley@coleschotz.com

(b)    if to the Purchaser, to:

    c/o Weil, Gotshal & Manges LLP
    201 Redwood Shores Parkway
    Redwood Shores, CA 94065
    Attention: Keith Flaum
    Facsimile: (650) 802-3100
    E-mail: keith.flaum@weil.com

    and:

    c/o Weil, Gotshal & Manges LLP
    767 Fifth Avenue
    New York, NY 10153
    Attention: Gary T. Holtzer
    Facsimile: (212) 310-8007
    E-mail: gary.holtzer@weil.com

with a copy to:

    c/o Richards, Layton & Finger
    One Rodney Square
    920 North King Street
    Wilmington, DE 19801
    Attention: Mark D. Collins
    Facsimile: (212) 310-8007
    E-mail: collins@rlf.com

59

(c)    if to the Guarantors, to:

> Khosla Ventures
> 2128 Sand Hill Road
> Menlo Park, CA 94025
> Attention:  General Counsel
> Facsimile:  (650) 926-9590
> E-mail: legal@khoslaventures.com

> and:

> TriplePoint Capital LLC
> 2755 Sand Hill Road, Suite 150
> Menlo Park, CA 94025
> Attention: Legal Dept.
> Facsimile: 650-854-1850
> E-mail: legal@triplepointcapital.com

> with a copy to:

> McDermott Will & Emery LLP
> 2049 Century Park East, Suite 3800
> Los Angeles, California 90067
> Attention: Gary Rosenbaum
> Facsimile:  310-317-7268
> E-mail: grosenbaum@mwe.com

or to such other address as the party to whom such notice or other communication is to be given may have furnished to each other party in writing in accordance herewith. Any such notice or communication shall be deemed to have been received (i) when delivered, if personally delivered, (ii) when sent, if sent by facsimile or email during normal business hours on a Business Day (or, if not sent during normal business hours on a Business Day, on the next Business Day after the date sent by facsimile or email), (iii) on the next Business Day after dispatch, if sent by nationally recognized, overnight courier guaranteeing next Business Day delivery, and (iv) on the date indicated on the return receipt, if sent by registered or certified mail.

10.6    Amendments, Modifications and Waivers.  The terms and provisions of this Agreement may not be modified or amended, nor may any of the provisions hereof be waived, temporarily or permanently, except pursuant to a written instrument executed by the Purchaser and the Seller.

10.7    Governing Law; Disputes; Consent to Jurisdiction; Waiver of Jury Trial.

(a)    This Agreement shall be governed by and construed in accordance with the domestic laws of the State of Delaware without giving effect to any choice of law or conflict of laws provision or rule (whether of the State of Delaware or any other jurisdiction) that would cause the application of the laws of any jurisdiction other than the State of Delaware.

US_ACTIVE:\44326725\16\66385.0034

(b)        Without limiting any party's right to appeal any order of the Bankruptcy Court, (i) the Bankruptcy Court shall retain exclusive jurisdiction to enforce the terms of this Agreement and to decide any claims or disputes which may arise or result from, or be connected with, this Agreement, any breach or default hereunder, or the Transactions and (ii) any and all proceedings related to the foregoing shall be filed and maintained only in the Bankruptcy Court, and the parties hereto hereby consent to and submit to the jurisdiction and venue of the Bankruptcy Court and shall receive notices at such locations as indicated in Section 10.5; provided that if the Bankruptcy Case has closed, the parties agree to unconditionally and irrevocably submit to the exclusive jurisdiction of the Delaware Court of Chancery and any state appellate court therefrom within the State of Delaware (or, if the Delaware Court of Chancery declines to accept jurisdiction over a particular matter, any state or federal court within the State of Delaware), for the resolution of any such claim or dispute arising out of or relating to this Agreement or any of the Transactions and each party hereto hereby irrevocably agrees that all claims in respect of such dispute or any suit, action or proceeding related thereto may be heard and determined in such courts. The parties hereby irrevocably waive, to the fullest extent permitted by applicable Law, any objection, which they may now or hereafter have to the laying of venue of any such dispute brought in such court or any defense of inconvenient forum for the maintenance of such dispute. Each of the parties hereto agrees that a judgment in any such dispute may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by Law.

(c)        Each party hereto waives any right to trial by jury in any action, matter or proceeding regarding this Agreement or any provision hereof.

(d)        Except as set forth in the definition of "Losses" and as set forth in Section 8.2, each party hereto, to the fullest extent permitted by Law, irrevocably waives any rights that it may have to punitive, speculative, remote, exemplary or similar damages based upon, or arising out of, this Agreement or any course of conduct, course of dealing, statements or actions of any of them relating thereto.

10.8        No Third Party Reliance. Anything contained herein to the contrary notwithstanding, the representations and warranties of the Seller contained in this Agreement (a) are being given by the Seller as an inducement to the Purchaser to enter into this Agreement and the other Transaction Documents (and the Seller acknowledges that the Purchaser has expressly relied thereon) and (b) are solely for the benefit of the Purchaser and the Indemnified Parties. Accordingly, no third party, other than the Indemnified Parties, shall be a third party or other beneficiary of such representations and warranties, except as expressly set forth herein, and no such third party shall have any rights of contribution against the Purchaser or the Seller with respect to such representations or warranties or any matter subject to or resulting in indemnification under this Agreement or otherwise. TriplePoint shall be an intended third party beneficiary entitled to enforce all of the Seller's rights and remedies under this Agreement as referenced in Section 10.3.

10.9        Severability. It is the desire and intent of the parties hereto that the provisions of this Agreement be enforced to the fullest extent permissible under the Law and public policies applied in each jurisdiction in which enforcement is sought. Accordingly, in the event that any provision of this Agreement would be held in any jurisdiction to be invalid, prohibited or

US_ACTIVE:\44326725\16\66385.0034

unenforceable for any reason, such provision, as to such jurisdiction, shall be ineffective, without invalidating the remaining provisions of this Agreement or affecting the validity or enforceability of such provision in any jurisdiction. Notwithstanding the foregoing, if such provision could be more narrowly drawn so as not be invalid, prohibited or unenforceable in such jurisdiction, it shall, as to such jurisdiction, be so narrowly drawn, without invalidating the remaining provisions of this Agreement or affecting the validity or enforceability of such provision in any other jurisdiction.

10.10   Independence of Agreements, Covenants, Representations and Warranties.  All agreements and covenants hereunder shall be given independent effect so that if a certain action or condition constitutes a default under a certain agreement or covenant, the fact that such action or condition is permitted by another agreement or covenant shall not affect the occurrence of such default, unless expressly permitted under an exception to such initial covenant. In addition, all representations and warranties hereunder shall be given independent effect so that if a particular representation or warranty proves to be incorrect or is breached, the fact that another representation or warranty concerning the same or similar subject matter is correct or is not breached will not affect the incorrectness of or a breach of a representation and warranty hereunder.

10.11   Counterparts; Facsimile Signatures.  This Agreement may be executed in any number of counterparts, and each such counterpart hereof shall be deemed to be an original instrument, but all such counterparts together shall constitute but one agreement. Facsimile and electronic (PDF) counterpart signatures to this Agreement shall be acceptable and binding.

10.12   Non-Recourse.  No past, present or future director, officer, employee, incorporator, member, partner or equityholder of Seller, on the one hand, or Purchaser or its Affiliates, on the other hand, shall have any liability for any obligations or liabilities of the Seller or the Purchaser, respectively, under this Agreement or any agreement entered into in connection herewith of or for any claim based on, in respect of, or by reason of, the Transactions.

*       *       *       *

[Signatures Appear on Following Pages]

US_ACTIVE\44326725\16\66385.0034

IN·WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date first above written.

THE SELLER:

NIRVANIX, INC.

By: _Debra Chrapaty_ _____

Name: Debra Chrapaty

Title: Chief Executive Officer

THE PURCHASER:

ACME ACQUISITION LLC

By: _____
Name: Brian Higgins
Title: Vice President

[Signature Page to Asset Purchase Agreement]

**Solely for purposes of <u>Section 7.9</u>:**

<u>THE GUARANTORS</u>:

KHOSLA VENTURES IV, LP

By:_____

Name: David Weiden

Title: Member


TRIPLEPOINT CAPITAL LLC


By:_____

Name:

Title:

Solely for purposes of <u>Section 7.9</u>:

<u>THE GUARANTORS</u>:

KHOSLA VENTURES IV, LP

By:_____
Name:
Title:


TRIPLEPOINT CAPITAL LLC

By:_____
Name: JAMES LABE
Title: CEO