**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re:<br><br>Nirvanix, Inc.,[1]<br><br>                      Debtor. | Chapter 11<br><br>Case No. 13-12595 (BLS)<br><br>Hearing Date: November 5, 2013 at 12:00 pm (ET)<br>Objection Deadline: October 29, 2013 at 4:00 pm (ET) |

**DEBTOR'S MOTION FOR APPROVAL OF MANAGEMENT
INCENTIVE PLAN AND AUTHORIZATION OF PAYMENTS THEREUNDER**

The debtor and debtor in possession in the above-captioned case (the "Debtor") hereby files this motion (this "Motion") for entry of an order, substantially in the proposed form attached hereto as Exhibit B, under 11 U.S.C. §§ 105, 363(b), 503(b)(1) and 503(c)(3), authorizing and approving the implementation of a management incentive program.  In support of the Motion, the Debtor relies upon and incorporates by reference the *Declaration of Debra Chrapaty in Support of Debtor's Motion for Approval of Management Incentive Plan and Authorization of Payments Thereunder* (the "Chrapaty Declaration"), which is annexed hereto as Exhibit A.  In further support of the Motion, the Debtor, by and through its undersigned counsel, respectfully represents as follows:

**Preliminary Statement**

As set forth in detail below, the Debtor intends, pursuant to a Court approved auction and sale process (the "Sale"), to sell substantially all of its assets as more fully described below.  As the Court is aware, the time frame for the Sale is short and requires a substantial commitment of time and effort on the part of the Debtor's management and other key employees.  To maximize the value generated by the Sale, the Debtor must comply with the bidding procedures to be

---

[1] The last four digits of the Debtor's federal tax identification number are 6586.  The Debtor's address is 9191 Towne Centre Drive, Suite 510, San Diego, California 92122.

2081328 v3/NY

approved by the Court for the Sale, market its assets, generate interest on the part of potential purchasers, support potentially extensive due diligence requests from interested parties, receive qualified bids, conduct one or more auctions, obtain court approval for the Sale, and then close upon the Sale. The work and effort of Ms. Catherine Clark ("Clark"), the Debtor's Vice President of Legal and Human Resources, is critical to the Sale and the management of the Debtor's chapter 11 case. Clark is one of two remaining officers of the Debtor and is the officer with the longest tenure and most institutional knowledge regarding the Debtor's business, the latter of which is critical to the Debtor's sale efforts and efficient management of this chapter 11 case. Ms. Clark's involvement is particularly vital to ensuring the Debtor's satisfaction of the rigorous closing conditions contained in the Lot 1 Stalking Horse Agreement (defined below).

The recoveries that will ultimately be realized by the Debtor's creditors and other stakeholders depend, in the first instance, on the successful consummation of the Debtor's proposed Sale. To incentivize Clark to maximize value with respect to the Sale, the Debtor seeks authority to implement the incentive plan described in detail below (the "Incentive Plan"). The Debtor requires the uninterrupted and fully committed services of Clark in connection with the pending Sale. Under the terms of the Incentive Plan, Clark will be paid an incentive payment only if she actually meets certain objective benchmarks (the "Performance Goals"). The maximum amount of incentive payments that Clark could receive under the Incentive Plan — if she meets all applicable performance criteria — is $21,340 (the "Incentive Pool").

Approval of the Incentive Plan will motivate Clark to effectuate the Sale and achieve the maximum possible recovery for creditors and other stakeholders. Accordingly, the Debtor has determined in the exercise of its sound business judgment that it is in the best interests of its estate to institute the Incentive Plan for Clark.

## Jurisdiction

1. The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1334 and 157. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2). Venue of the Debtor's Chapter 11 case and this Motion is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

2. The statutory predicates for the relief sought herein are sections 105(a), 363(b), 503(b)(1) and 503(c)(3) of title 11 of the United States Code (the "Bankruptcy Code").

## Background

3. On October 1, 2013 (the "Petition Date"), the Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code. The Debtor is continuing in possession of its property and managing its business as debtor in possession pursuant to sections 1107 and 1108 of the Bankruptcy Code. No trustee or official committee of unsecured creditors has been appointed as of the filing of this Motion.

4. The events leading up to the Petition Date and the facts and circumstances further supporting the relief requested herein are set forth in the *Declaration of Debra Chrapaty in Support of Chapter 11 Petition and First Day Motions* (the "First Day Declaration") [D.I. 13].

5. In the three months prior to the Petition Date, the Debtor's management has held discussions with potential strategic acquirers in an effort to find a buyer for the Debtor or its assets (the "Prepetition Marketing Process"). Despite the expressed interest of a number of parties in the Debtor's business, the Debtor was unable to agree on the terms of a sale prior to the

filing of this chapter 11 case. As part of the Prepetition Marketing Process, the Debtor contacted over twenty-five potential strategic buyers. Several parties expressed interest. The Debtor's management held several presentations regarding the Debtor's business and its various assets and conducted in-person meetings with a number of potential buyers. Several buyers expressed interest and the Debtor has continued to work with some of these parties to make a formal offer to acquire some or all of the Debtor's assets. Given the Debtor's liquidity constraints and the difficulty of securing long term financing to support reorganization, the Debtor believes that the best way to maximize the value of its assets for all stakeholders is through one or more sales of substantially all of its assets (the "Assets").

6. Since the Petition Date, the Debtor has continued its sales efforts (the "Sale Process"). Accordingly and as a result of both the Prepetition Marketing Process and the Sale Process, shortly after the commencement of this case, the Debtor entered into a "stalking horse" purchase agreement dated October 10, 2013 [D.I. #62] (the "Lot 1 Stalking Horse Agreement") with Acme Acquisition LLC, as buyer (the "Lot 1 Stalking Horse Bidder"), wherein the Lot 1 Stalking Horse Bidder will purchase, *inter alia*, substantially all of the Debtor's intellectual property (the "Lot 1" Assets), subject to competitive bidding. The Debtor has also received indications of interest from multiple parties with regard to the Debtor's Assets not included in the Lot 1 Stalking Horse Agreement (collectively, the "Lot 2" Assets), but has not entered into a stalking horse agreement with a potential purchaser with regard to the Lot 2 Assets as of the date of this Motion.

7. On October 15, 2013, the Debtor also filed the *Debtor's Motion for Entry of an Order Approving Key Employee Retention Plan Pursuant to Sections 105(a), 363(b) and 503(c) of the Bankruptcy Code* [D.I. #73] (the "Key Employee Retention Motion"). The Key Employee

Retention Motion requests approval for a proposed retention plan designed by the Debtor to motivate certain non-insider key employees to remain with the Debtor through the earlier to occur of (i) November 30, 2013 and (ii) the date upon which the Debtor terminates such Key Employee's employment without cause (the "Termination Date"), to receive, in addition to such employee's current base salary, a one-time retention payment (the "Retention Bonus") of one month of such employee's base salary payable no later than thirty (30) days after such Key Employee's Termination Date.  The Key Employee Retention Motion is also scheduled to be heard on November 5, 2013 at 12:00 p.m. (prevailing Eastern Time).

8. The Debtor is hopeful the Debtor's efforts to market its assets will result in robust interest from potential bidders.  Clark's efforts will be instrumental in facilitating these potential bidders' due diligence efforts during a relatively short sale process.  This will potentially require a substantial effort on Clark's part over and above her day-to-day duties.  The proposed Incentive Plan is designed to incentivize Clark to work hard to facilitate a competitive bidding process, including by meeting with potential purchasers and coordinating their diligence efforts.

**The Proposed Incentive Plan**

9. To incentivize Clark, whose work is critical to managing and motivating the Debtor's employees, supporting due diligence efforts, participating in the auction(s), and closing the Sale, the Debtor seeks to implement the Incentive Plan.

10. As set forth above, recoveries to the Debtor's creditors and other stakeholders are contingent on the success of the Sale process.  Accordingly, the Debtor has determined in its business judgment that the Incentive Plan is the best way to motivate Clark to make every effort to manage the Debtor through this rigorous process and maximize value for creditors and other stakeholders.

11. <u>Eligible Employees</u>.  The Incentive Plan applies only to Clark, whose services are absolutely critical to the successful consummation of the Sale.

12. <u>Performance Goals</u>.  Payments in the amounts set forth below will be made under the Incentive Plan if the following Performance Goals are met:

   a. <u>First Tier</u>: Clark will receive an amount equal to $16,500 if a sale of the Lot 1 Assets is consummated with a purchase price equal to or greater than $2,800,000.

   b. <u>Second Tier</u>: Clark will receive an amount equal to $4,840 if a sale of the Lot 2 Assets is consummated with a purchase price equal to or greater than $500,000.

13. Incentive payments payable in connection with the Performance Goals will be paid with the Debtor's first regularly scheduled payroll following the Debtor's receipt of the respective Sale proceeds.

14. Finally, the proposed Incentive Plan provides that by accepting any incentive payment, Clark waives the right to receive any other bonus or severance payment from the Debtor.

**Relief Requested**

15. By this Motion, the Debtor requests that the Court enter an order, pursuant to sections 105(a), 363(b), 503(b)(1) and 503(c) of the Bankruptcy Code, approving the proposed Incentive Plan and authorizing the Debtor to make the payments contemplated thereunder, <u>provided</u> that Clark satisfies the Performance Goals set forth above.

**Basis for the Relief Requested**

A. **Implementation of the Incentive Plan is a Valid Exercise of the Debtor's Business Judgment Pursuant to Section 363(b) of the Bankruptcy Code**

16. The Court may authorize the Debtor to implement the Incentive Plan under section 363(b)(1) of the Bankruptcy Code. Section 363(b)(1) provides that "[t]he trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1). The use, sale, or lease of property of the estate, other than in the ordinary course of business, is authorized when a "sound business purpose" justifies such action. See, e.g., Myers v. Martin (In re Martin), 91 F.3d 389, 395 (3d Cir. 1996) (noting that under normal circumstances, courts defer to a trustee's judgment concerning use of property under §363(b) when there is a legitimate business justification); In re Delaware & Hudson R.R. Co., 124 B.R. 169, 176 (D. Del. 1991) (explaining that the Third Circuit has adopted the "sound business purpose" test to evaluate motions brought pursuant to section 363(b)).

17. Historically, courts have approved employee compensation programs that are outside of the ordinary course of business pursuant to section 363(b) of the Bankruptcy Code. See, e.g., Dai-Ichi Kangyo Bank Ltd. v. Montgomery Ward Holding Corp., (In re Montgomery Ward Holding Corp., 242 B.R. 147, 153 (D. Del. 1999) (affirming bankruptcy court approval of key employee retention program; stating that "in determining whether to authorize the use, sale, or lease of property of the estate under [section 363(b)], courts require the debtors to show that a sound business purpose justifies such actions"); In re Global Home Products, LLC, 369 B.R. 778, 784 (Bankr. D. Del.) ("The reasonable use of incentives and performance bonuses are considered the proper exercise of a debtor's business judgment."); In re Nobex Corp., 2006 WL

4063024, at *2 (Bankr. D. Del. Jan. 19, 2006) (approving incentive pay outside of ordinary course where it was "an appropriate exercise of the Debtor's business judgment"); In re America West Airlines, Inc., 171 B.R. 674, 678 (Bankr. D. Ariz 1994) (it is the proper use of a debtors' business judgment to propose bonuses for employees who helped propel the debtor successfully through the bankruptcy process); In re Interco Inc., 128 B.R. 229, 234 (Bankr. E.D. Mo. 1991) ("debtors' business judgment" was controlling in the approval of a "performance/retention program"); see also In re Riverstone Networks, Inc., Case No. 06-10110 (CSS) [Docket No. 224] (Bankr. D. Del. Mar. 28, 2006); In re Pliant Corp., Case No. 06-10001 (MFW) [Docket No. 355] (Bankr. D. Del. Mar. 14, 2006).

18. The Debtor submits that implementation of the Incentive Plan is a proper exercise of its business judgment. As noted above, to maximize recoveries to stakeholders in this Chapter 11 case, the Debtor is currently in the midst of an expedited process to sell its Assets. To successfully complete the Sale, the Debtor must, among other things: (i) market its assets; (ii) generate interest on the part of other potential purchasers; (iii) respond to potentially substantial due diligence requests; (iv) receive qualified bids; (v) engage in an auction process; and (vi) meet all closing conditions in (x) the Lot 1 Stalking Horse Agreement (or other agreement entered into by the Debtor with respect to the sale of its Lot 1 Assets to an overbidder) to close on the Sale to the Lot 1 Stalking Horse Bidder or overbidder, and (y) any agreement entered into by the Debtor with respect to the sale of its Lot 2 Assets.

19. To ensure that the foregoing tasks are completed and that the value of the Debtor's Assets is maximized for the benefit of the Debtor's creditors and other stakeholders in this Chapter 11 case, the Debtor developed the Incentive Plan. The Debtor believes that the Incentive Plan provides an appropriate mechanism by which to motivate Clark to complete the

work necessary to meet the conditions precedent to closing the Lot 1 Stalking Horse Agreement or otherwise improve the value received for the Debtor's assets as a result of the Sale. Pursuant to the terms of the Incentive Plan, Clark will only be paid an incentive payment if the objective Performance Goals set forth herein are achieved.

20. The Debtor submits that implementation of the Incentive Plan is an appropriate exercise of its business judgment under section 363(b)(1) of the Bankruptcy Code, and therefore should be approved by the Court.

**B.    The Incentive Plan Complies With Section 503(c) of the Bankruptcy Code**

21. Section 503(c) of the Bankruptcy Code provides criteria for courts to use in approving certain types of payments to insiders and "other transfers of obligations that are outside of the ordinary course of business." Section 503(c) contains: (1) a general prohibition of retention plans for insiders of a debtor; (2) limitations on severance payments to insiders of a debtor; and (3) standards governing other transfers or obligations that are outside the ordinary course of business and not justified by the facts and circumstances of the case, including transfers made to, or obligations incurred for the benefit of, officers, managers, or consultants hired after the date of the filing of the Petition. 11 U.S.C. § 503(c).

22. As the Vice President of Legal and Human Resources of the Debtor, Clark is an "insider" of the Debtor as that term is defined in the Bankruptcy Code. For the reasons set forth below, neither section 503(c)(1) nor 503(c)(2) of the Bankruptcy Code are applicable to the Incentive Plan. Moreover, the Incentive Plan complies with section 503(c)(3) of the Bankruptcy Code and should therefore be approved.

**C.     Sections 503(c)(1) and (2) are Not Applicable to the Incentive Plan**

23.     Pursuant to the statute's plain language, section 503(c)(1) of the Bankruptcy Code pertains solely to retention plans, and section 503(c)(2) only addresses the requirements for severance plans.  Neither section applies to performance-based incentive plans.  See, e.g., Global Home Products, 369 B.R. at 783 ("If [the proposed plans] are plans to incentivize management, the analysis utilizes the more liberal business judgment review under § 363."); In re Nobex Corp., Case No. 05-20050, January 12, 2006 Hearing Tr. at 67 (Bankr. D. Del.) (MFW)[2]; In re Calpine Corp., Case No. 05-60200, April 26, 2006 Hearing Tr. at 87 (Bankr. S.D.N.Y.) (BRL).[3]  Indeed, Judge Lifland has held that:

> If sections 503(c)(1) and (c)(2) are not operative, a court may consider whether the payments are permissible under section 503(c)(3), which limits payments made to management and employees, among other things, outside of the ordinary course, unless such payments are shown to be justified under the facts and circumstances of the chapter 11 case.  As one treatise points out, the test appears to be no more stringent a test than the one courts must apply in approving any administrative expense under section 503 (b)(1)(A).

In re Dana Corporation, 358 B.R. 567, 576-77 (Bankr. S.D.N.Y. 2006).

24.     The Incentive Plan is neither a retention plan nor a severance plan.  Instead, the Incentive Plan is a performance-based plan that provides for targeted payments to Clark if she meets certain objective performance criteria.  The purpose of the Incentive Plan is to motivate Clark to work as hard as necessary to achieve the closing of the Sale and thereby receive the incentive payments.  If those milestones are not met, no payment will be made under the Incentive Plan.  The Incentive Plan does not have an impermissible retention or severance component.  Therefore, sections 503(c)(1) and (c)(2) are not applicable to the Incentive Plan.

---

[2] Excerpts from the January 12, 2006 hearing transcript in Nobex are attached hereto as Exhibit C.
[3] Excerpts from the April 4, 2006 hearing transcript in Calpine are attached hereto as Exhibit D.

**D.     The Incentive Plan Complies With Section 503(c)(3)**

25.     The Incentive Plan and the payments contemplated thereunder comply with section 503(c)(3) of the Bankruptcy Code. The statute states that:

> Notwithstanding subsection (b), there shall neither be allowed, nor paid-
>
> (3) other transfers or obligations that are outside of the ordinary course of business and not justified by the facts and circumstances of the case, including transfers made to, or obligations incurred for the benefit of, officers, managers, or consultants hired after the date of the filing of the petition.

11 U.S.C. § 503(c)(3). Since courts have begun to analyze various payments under section 503(c)(3), they have been consistent in holding that they must use the "business judgment" standard as the proper standard for determining whether incentive programs and payments thereunder are justified. See e.g., Global Home Products, 369 B.R. at 783; In re Riverstone Networks, Inc., Case No. 06-10110 (CSS) [Docket No. 224] (Bankr. D. Del. Mar. 28, 2006); In re Pliant Corp., Case No. 06-10001 (MFW) [Docket No. 355] (Bankr. D. Del. Mar. 14, 2006).

26.     Indeed, in the Nobex case, Judge Walrath stated that:

> [Section] (c)(3) was meant to provide a standard, albeit not as clear, for any other transfers or obligations outside of the ordinary course of business ... I read (c)(3) to be the catch-all and the standard under (c)(3) for any transfers or obligations made outside of the ordinary course of business are those that are justified by the facts and circumstances of the case... I find it quite frankly nothing more than a reiteration of the standard under 363... under which courts had previously authorized transfers outside of the ordinary course of business and that [are], based on the business judgment of the debtor...

Exhibit C at 86-87 (an order approving the management incentive plan was entered January 20, 2006 [Docket No. 172]). In Dana, Judge Lifland agreed with Judge Walrath, stating that management incentive programs should be evaluated under the business judgment standard, which requires a debtor to satisfy the Court's inquiry into factors such as:

  (1) Is there a reasonable relationship between the plan proposed and the results to be obtained, i.e. will the key employee stay for as long as it takes for the debtor to reorganize or market its assets, or in the case of a performance incentive, <u>is the plan calculated to achieve the desired performance</u> (emphasis added)?

  (2) Is the cost of the plan reasonable in the context of the debtors' assets, liabilities and earning potential?

  (3) Is the scope of the plan fair and reasonable; does it apply to employees; does it discriminate unfairly?

  (4) Is the plan or proposal consistent with industry standards?

  (5) What were the due diligence efforts of the debtor in investigating the need for a plan; analyzing which key employees need to be incentivized; what is available; what is generally applicable in a particular industry?

  (6) Did the debtor receive independent counsel in performing due diligence and in creating and authorizing the incentive compensation?

<u>Dana Corp.</u>, 358 B.R. at 576-77 (citations omitted). Moreover, Judge Lifland noted that courts generally take a "holistic" view of and measure of compensation packages. <u>Id.</u> at 571.

  27. As noted above, the Debtor has a sound business purpose for establishing the Incentive Plan, and the Incentive Plan satisfies the factors articulated by Judge Lifland in <u>Dana</u>. <u>First</u>, the Incentive Plan is a performance-based plan that has been calibrated by the Debtor to motivate Clark to "achieve the desired performance" under performance goals specified under the Incentive Plan. Indeed, Clark is only entitled to the incentive payments associated with the Performance Goals if she is able to achieve a closing of the Sale of the Debtor's assets and these incentives are enhanced only if a purchaser is also found and a sale consummated with regard to the Lot 2 Assets.

  28. <u>Second</u>, the Debtor believes that the cost of the Incentive Plan is reasonable in the context of this Chapter 11 case, and in light of the amount of work that must be completed by

Clark, in a compressed amount of time, to obtain the proposed incentive payments. Specifically, the proposed maximum incentive payment under the Incentive Plan with respect to Performance Goals would be equal to approximately 0.65% of the proceeds of the Sale, assuming the proceeds of the Sale are the minimum amount necessary to meet both tiers of the Performance Goals (i.e., $2,800,000 for Lot 1 and $500,000 for Lot 2).

29. <u>Third</u>, the Incentive Plan is "fair and reasonable" in its scope and does not "discriminate unfairly" because the Debtor designed the Incentive Plan to only include Clark, whose services, in the Debtor's opinion, are truly critical to achieving the performance milestones set forth in the Incentive Plan.

30. The Debtor submits that the <u>fourth</u> factor noted by Judge Lifland - i.e., whether the plan or proposal is consistent with industry standards - is not applicable to the facts and circumstances of the Debtor's case. To the best of the Debtor's knowledge, there is no "industry standard" for compensation programs for the employees of bankrupt or insolvent companies in the Debtor's business.

31. <u>Fifth</u>, the Debtor engaged in appropriate due diligence in formulating the Incentive Plan under the facts and circumstances of this Chapter 11 case.

32. <u>Finally</u>, the Debtor consulted with its bankruptcy counsel and special corporate counsel in formulating the Incentive Plan. Due to the exigencies of the Debtor's bankruptcy case, the Debtor did not consult any other outside advisor in connection with the development of the Incentive Plan. As noted above, the application of the <u>Dana</u> "factors" is a holistic endeavor. <u>Id.</u> Further, in <u>In re American Home Mortgage Holdings</u>, Judge Sontchi articulated the holistic application of the <u>Dana</u> factors while considering the interim approval of a retention plan. In approving that plan, in part on an interim basis, Judge Sontchi stated that:

> I think the Debtors have satisfied certainly the most important criteria in connection with the non-insiders. There's a reasonable relationship between the plan and the results to be obtained, the cost of the plan is reasonable, the context of the debtors' assets, liabilities, and the scope of the plan is fair and reasonable... Some of the other criteria may not have been met such as what were the due diligence efforts, you know, did you shop around and see what other plans were out there? <u>Did the debtor receive independent counsel from some sort of expert? Frankly, I don't consider those overtly significant, and certainly understandable that they weren't done in the context of what was an extremely quick meltdown of the debtors' business</u>.  (emphasis added)

<u>In re American Home Mortgage Holdings, et al.</u>, Case No. 07-11047, August 7, 2007 Hearing Tr. at 110 (Bankr. D. Del.) (CSS)[4]  The Debtor submits that the fact that it did not obtain independent counsel in formulating the Incentive Plan is a consequence of the exigent circumstances faced by the Debtor prior to and following the Petition Date (outlined in greater detail in the First Day Declaration), and, as with <u>American Home Mortgage Holdings</u>, is not overtly significant.

33.    Based upon the foregoing, the Debtor submits that it has established a "sound business purpose" for the formulation and implementation of the Incentive Plan, and therefore has satisfied the requirements of section 363(b) and 503(c)(3) of the Bankruptcy Code. As set forth in detail above, the Incentive Plan is a "true" Incentive Plan that has been designed to motivate Clark to produce results that will inure to the benefit of the Debtor's creditors and other stakeholders. Accordingly, the Debtor submits that the Incentive Plan should be approved and, if Clark meets the Performance Goals provided thereunder, she should be paid the corresponding incentive payment by the Debtor.

## Notice

34.    Notice of this Motion will be given to: (a) the U.S. Trustee; (b) the parties listed on the Debtor's list of twenty largest unsecured creditors; (c) counsel to the DIP Lenders; and (d)

---

[4] Excerpts from the August 7, 2007 hearing transcript in <u>American Home Mortgage</u> are attached hereto as <u>Exhibit E</u>.

all parties requesting notice pursuant to Bankruptcy Rule 2002, in accordance with Local Rule 2002-1(b). The Debtor submits that, in light of the nature of the relief requested, no other or further notice need be given.

### No Prior Request

35. No prior request for the relief sought in this Motion has been made to this or any other court.

### Conclusion

WHEREFORE, the Debtor respectfully requests that the Court enter an order, substantially in the form annexed hereto, granting the Motion, and grant such other and further relief as is just and proper.

| | |
|---|---|
| Dated:  October 17, 2013<br>Wilmington, Delaware | Respectfully submitted,<br><br>COLE, SCHOTZ, MEISEL,<br>FORMAN & LEONARD, P.A.<br><br>By: /s/ Patrick J. Reilley<br>Norman L. Pernick (No. 2290)<br>Marion M. Quirk (No. 4136)<br>Patrick J. Reilley (No. 4451)<br>500 Delaware Avenue, Suite 1410<br>Wilmington, DE  19801<br>Tel: (302) 652-3131<br>Fax: (302) 652-3117<br><br>Proposed Counsel for the Debtor<br>and Debtor-in-Possession |